**IN THE UNITED STATES DISTRICT COURT. FOR THE SOUTHERN DISTRICT OF TEXAS HOUSTON DIVISION**

| | | |
|---|---|---|
| MATTHEW WALKER, ET AL | ) | No. 4-15-CV-2428 |
| | ) | |
| | ) | |
| VS. | ) | Houston, Texas |
| | ) | 8:59 a.m. |
| | ) | |
| E & L TRANSFER, ET AL | ) | January 28, 2019 |

*****************************************************

**BENCH TRIAL**

**BEFORE THE HONORABLE ALFRED H. BENNETT**

**UNITED STATES DISTRICT JUDGE**

**VOLUME 1 OF 2**

*****************************************************

APPEARANCES:

FOR E & L TRANSFER AND EDWARD J. TWEED:

Mr. Neel Hooper Banes
1800 West Loop South
Suite 1750
Houston, Texas 77027
Tel: 713-629-1800
Email: Bbanes@nhblaw.com

FOR FISHER & PHILLIPS:

Mr. Martin Samuel Schexnayder
Ms. Farnaz Pishgahzadeh
Winget, Spadafora & Schwartzberg LLP
Two Riverway
Suite 725
Houston, TX 77056
Tel: 713-343-9200
Email: Schexnayder.m@wssllp.com

COURT REPORTER:

Ms. Kathleen K. Miller, CSR, RMR, CRR
515 Rusk, Room 8004
Houston, Texas 77002
Tel: 713-250-5087

Proceedings recorded by mechanical stenography. Transcript produced by computer-assisted transcription.

INDEX

**OPENING STATEMENTS:**

By Mr. Banes 6
By Mr. Schexnayder 13

**EDWARD J. TWEED**

Direct by Mr. Banes 16
Cross by Mr. Schexnayder 131
ReDirect by Mr. Banes 189
ReCross by Mr. Schexnayder 205

**STEPHEN J. ROPOLLO**

Direct by Mr. Banes 208

P R O C E E D I N G S

THE LAW CLERK: All rise.

THE COURT: Good morning. Thank you. Please have a seat.

08:59:22 Cause Number 4-15-CV-2428, Matthew Walker, et al, vs. E & L Transfer, et al.

Counsel, please announce your appearances for the record.

MR. BANES: Bryant Banes for E & L Transfer and 08:59:36 Mr. Tweed. Your Honor, with me at counsel table is Mr. Tweed.

MR. SCHEXNAYDER: Your Honor, Martin Schexnayder and Farnaz Pishgahzadeh are counsel for Fisher & Phillips; and I have Mr. Roppolo, Steve Roppolo, here as 08:59:49 the representative of Fisher & Phillips.

THE COURT: Very well. The case was originally styled as I called it, Walker vs. E & L Transfer.

Effectively now the case is E & L Transfer, et al vs. Fisher & Phillips. So going forward, 09:00:08 that will be the style that I will be using for the case.

Counsel, by way of any preliminary matters before we start, anything you need to bring to my attention?

MR. BANES: Your Honor, we have the exhibits 09:00:22 there right next to you, and there are some for the -- for

the witness up there right next to the -- I assume the witness is going to go here.

THE COURT: Very well.

MR. SCHEXNAYDER: And, Your Honor --

09:00:56 THE COURT: And I -- oh, and I have your exhibit list that I took out of binder one, which I assume is your full exhibit list. And anything else, Counsel?

MR. BANES: There is also -- in the pretrial order, Your Honor, there is this exhibit list that uses the

09:01:11 form so we can show that it is marked and admitted and things of that nature. So I'm not sure which one you want to use.

THE COURT: Ms. Edwards, could you print that one out for me, the one that he's referring to?

09:01:24 Anything else, Counsel?

MR. BANES: No, Your Honor.

THE COURT: Okay. Counsel, any preliminary matters?

MR. SCHEXNAYDER: Your Honor, our exhibits are

09:01:31 right here. This is your copy. Same thing; it's in one binder, with the exhibit list in the front.

MR. BANES: Ma'am, for easy reference, it's document 157-1 and starts at page 2.

THE COURT: Very well. Anything else, Counsel?

09:01:58 MR. BANES: No.

                    THE COURT:  All right.  Counsel, your opening
statement.

                    MR. BANES:  All righty, Your Honor.  Your
Honor, would you like us to go to the dais or stay here?

09:02:05            THE COURT:  Whatever you like.

                    MR. BANES:  May it please the Court, Your
Honor.  Your Honor, this case -- Your Honor is already
familiar with the facts in this case to a large degree and
ruled on a motion for summary judgment.  So you will hear
09:02:43  much the same testimony today as that you -- that has
already been before you.

                        The only things I want to emphasize as we
go through this are that when a lawyer -- or when a
client -- there are a few professions that are out there
09:03:00  when a -- that when someone approaches or encounters those
professions, they're at their most vulnerable.  There is
police.  There is -- there is -- there are doctors,
priests, and then ultimately there are lawyers.

                        When a client goes to a lawyer and seeks
09:03:20  their advice, it is important for the lawyer to understand
that the client is vulnerable and needs to understand
exactly what is going on, needs to understand all the
implications.  And our ethical rules require us to ensure
that the client is fully informed, that all the limitations
09:03:41  of that attorney are known to the client and that all the

different permutations and abilities that the lawyer has to exercise in the client's behalf are known.

There are actually specific rules that apply in this instance. What we have in Exhibit 16 is the conflict waiver. Fisher & Phillips will rely heavily on that document throughout this hearing to say that Mr. Tweed knew and understood what he was getting into and waived, you know, the -- any conflict that exists.

The Court has already found an issue of disputed fact on that point, and we will prove today that it -- that he did not understand, that he did not -- that not everything was fully disclosed to him and, consistent with Rule 10 -- 1.06, that a settlement or a resolution of claims between clients was made without full explanation as required by that rule.

Exhibit 40 in the record has many of the ethical rules we will talk about, but when we're looking at them, what is full disclosure and informed consent? What is it?

The rule says -- and I am looking at the notes to Rule 1.06 -- that when a disinterested lawyer would conclude that the client should not agree to the representation under the circumstances, the lawyer involved should not ask for such agreement or provide representation on the basis of the client's consent. When more than one

client is involved, the question of conflict must be resolved as to each client. Moreover, there may be circumstances where it is impossible to make the full disclosure necessary to obtain informed consent. For example, when a lawyer represents different clients in related matters and one of the clients refuses to consent to the disclosure necessary to permit the other client to make the -- an informed decision, the lawyer cannot properly ask the latter to consent.

09:05:35

09:05:52

As we're going through the documents here, sir -- or Your Honor, you will see that Fisher & Phillips started representing Ms. Radel and Veritas against Mr. Tweed's interests from the moment this lawsuit was filed.

09:06:09

Historically they had all been -- Ms. Radel and Fisher & Phillips had been representing Mr. Tweed, E & L, Veritas, and Ms. Radel in various litigation that was similar to this. Mr. Tweed understood that they were representing his interests in that, and when this case started, he believed that they were representing his interests still. But, Fisher & Phillips wants to create a dividing line between those cases and this one. We don't think any such real dividing line exists, and we think what Mr. Tweed's impression was governs the lawyers' role here.

09:06:25

09:06:46

When we look at what had to happen for this conflict waiver to be valid, of course it had to be informed consent. The client needed to know everything. The client needed to know what was going on with Ms. Radel, what was going on with ADP, what types of claims and -- and contribution could be made for this lawsuit.

When we look at Rule 1.08 itself -- or 1.8 itself, 1.8(g), we find the answer to this very, very simple question.

A lawyer who represents two or more clients shall not participate in making an aggregate settlement of the claims of or against the clients unless each client gives informed consent in a writing signed by the client. The lawyer's disclosure shall include the existence and nature of all the claims or pleas involved and the participation of each person in the settlement.

When we look at the conflict waiver or see what purports to be a conflict waiver, that does not exist here. There is an apportionment and a settlement -- a purported settlement of claims in the aggregate between Veritas and E & L. Ms. Radel, oddly, is not a party to that even though in every FLSA case, you know, as labor and employment lawyers, we know that personal liability is part of those cases, and it is certainly a potential liability.

But what we have here ultimately is best

borne out by Mr. -- Mr. Tweed's affidavit himself. In his affidavit he says this: "In the complaint against Fisher & Phillips, we have alleged that our former counsel breached its fiduciary duties to us."

09:08:41 THE COURT: Just a moment.

MR. SCHEXNAYDER: I think I have to object on hearsay, Your Honor, the affidavit.

MR. BANES: What, in the opening statement?

THE COURT: That objection is sustained.

09:08:51 MR. BANES: Okay. All right. Well, Your Honor, the evidence will show that Mr. Tweed, when he entered into the conflict waiver, did not understand -- did not have full informed consent, and it was not conveyed to him all the limitations that Fisher & Phillips had.

09:09:12 When we are looking at the rule itself, 1.06(b), we see what has to be disclosed and what has to be waived and what could be permitted.

It says, "A lawyer shall not represent a person if the representation of that person involves a 09:09:33 substantially related matter in which that person's interests are materially and directly adverse to the interests of another client of the lawyer or the lawyer's firm or reasonably appears to be or become adversely limited by the lawyer's or law firms' responsibility to 09:09:51 another client or to a third person or by the lawyers or

law firm's own interests.

"In those types of situations, it can only be waived if there are no adverse consequences from the common representation and the advantages and disadvantages are fully explained."

09:10:06

That did not happen here. Mr. -- Mr. Tweed will testify about this, and he will explain what his impressions were, what his understanding was. And we will see from the documents involved how much Fisher & Phillips knew, what they didn't disclose and the conflict waiver, what's not in it.

09:10:23

What is ironic in this case is ultimately what was -- what wasn't disclosed was the primary cause for Fisher & Phillips' withdrawal because when they got to the point -- you know, there were several points that they needed new informed consent or new waivers. There were points at which they learned that ADP was contributing to what Mr. Radel and Mr. Tweed didn't know. That happened in April of 2016, yet they continued forward without telling Mr. Tweed.

09:10:40

09:10:59

Not until Ms. Radel came forward and said that, "I can't pay your fees anymore and I might not be able to pay the settlement," in effect breaching the same conflict waiver that they're trying to bind Mr. Tweed to today, that at that point, they decided to withdraw, only

09:11:13

when their fees were threatened.

With that, we believe that the evidence will show and prove a breach of fiduciary duty, a breach of their contractual arrangement with Mr. Tweed, and if there is any -- if there isn't a contractual arrangement in certain degrees, that they got an advantage from him that wasn't reciprocated.

Ultimately, this is not about how they approached this case. This is about how they approached their other clients with respect to Mr. Tweed, and they treated him very poorly.

As the Court said in its recent decision about the summary judgment, it is Fisher & Phillips' duty and -- and it is their burden of proof today to show that that agreement, that conflict waiver, was fair to Mr. Tweed. There is a presumption of unfairness in these types of agreements when the party -- when the client that they are trying to enforce it against did not benefit at all from it, or did not -- it wasn't -- you know, the -- there is a presumption of unfairness where the client did not benefit from the transaction.

Fisher & Phillips was paid by Mr. Tweed. Mr. Tweed had to pay the settlement in accordance with this apportionment ultimately, and he also paid our firm to get him out of things and to sue -- to pursue this case.

So Mr. Tweed has lost several times where ultimately the -- the agreement he had with Veritas would have required that he pay none of that. And historically, that is exactly what happened.

09:13:09 With that, I'll turn it over to my esteemed colleague, Your Honor.

THE COURT: Any opening from the defense at this time?

MR. SCHEXNAYDER: Yeah. Brief, Your Honor, if it is all right. 09:13:19

I do agree with counsel when he says that Rule 1.06 of the disciplinary rules is the governing rule. That is the conflict of interest rule which states as follows: "A lawyer may represent a client when the clients are potentially adverse to each other if the lawyer 09:13:35 reasonably believes the representation of each client will not be materially affected and each affected or potentially affected client consents to such representation after full disclosure of the existence, nature, implications and possible adverse consequences of the common 09:13:52 representation."

There is no requirement in the Texas rule that that consent be in writing. That is in the model rules that apply to the American Bar Association. In this case, we complied with both. We have a written waiver that 09:14:03

is five pages long, single spaced, goes in great detail to all the pros and cons of the joint representation.

Also, there is no requirement in the Texas rule, but we also went a step further and suggested very strongly to Mr. Tweed that before he signs anything that he seek out independent counsel. And we will find out today if he did that. I have never deposed Mr. Tweed, but he was cautioned and recommended to seek independent counsel.

I think the letter itself, which was ultimately signed by Mr. Tweed, is de facto a rebuttal of the presumption of unfairness because the letter itself complies with the rules. And then we will have Mr. Roppolo testify, if necessary, why he thought that this was in the best interest of both clients to have the joint representation.

You didn't hear any representation by counsel that he is going to bring any lawyer to the contrary. I think in this kind of case where we're talking about what is ethical and what is commonly done in the industry of lawyers, we need to hear from someone on his side that what we did was wrong or in breach of duty. You are not going to hear that. That is one of the bases that we are going to be asking the Court to dismiss this case after the direct testimony of the plaintiff.

We will address the other issues as the

09:15:43 09:15:58 09:16:11 09:16:23 09:16:48

case goes on, but I think you are going to see there was no taking advantage of anyone. This was a very standard issue conflict waiver. Mr. Tweed had the opportunity to go out and hire his own lawyer. He didn't do it. He saw the benefit of joint representation. He got the benefit of that joint representation because he didn't have to hire his own lawyer. He was able to share the fees with the other co-defendant, Veritas, in the case. That was a definite advantage to him. He had cost savings that he took advantage of. That is why he wanted to do the deal in the first place.

He came up with this arrangement directly with the other party, Ms. Radel, at Veritas, before he even talked to our clients about it. Our clients could have gone either way. They could have represented Veritas or they could have represented Veritas and Mr. Tweed. That was up to him. That's the choice he made. He signed the conflict waiver. He has never denied he signed the conflict waiver. And we think this case should be dismissed as a matter of law, Your Honor.

THE COURT: Plaintiff, call your first witness.

MR. BANES: Your Honor, we call Mr. Ed Tweed to the stand.

THE COURT: Mr. Tweed.

Mr. Tweed, if you will stand next to the

witness stand, face the clerk and raise your right hand.

(Witness sworn.)

THE WITNESS: I do.

THE CASE MANAGER: Thank you.

09:17:02 THE COURT: Mr. Tweed, please take the stand.

Mr. Tweed, we have a court reporter who is taking down the testimony and questions. Please allow the lawyers to finish their questions before you begin your answer. I will make sure that they extend to you that same 09:17:21 courtesy. Understand?

THE WITNESS: Yes, Your Honor.

THE COURT: Very well.

Counselor.

MR. BANES: Your Honor, do you want us to stand 09:17:26 at the podium?

THE COURT: Whatever your pleasure.

MR. BANES: Okay.

**EDWARD JOHN TWEED,**

duly sworn, testified as follows:

09:17:30 **DIRECT EXAMINATION**

BY MR. BANES:

**Q.** Mr. Tweed, can you, please, state your full name and current job for the record?

**A.** My name is Edward John Tweed, and I am the president 09:17:44 of E & L Transfer.

**Q.** Were you sued in this case under the Fair Labor Standards Act?
**A.** Yes.
**Q.** Both your company and you individually?
09:17:55 **A.** Yes.
**Q.** Now, can you go back and tell me how -- what is your background, generally, sir?
**A.** I have always been in the trucking industry. My father was a trucker; and when I was in high school, he
09:18:15 used to take me out and we would work on his pickup truck, picking up and delivering stuff for the neighbors and hauling it to the dumps, and, you know, just sharecropper, basically.
**Q.** Now, can you tell me -- can you go through and tell
09:18:30 me what kinds of jobs you have had over the years? When did -- did you go to college?
**A.** No. I -- we didn't have the means at the time. We lived in a rural part of Pennsylvania, and I went down and grabbed a job at the airport, down at Newark Airport,
09:18:51 about an hour-and-a-half away.
**Q.** What --
**A.** And I continued to work in the trucking and air freight business.
**Q.** So what do you -- do you have any legal training at
09:19:03 all?

**A.** No.
**Q.** Do you have any training in human resources?
**A.** No.
**Q.** All right. So how long did -- like how long did you work at Newark doing air freight?
09:19:18
**A.** Gosh, I think I was probably 18 to -- when I married my wife. That was probably maybe 18 years later. She was -- I was 33, I think, or something like that. Fifteen, 16 years.
09:19:44
**Q.** Now, so when you married your wife, Leslie, where did you -- where did you go then?
**A.** Well, we worked together at the -- at the airport at an air freight forwarder, and had a son. And then we went out to Colorado to work for another trucking company. So we stayed there for four years. And then the trucking industry had a strike, so that job pretty much ended. And one of the people that I was working with got transferred out to Sacramento, and they offered us a position out there in the trucking business.
09:20:12
09:20:34
**Q.** What did you do out there?
**A.** Well, I ended up buying a couple of trucks, because that's what my dad did, from FedEx Ground. When he passed away, I got a small settlement of $30,000 from his checking account, so I bought a route from FedEx Ground and started delivering it. And, you know, then he -- I
09:20:56

did that for five or six years and ended up with five trucks. And then -- and then we -- DHL ran an ad in the paper that they were looking for independent contractors like us, and I responded to the ad, and they gave us some -- they gave us our first contract. And that's what I do now.

09:21:28

**Q.** When was that first contract, sir?

**A.** It was in, I think, like June of 2004.

**Q.** Okay. And so -- and that is what you have been doing since?

09:21:43

**A.** Yes.

**Q.** All right. Now, did you have locations in both California and Texas?

**A.** Well, what happened was that -- no. I had -- I had --

09:22:04

THE WITNESS: Your Honor, you want to listen to this? I mean, seriously, are you interested in it? Okay. I'm sorry.

THE COURT: He's asking the questions.

THE WITNESS: Okay.

09:22:10

**A.** So in 2004, DHL Express started the domestic business, so I was in, basically, California. Our contract was in California. And in 2008, 2009, basically, they were losing a lot of money, so they got out of the domestic business and they went from 700 owners down to 20

09:22:38

owners, and I was one -- one of the -- one that was picked to stay in California. So, that was good, otherwise, we were out of work.

And then soon after that -- well, it was 2009, the fellow here in Texas, they -- they failed to, from what I understand, pay the severance money to the employees that they were giving and defaulted on the other contract. And I was the only one that showed up for the interview for the Texas one, so I kind of won it by default.

**Q.** All right. Now, at the time you entered into the Texas contract with DHL, did you -- how did -- how did -- did you set it up directly or hire employees directly?

**A.** No.

**Q.** All right. So what did you choose to do?

**A.** I brought the same hiring agent and personnel company that I had in California out to Texas to set it up.

**Q.** And who was that?

**A.** Marcia Radel. Marcia Radel at the time was operating under a company named HireGround; and when she got out to Texas, she, for whatever reason, decided to change her name to Veritas.

**Q.** How many clients did she have with Veritas?

**A.** As I understand it, only one.

**Q.** Who was that?

**A.** E & L Transfer.

**Q.** All right. Now, can you turn to page -- or Exhibit 4, sir? There are some books up there. Go to Book 1.

**A.** Okay.

09:24:41 **Q.** All right, sir. Can you identify this document for the record?

MR. SCHEXNAYDER: I'm sorry. What exhibit are we in?

MR. BANES: Exhibit 4.

09:24:54 **A.** This is the -- this is the client agreement between E & L Transfer and Marcia Radel of Veritas.

BY MR. BANES:

**Q.** Now, is this -- is this just a payroll service -- or is this just a payroll agreement?

09:25:10 **A.** No. I paid Veritas 40 percent of -- of the settlement from DHL to -- to hire, pay and to retain the employees.

**Q.** Now, have you since hired -- have you since hired the employees that Veritas was doing at the time?

09:25:32 **A.** Yes. I believe over 90 percent of the employees stayed on when -- when I changed them to hourly.

**Q.** All right. Now, when did -- when did you basically assume the responsibility for the employees?

**A.** January of 2016.

09:25:52 **Q.** All right. So before that -- so what was -- who

was -- who were they employees of before that?
**A.** They were employees of Marcia Radel and Veritas.
**Q.** Looking at the agreements -- and you have a payroll services company now?
09:26:11 **A.** We use a company called Paycom.
**Q.** And how much do you pay them for the payroll service?
**A.** Between one-and-a-half and two percent.
**Q.** All right. So then looking -- taking a look at page 2 of Exhibit 4, sir --
09:26:28 **A.** Right.
**Q.** -- there is a markup percentage in there.
Do you see that?
**A.** Yes. She got 40 percent of the settlement, the weekly settlement.
09:26:38 **Q.** So of -- and let's see.
All right. Now -- all right, sir. Now, taking a look at paragraph 17A at the bottom of page 2, does that list some of Veritas' responsibilities under the agreement?
09:27:17 **A.** Yes. It says "Veritas will recruit, screen, hire employees" --
MR. SCHEXNAYDER: Object to the responsiveness. I think that was a yes or no.
THE COURT: Overruled.
09:27:29 Next question.

BY MR. BANES:

**Q.** Yeah. Mr. Tweed, taking a look at -- taking a look at 17F, what does that say? Can you read that out loud, 17F? It is on page 3.

09:27:44 **A.** 17F says, "Client will maintain its premises and work areas in compliance with all applicable health and safety laws, regulations, and ordinances. Client will further comply at its own" --

**Q.** Hold on just a second, sir. Just 17F.

09:28:02 **A.** Oh, okay.

**Q.** 17A --

**A.** Okay. That was A.

**Q.** Yeah.

**A.** Sorry. "Veritas has sole responsibility to determine 09:28:09 and set the level of compensation and fringe benefits for its employees."

**Q.** How is that important for this case?

MR. SCHEXNAYDER: Objection; calls for a legal conclusion.

09:28:22 THE COURT: Rephrase, Counselor.

BY MR. BANES:

**Q.** What -- what importance did you see that that had with respect -- as between you and Veritas governing the employees?

09:28:32 **A.** Well, it had everything to do with it. Veritas came

to Texas with her staff and her human resources department and collected all of the current at that time employees' pay stubs and brought them all into a room. Because there were multiple different groups of contractors there, so everybody's pay was day rates, and they were all different.

So she brought them all in and sat them down and averaged them out and then had them agree to pay what the average over the group of them was as their new pay.

**Q.** Now, you said they were paid a day rate?

**A.** They were paid by the day.

**Q.** And that was ultimately the basis for the lawsuit by Walker, wasn't it?

**A.** That's correct.

**Q.** All right. Now, did you -- was it -- did you determine that they would be paid day rates?

**A.** I had never been in the state of Texas in my life other than to come down here to --

MR. SCHEXNAYDER: Objection; responsiveness.

**A.** -- a relative's --

THE COURT: Just a moment. Occasionally, the lawyers will object.

THE WITNESS: Okay.

THE COURT: When you hear an objection from

either lawyer, stop talking --

THE WITNESS: Okay. Sorry, sir.

THE COURT: -- no, no -- to give me the opportunity to deal with the objection.

09:29:51 THE WITNESS: Yes, Your Honor.

THE COURT: Counsel, what is your legal objection?

MR. SCHEXNAYDER: Nonresponsive, Your Honor.

THE COURT: Overruled.

09:30:01 BY MR. BANES:

**Q.** Okay, sir.

THE WITNESS: What does overruled mean, Your Honor?

THE COURT: Very good.

09:30:07 THE WITNESS: Sorry.

THE COURT: Yes. When I am dealing with an objection, I will do one of two things: I will say "overruled," meaning the objection has no legal merit for the point they're making --

09:30:21 THE WITNESS: Oh.

THE COURT: -- or I will say "sustained," meaning the objection has legal merit and that the attorney is correct in the objection.

THE WITNESS: Thank you, sir.

09:30:30 THE COURT: All right. Counselor, your next

question.

MR. BANES: All right, sir.

BY MR. BANES:

**Q.** Sir, did you have anything to do with establishing the day rate for the employees?

**A.** No.

**Q.** All right. Who did that?

**A.** Marcia. And she had a human resource lady, and I don't remember the human resources girl's name.

**Q.** Was that Norma -- Nora Gonzalez?

**A.** It was Nora Gonzalez.

**Q.** All right. So -- all right. So, there is another provision under 17B that I want you to look at, sir. If you can turn to -- on page 3 of Exhibit 4.

**A.** 17. Okay. What is it now?

**Q.** Take a look at 17B and then D under there.

**A.** Okay.

**Q.** Now, that one says, "It is client's responsibility to ensure that all of its wage and hour practices affecting Veritas employees are in compliance with state and federal laws."

Now, did you set the day rate?

**A.** No.

**Q.** Was that your practice?

**A.** No.

**Q.** All right. Whose practice was that?
**A.** Marcia collected, as I said before, the pay stubs from the employees that were already in the building. What she told me was that she grouped them together, averaged them out and that is what she offered her employees.
**Q.** Now, did she ever tell -- did -- at what point did she tell you that a day rate was not proper?
**A.** It was in -- sometime in -- sometime in August where she approached me and said that she had gotten bad information and that she was settling some lawsuits over that bad information that she got regarding the pay rates.
**Q.** Do you remember the year?
**A.** I would say it was 2015 -- or early 2015.
**Q.** Okay. Well, we will go -- actually, take a look at Exhibit 20 for a second, sir. Keep your hand in that.
**A.** Exhibit 20. Okay. Yeah.
**Q.** Can you identify this document for the record, sir?
**A.** Yeah. It's -- it looks like it's an e-mail from Marcia to me in August of 2014, I guess that is.
**Q.** All right.
**A.** Where she starts talking about the day rates.
**Q.** So was this the -- was this the first time that you knew about this?
**A.** That would make sense to me, yes.

**Q.** So the year was 2014?
**A.** Yes.
**Q.** August of 2014?
**A.** Yeah.
09:33:54 **Q.** All right. Sir, can we --
MR. BANES: I would like to offer Exhibit 20 -- Exhibit 4 and 20 for the record. Oh, I'm sorry, Your Honor. I would like to offer Exhibit 4 and 20.
THE COURT: Any objection?
09:34:04 MR. SCHEXNAYDER: No, Your Honor.
THE COURT: Plaintiff's 4 and Plaintiff's 20 are admitted without objection.
BY MR. BANES:
**Q.** Turning back to Exhibit 4, sir. Can you turn to page 09:34:41 4 and then turn to paragraph 22?
**A.** Uh-huh.
**Q.** Can you read that into the record, sir?
**A.** Okay. It says, "Veritas agrees to indemnify and defend client from any and all losses, liability, 09:35:08 expenses, including court costs, and attorney fees, and claims for damages of any nature whatsoever which client may incur, suffer, become liable for, or which may be asserted or claimed against client as the basis that Veritas' actions failed to comply with any federal, state, 09:35:30 or local laws in the capacity as employer of the employees

assigned to the client."

**Q.** What did you -- what do -- what was your view of what this provision did with respect to -- as between E & L and Veritas?

09:35:44 **A.** My clear view of that was that she was going to indemnify me against any lawsuits and protect me if the -- or represent me in case any of her employees tried to organize and that she did this with Mason and Ozen and Emerson and Bellard. So I had no -- no belief that that
09:36:11 was something that she wasn't going to continue doing.

**Q.** Now, those cases that you just mentioned, Mason, Ozen, Emerson and Bellard, those are prior cases, prior to Walker?

**A.** Yeah. The employees actually were telling me -- her
09:36:28 employees were contacting me that -- asking me if I knew that there was -- people were getting paid money --

MR. SCHEXNAYDER: Object to the responsiveness, Your Honor.

THE COURT: Sustained.

09:36:40 Next question.

BY MR. BANES:

**Q.** All right, sir. Let's ask -- let's ask that a different way.

Did -- all right. Take a look at
09:36:53 paragraph 23 for a moment, sir.

**A.** Uh-huh.
**Q.** Can you read that out loud?
**A.** "Veritas agrees to indemnify and defend client from any and all losses, liability, expenses, including court costs and attorneys' fees, any claims for damages of any nature whatsoever which client may incur, suffer, become liable for, or which may be asserted or claimed against client on the basis that Veritas has materially breached any of its responsibilities as set forth in Section 17A above."
**Q.** Now, I am going to -- take a look at Exhibit 16 for one moment, sir. I just want to get the timeline in time.
**A.** Exhibit 16?
**Q.** Keep your hand there in the other exhibit, Exhibit 4.
**A.** Okay.
**Q.** All right. Now, what is the -- what is the document in Exhibit 16, sir?
**A.** It's a document from Fisher & Phillips and it talks about the Matthew Walker E & L Transfer, L.L.C., Civil Action 4-15-2428.
**Q.** Is this the purported conflict waiver?
**A.** I guess -- I assume it is, yes.
**Q.** Well, take a look at it, sir. Just read through it.
**A.** "Potential conflict." Yes, this is the conflict letter.

09:39:09
09:39:35
**Q.** All right. Now, looking through this document, do you see any of the -- these provisions that we have just gone over? Do you see any of these provisions in exhibit -- from Exhibit 4 specifically discussed in Exhibit 16?

**A.** No.

**Q.** All right. Now, did -- you heard Mr. Schexnayder speaking earlier that under Texas law he believes that a conflict waiver could be oral as well. So I asked you did either Ms. Wynne or Mr. Roppolo talk to you about these provisions from Exhibit 4 before Exhibit 16 was executed?

**A.** No.

MR. BANES: Your Honor, I would like to -- oh, I'm sorry. Your Honor, I would like to offer Exhibit 16 for the record.

09:40:14

MR. SCHEXNAYDER: No objection, Your Honor.

THE COURT: Plaintiff's 16 is admitted without objection.

BY MR. BANES:

09:40:33

**Q.** Looking back to Exhibit 16 for a moment, sir, do you think this document -- do you think this document is a valid waiver with respect to you?

MR. SCHEXNAYDER: Your Honor, I object on the basis that is in his -- this witness --

09:40:46

THE COURT: Specific legal objection.

MR. SCHEXNAYDER: Calls for a legal conclusion.

THE COURT: Sustained.

MR. BANES: Your Honor, I ask that --

THE COURT: The objection has been sustained. Your next question.

MR. BANES: Okay, Your Honor.

BY MR. BANES:

09:40:54

**Q.** Mr. Tweed, do you -- all right. Mr. Tweed, what do you think about this -- this conflict waiver?

09:41:12

**A.** I think that it should never have happened. It should never have been a document.

**Q.** Why?

**A.** Because I was already indemnified and I was falsely lead to believe that I had to, to become a client of Fisher & Phillips, because Ms. Radel and Veritas clearly made it -- Miss Wynne -- this Alia Wynne and Marcia Radel clearly stated to me that they had no liability to respond to the -- to the lawsuit, that I was totally the only one that was included, and they had no responsibility, and that my window of opportunity to respond to the lawsuit was closing quickly, and that I am going -- I was going -- I was going to potentially lose my business.

09:41:28

09:41:52

**Q.** Now, did you feel any pressure from -- now, did you feel any pressure from Ms. Wynne to agree to that?

09:42:10

**A.** I -- I thought that -- that she totally intimidated

me.

**Q.** All right. Now, with respect -- how many times prior to the conflict waiver being executed did you talk to Ms. Wynne?

09:42:23 **A.** Never.

**Q.** You talked to her once, right?

**A.** Yeah, but --

MR. SCHEXNAYDER: Your Honor, object.

BY MR. BANES:

09:42:31 **Q.** How many times --

THE COURT: Just a moment.

MR. SCHEXNAYDER: Leading.

MR. BANES: All right. Go ahead.

THE COURT: Don't lead your witness. But...

09:42:36 MR. BANES: All right, Your Honor. I understand.

BY MR. BANES:

**Q.** You just said that Ms. Wynne talked to you.

**A.** Yeah. And that's -- she -- what happened was I

09:42:45 was -- I was contacted by Ms. Wynne. She said that she represented Veritas and Marcia Radel and that Marcia felt it was important for her to notify me that I needed legal counsel because she wasn't -- she wasn't being sued in this particular case.

09:43:13 **Q.** Now, her advice that she was just representing

Ms. Radel and Veritas, was that confusing to you?
**A.** Very confusing.
**Q.** Why was that?
**A.** Well, because she had been representing, from what I understood, Veritas in all of the prior lawsuits that were all similar in nature.
**Q.** Was she representing you, too?
**A.** Well, I thought she was.
**Q.** All right. Was that your understanding?
**A.** It was my understanding, because in -- in three of -- three of the four suits, it named both parties, and in one particular one it didn't even name Veritas, and they still handled it, following the contracts I had with them to indemnify me.
**Q.** Do you remember when this -- when this one conversation with Ms. Wynne was?
**A.** It was -- it was -- it was a real short period of -- between the time -- I mean, it -- it was -- it was pretty much a blur. But, you know, once she called me and told me that I had to have representation to the time the conflict waiver was written, I -- I really didn't have any idea what was going on at that point.
**Q.** Did she make -- did she make you feel like you couldn't -- couldn't have any other representation?
MR. SCHEXNAYDER: Objection; leading.

THE COURT: Overruled.

**A.** She made me feel like I was in a bad position and that she was there to help.

BY MR. BANES:

09:44:40 **Q.** Did she -- did she make -- did she make you feel like that Fisher & Phillips was the only one that could represent you?

**A.** She did. She made -- she made it sound that if I didn't choose them, that I was going to have to go back

09:44:52 and start all over from the beginning for all of the other lawsuits, and that they would be drug -- would be drug back into it and that if I didn't -- you know, they had already done all the groundwork, so it was going to be a huge cost savings for me because they had already done all

09:45:09 the research. They already had the documentation. They had already went to DHL, got information from the G.P.S. locators and so on so that it would be a lot easier for them to just simply represent me as well.

**Q.** Now, did you feel you had an ability to go to anyone

09:45:26 else at that point?

**A.** She made it sound as it would be a really bad choice for me.

**Q.** All right. Now, with respect to the conflict waiver, Exhibit 16, sir, the content of that letter and the

09:45:43 apportionment in there, who came up with that?

09:45:57 09:46:18 09:46:35 09:46:52 09:47:07

**A.** Alia and Marcia.
**Q.** Did you have anything to do with that?
**A.** No.
**Q.** All right. Prior to her talking to you on September 16th of 2015, had you had any idea that that would be improper?
**A.** I no idea.
**Q.** So you heard Mr. Schexnayder during his opening statement say that the conflict waiver was just memorializing your agreement with Ms. Radel.

Would you agree with that?
**A.** What I was told by Alia was that all they had to do was draft some documents that would make it legal for her to represent the two of us.
**Q.** Now, did she -- now, did -- did you come up with that?
**A.** No. I explained to her, and then she got upset when I told her, I said, "Why do I have to" -- "I am already indemnified from this by" -- "by Marcia and Veritas, and it's been shown over and over again. Why now do I need another lawyer since this is her responsibility?"
**Q.** What did she say to that?
**A.** She said that she had --

THE COURT: Counsel, I apologize. You keep saying "she." I am --

BY MR. BANES:

**Q.** What did Ms. Wynne say to that?

MR. BANES: I'm sorry, Your Honor.

THE COURT: Thank you.

09:47:12 **A.** What she kept over and over explaining to me was that Marcia and Veritas were not being sued in this particular lawsuit, that I personally and E & L Transfer, L.L.C. were being sued alone and that we failed to reply properly to the response to the letter that was sent out, which I 09:47:38 don't even know if I ever even saw it, because I -- I never paid any attention. I mean, these cases were going on without me having any idea.

**Q.** Now, did you have -- did you know any different that -- at that point, during that September 16th 09:47:54 conversation with Ms. Wynne, that -- that E & L and you were the only ones sued?

**A.** No.

**Q.** Now that you have had a chance to look at some of the documents, was that accurate?

09:48:06 **A.** No. They -- when we looked through the documents, it was -- it was clear to me that -- and Alia even states that, you know, this is -- we're already -- we're already working on the Bellard case. We have already processed the Mason, Ozen and Emerson cases, so they already had the 09:48:28 information --

THE COURT: Just a moment. Just a moment.

**A.** -- of what we were doing.

THE COURT: Do you have a legal objection?

MR. SCHEXNAYDER: Nonresponsive.

09:48:34 THE COURT: Overruled.

You may continue.

BY MR. BANES:

**Q.** Keep going, sir.

**A.** So, Alia, in the documents, clearly shows that she 09:48:42 was already working with Marcia on this and advised her that the case was identical to the previous cases.

**Q.** All right. Now, sir, if you could -- you might have to -- let's see. I think it's -- in Book 1 there, sir, could you turn to Exhibit 41?

09:49:55 Mr. Tweed, I'll represent to you that this is an e-mail between Ms. Wynne and Ms. Ropollo on August 25th, 2015.

Can you look at the second paragraph --

THE COURT: Counsel, let me interrupt you 09:50:12 because you just said this was an e-mail between Ms. Wynne, W-Y-N-N-E, and Ms. Ropollo.

MR. BANES: Oh, Mr. Ropollo, Your Honor.

THE COURT: All right.

MR. BANES: I didn't mean to -- I didn't mean 09:50:30 to do that.

BY MR. BANES:

**Q.** So, yes, this is an e-mail between Ms. Wynne and Mr. Ropollo.

Do you see that, sir?

09:50:39 **A.** Yes.

**Q.** On August 25th of 2015?

**A.** Yes.

**Q.** All right. Now, at this point did you know about the Walker suit?

09:50:55 **A.** August 2015? August -- I got the call about the suit from Alia on or around September 16th of 2015 --

**Q.** Well, you didn't really know about it before then?

**A.** It was -- like I said earlier, there was rumors of law -- lawsuits from my employees, but I -- I didn't pay any attention to them. 09:51:25

**Q.** Well, prior to that call with Ms. Wynne, you hadn't been contacted by Ms. Wynne or anyone at Fisher & Phillips or Ms. Radel about the lawsuit?

**A.** No.

09:51:37 **Q.** Is that no?

**A.** No.

**Q.** All right. Now -- so at this point -- take a look at the second paragraph, Mr. Tweed. It says, "Marcia's initial reaction was that she does not want to become involved in this suit unless and until Tweed brings her in 09:51:51

as a party. She felt responsible for the other lawsuits because he was acting on her advice regarding the day rate, which she had apparently gotten from a PEO."

All right. Did -- all right. Now, you already testified that the prior lawsuits she was already indemnifying you for, right?

09:52:08

**A.** That's correct. Yes.

**Q.** So this part of it is accurate?

**A.** That's correct.

09:52:17 **Q.** Now, did -- did -- when Ms. Wynne called you, did she ever tell you anything about Ms. Radel's resistance, you know --

**A.** No.

**Q.** -- to joining the lawsuit?

09:52:28 Did she tell you that she was already advising Ms. -- Ms. Radel about how to avoid the lawsuit?

**A.** No.

**Q.** Now, taking a look at the bottom of the page, she shifts to Bellard. What was the Bellard case?

09:52:58 **A.** I don't even know who these folks were, but they were people that sued Veritas over the day rates.

**Q.** So that was another one of these cases --

**A.** Exactly -- as I understand the exact same case.

**Q.** All right. Now, take a look at the first paragraph, sir, and where it says, "Their pay was changed finally in

09:53:24

March." Well, it says, "She said she told Ed Tweed that he has to discontinue the day rate back in January of '15 but Ed dragged his feet in changing the system because he was afraid that employees would leave their compensation" -- or "would leave if their compensation changed."

09:53:42

Was that -- is that an accurate portrayal of what actually happened?

**A.** The accurate portrayal was -- what I explained to Marcia was that, you know, "You hired these people, and now you're coming to me and you are telling me you made a mistake. You are going" -- "you are going to have to" -- "you are going to have to find a way to properly compensate them so that they don't get damaged."

09:53:53

**Q.** Now, she told you about this in August of 2014, as you testified earlier?

09:54:09

**A.** Right.

**Q.** Now, did you tell her that they needed to get in compliance at that time?

**A.** Yes.

09:54:20

**Q.** Did you tell her how to do it?

**A.** No.

**Q.** Did you ask her how to do it?

**A.** No.

**Q.** Did you -- did you leave it up to her to come up with

09:54:26

a compliant way?

**A.** Yes.

**Q.** All right. Now, did -- take a look at --

MR. BANES: First of all, Your Honor, I would like to admit Exhibit 124 -- or 41 for the record.

THE COURT: Exhibit -- Plaintiff's 41?

MR. BANES: Plaintiff's Exhibit 41.

THE COURT: Any objection?

MR. SCHEXNAYDER: No, Your Honor.

THE COURT: Plaintiff's Exhibit 41 is admitted without objection.

THE WITNESS: Your Honor, is there any way I could have my water down there?

THE COURT: Absolutely.

THE WITNESS: I am dried out here.

BY MR. BANES:

**Q.** Sir, can you take a look at Exhibit 7?

**A.** Uh-huh.

**Q.** What is this document, sir?

**A.** This is Marcia's notice to the employees that she was -- she was going to make a -- she was going to make a change in the way they got paid.

**Q.** All right. Now, I notice it is on Veritas letterhead. Did you have any input into this document?

**A.** Absolutely not.

**Q.** Did you tell her what to say? Did you tell Ms. Radel what to say in this?
**A.** Absolutely not.
**Q.** Was this solely her, Ms. Radel, that did this?
09:56:47 **A.** Yes.
**Q.** All right. Now, take a look at -- now, did -- did Ms. Radel tell you that this was going to be compliant?
**A.** This letter?
**Q.** Well, the changes were going to -- did she ensure
09:57:06 you --
**A.** Yes.
**Q.** -- that the changes were going to be --
**A.** Yes.
**Q.** -- compliant?
09:57:09 **A.** She said that she had done a mathematical study. She had tested a mathematical study that would allow the employees to make the same amount of money paying them through a formula that she had created.
**Q.** Now, take a look at Exhibit 8.
09:57:38 MR. BANES: Oh, first of all, Your Honor, I would like to admit Exhibit 7 for the record, please.
THE COURT: Any objection?
MR. SCHEXNAYDER: No, Your Honor.
THE COURT: Plaintiff's 7 is admitted without
09:57:46 objection.

BY MR. BANES:

**Q.** Sir, can you identify Exhibit 8 for the record?

**A.** Well, it's a letter from Marcia.

**Q.** Ms. Radel?

09:58:17 **A.** Marcia Radel from Veritas, explaining to the -- the employees how they were now going to be paid.

**Q.** Now, was this document later used against you in the -- in this -- in this case?

**A.** This document -- yes. I mean, yeah. It was -- let

09:58:43 me think of a better way to say that.

It was -- it was used in the lawsuit, yes.

**Q.** All right. Now, did they -- did Ms. Radel tell you that this was -- the way she had calculated would be proper when she issued it?

09:59:03 **A.** Yes.

**Q.** All right. Now, did you have anything to do with coming up with this formula --

**A.** No.

**Q.** -- that is contained in Exhibit 8?

09:59:16 **A.** Had no idea what she was talking about, to be honest with you.

**Q.** Taking a look at Exhibit 25, Mr. --

MR. BANES: Actually, can I -- I would like to admit Exhibit 8 for the record, sir.

09:59:42 MR. SCHEXNAYDER: No objection.

THE COURT: Plaintiff's 8 is admitted without objection.

BY MR. BANES:

**Q.** All right. Taking a look at Exhibit 25, Mr. Tweed, can you identify this document for the record, please?

**A.** This is -- this is a document from Marcia Radel from -- now she changes for some reason back to HireGround, which is her California company -- to -- to Clint Straitwell and Esmerelda Cox about adding hours, I believe, to the mechanics.

**Q.** Is this the underlying calculations that were used in Exhibit 8?

**A.** Yes. It's just an amended -- she amended this particular payroll for this -- for the mechanic, it appears.

**Q.** And that -- and did you have any input into this?

**A.** No.

**Q.** Was this -- now, did Ms. Radel assure you this was compliant with the Fair Labor Standards Act?

**A.** I have never seen this document. But...

**Q.** Well, it is sent to -- sent to you.

**A.** Yeah, I --

THE COURT: Just a moment.

MR. BANES: I'm sorry.

THE COURT: Mr. Tweed, you're doing it a little

bit more now. So, please allow the lawyers to finish their question completely before you answer.

THE WITNESS: All right. Great. I'm sorry, Your Honor.

10:01:28 THE COURT: Very well.

Counselor.

MR. BANES: Thank you, Your Honor.

BY MR. BANES:

**Q.** Well, sir, you were cc'd on the document there, see?

10:01:35 **A.** Yeah. It's a -- it's a simple document between the payroll departments. She -- Joni Lance was her payroll department person, so I didn't see any reason to study the document.

**Q.** Well, as far as you were aware, Ms. Radel was acting

10:02:01 in compliance with the Fair Labor Standards Act?

**A.** Yes.

**Q.** She didn't tell you any different? You're fine, sir. There is no objection right now.

**A.** Okay.

10:02:13 **Q.** Now, who was Clint -- who was Clint Straitwell and Esmerelda Cox?

**A.** They were employees of -- of Veritas.

**Q.** Now, who -- how was --

MR. BANES: Judge, can we ---move to admit

10:02:35 Exhibit 25, sir.

MR. SCHEXNAYDER: No objection.

THE COURT: Plaintiff's 25 is admitted without objection.

BY MR. BANES:

10:02:50

**Q.** Who was Clint Straitwell, sir?

**A.** He was the supervisor employee for Veritas.

**Q.** Now, how many employees did -- up through the end of 2015, how many employees did E & L have?

**A.** I was the only employee; and I didn't take a paycheck, so I had no employees.

10:03:11

**Q.** What was the -- were the managers and supervisors also employed by Veritas?

**A.** That's correct. Yes.

**Q.** Was Mr. Straitwell an example of one of those?

**A.** Yes.

10:03:24

**Q.** How about Ms. Cox?

**A.** Yes. She was employed by Veritas.

**Q.** Now, taking a look at -- we were talking earlier about the markup that was paid. Did you actually pay that to Veritas, that level of markup for those employees, the 40 percent?

10:03:38

**A.** Yes, I did.

**Q.** All right. Take a look at Exhibit 10.

Sir, can you identify the series of documents in Exhibit 10 for the record?

10:04:09

10:04:47
10:05:00
10:05:28
10:05:41
10:06:00

**A.** Okay. This is a -- a document -- page -- page 2 is a payroll statement from Veritas.
**Q.** Well, take a look at the cover page under Exhibit 10, sir.
Did you send me these invoices?
**A.** Yes.
**Q.** And what were these invoices supposed to represent?
**A.** These are the -- can I look at the invoices?
**Q.** Yes, sir.
**A.** The invoices. I must be missing something here. There is a whole stack of payroll invoices here.
**Q.** Yes, sir. That's what they are. These are the payroll invoices between Veritas and E & L between 2013 and 2015, right?
**A.** Right.
**Q.** All right. Now, do these represent -- do these show the 40 percent markup that was paid?
**A.** Yes.
**Q.** Now -- and do these also show -- like, for example, you said that Mr. -- now, who -- who was responsible when -- when hours were being tracked? When they ultimately started being tracked in 2015, who were the -- who -- which employees were responsible for doing that?
**A.** Marcia had managers in each location.
**Q.** Now -- and so the manager -- but the managers were

employed by who?

**A.** Veritas.

**Q.** All right. So, for example, turn to page --

MR. BANES: I apologize, Your Honor. I don't have Bates stamps on these.

10:06:14

BY MR. BANES:

**Q.** Katie Skorupinski, was she a manager?

**A.** She was a manager/supervisor.

**Q.** All right. Take a look at the invoice dated June 7th, 2015.

10:06:38

THE COURT: Just a moment.

MR. BANES: May I object, Your Honor? Repetitive and irrelevant.

THE COURT: What is the relevance of this portion in regards to the breach of fiduciary duty and alternatively your breach of contract claims, Counsel?

10:06:44

MR. BANES: Your Honor, we're anticipating that they are going to try to argue on the indemnity agreement didn't apply because -- because their -- because the decisions and because the -- the matters at issue were decided by E & L rather than Veritas.

10:07:04

In their defense, during the deposition, that's what they explained, was that the certain indemnity provisions didn't apply to them so they didn't discuss them.

10:07:22

THE COURT: So, in regards to getting into the weeds on the invoices and correspondence, ultimately you're going to ask me to make a determination on breach of fiduciary duty. I'm trying to get the tie --

10:07:35 MR. BANES: Oh, well, yes, Your Honor. I mean, the point is, is that even the people that tracked the hours were Veritas employees. So the managers were Veritas employees. Everyone is Veritas employees. And so when you look at the indemnity agreement, it was important to at least discuss those items with Mr. Tweed before any valid conflict waiver could be -- could be entered into, because an apportionment would require a discussion of all those things, and we are going to show that it was never done.

10:07:52

THE COURT: Very well. The objection is overruled.

10:08:06

BY MR. BANES:

**Q.** Okay. So Ms. Skorupinski was a manager. Where was she a manager, sir?
**A.** IAH, the Houston Airport.
10:08:22 **Q.** All right. Now, take a look at page -- there are some pages at the top, sir, the fax page numbers --
**A.** Right.
**Q.** -- in the upper right-hand corner.
**A.** Right.
10:08:32 **Q.** First take a look at page -- page 4.

Who is Harold Murillo?

**A.** He is a manager as well.

**Q.** Where was he a manager?

**A.** At the time -- these managers, she moved them around. This -- at this time where she is talking to him, he was at Houston Hobby -- no, Houston on the Beltway, it looks like.

10:08:47

**Q.** All right. So by her -- by "she," you mean Ms. Radel?

**A.** That's correct.

10:09:04

**Q.** And then turn to the next page, page 5.

Ms. Skorupinski, who is -- was she a manager, too?

**A.** Yes.

**Q.** And she was a manager where?

10:09:14

**A.** Page 5 is to Harold. And -- but -- they -- they were all managers of the Houston market. So they would either work at the airport or they would work at the Beltway.

**Q.** All right. And then turning to page 9, is Mr. Straitwell on that one down at the bottom?

10:09:34

**A.** Yes.

**Q.** All right. So, these were all managers in the Houston -- or in the Houston market?

**A.** Yes.

**Q.** These were also the people that tracked hours?

10:09:41

**A.** Yes.
**Q.** Now, turning back to Exhibit 16, Mr. Tweed, these issues about -- these issues about where -- who was tracking hours and who came up with the -- the various approaches to pay for the employees, is any of that discussed in Exhibit 16?
**A.** No.
**Q.** Did anyone orally discuss those issues with you --
**A.** No.
**Q.** -- prior to the execution of Exhibit 16, from Fisher & Phillips?
**A.** No.
MR. BANES: Your Honor, I would like to move for admission of Exhibit 10.
MR. SCHEXNAYDER: No objection.
THE COURT: Plaintiff's 10 is admitted without objection.
THE WITNESS: I didn't get a chance to answer the one question. Can I answer it? You asked me --
BY MR. BANES:
**Q.** What question is that, sir?
**A.** The question with -- relative to where does it show the 40 percent.
**Q.** Yes, sir.
**A.** And it's clearly on page 2. If you -- if you look

at -- if you look at the invoice, the invoice that she paid -- paid the employees was $9,065.70 with a credit. But we paid her $14,434.

10:11:39

**Q.** Okay. So for the amount -- does Exhibit 9 contain the amounts actually paid?

**A.** This is what the -- this is what the employees were paid.

**Q.** Right.

**A.** On top is what we paid her.

10:11:48

**Q.** Okay. Oh, okay. I see it. All right.

So you're talking about the amount block?

**A.** I'm talking about the $14,434 is the 40 -- is her markup between the $9,000.

**Q.** So that shows the 40 percent markup?

10:12:04

**A.** Right.

**Q.** All right. Now, in terms of actual sums paid --

**A.** Something like that.

**Q.** -- take a look at Exhibit 9 for a moment, sir.

**A.** Okay. Wait a minute, that didn't work. Okay.

10:12:13

Exhibit 9?

**Q.** Yes, sir.

**A.** Okay.

**Q.** Do you recognize this document, sir?

**A.** These are -- these are checks written to Veritas.

10:12:36

**Q.** All right. Now, so -- okay. During the relevant

time period?
**A.** Yes.
**Q.** All right.
MR. BANES: Now, move for admission of Exhibit 9, Your Honor.
10:12:45
MR. SCHEXNAYDER: No objection.
THE COURT: Plaintiff's 9 is admitted without objection.
BY MR. BANES:
10:12:52
**Q.** Okay. Now, getting back to Exhibit 4, Mr. Tweed, for that 40 percent, what did you think you were paying Veritas for?
**A.** Well, I knew what I was clearly paying Veritas for, to hold me -- hold me not liable for any lawsuits, legal
10:13:21
fees, misrepresentations that she made, any -- any mistakes she made that would cause me financial concern.
**Q.** Taking a look at Exhibit 16, are any of those issues discussed in that document?
**A.** No.
10:13:49
**Q.** Mr. Tweed, do you know -- did you know anything about ADP in terms of its contributions to these cases prior to discovery -- prior to our receiving discovery?
**A.** I didn't know anything about ADP until you brought it to my attention.
10:14:24
**Q.** That was just a few months ago?

**A.** It was about two months ago.

**Q.** So was it September?

**A.** Well, it was -- trying to think. It was -- would it -- let's see. Yeah, I would say September.

10:14:47 **Q.** Let's strike that. It's not a memory test.

Anytime prior -- you know, you didn't know anything about ADP and its potential liability prior to the conflict?

**A.** I had never heard anything with regards to ADP. I

10:15:03 didn't even know we -- all I knew was that ADP issued checks for Marcia Radel.

**Q.** All right. Now, did you know that -- did you know at the time of the conflict waiver that it was Ms. Radel's position that ADP had given her the advice on the day

10:15:18 rate?

MR. SCHEXNAYDER: Objection; assumes facts not in evidence.

THE COURT: Sustained.

BY MR. BANES:

10:15:27 **Q.** Well, let's go through a few things, sir.

**A.** Okay.

**Q.** Take a look at Exhibit 42.

**A.** Okay.

**Q.** All right. I'll represent to you that this is the

10:15:49 referral from ADP of Ms. Radel to Mr. Ropollo -- to Fisher

& Phillips.

Did you know that this referral occurred?

MR. SCHEXNAYDER: Object as assuming facts not in evidence. Counsel is --

10:16:02 THE COURT: What was the exhibit that you're referring to, Counselor?

MR. BANES: Exhibit 42, sir.

THE COURT: As Exhibit 42 is not currently in evidence, the objection is sustained.

10:16:37 BY MR. BANES:

**Q.** All right. Mr. Tweed, take a look at Exhibit 42 for a moment.

**A.** Okay.

**Q.** Do you see that this is an e-mail from Ms. Radel to

10:16:50 Mr. --

**A.** Mine looks like --

MR. SCHEXNAYDER: I am going to object, Your Honor. This is hearsay and lack of predicate.

THE COURT: Well, first of all, I think it's a

10:17:04 misdescription of the e-mail. This is from a Mr. Ruble to, I assume, Ms. Radel.

MR. BANES: Well, the e-mail starts out with Ms. Radel to Mr. Rebel.

THE COURT: Well, that was not what you said.

10:17:21 To the extent you are going to point the witness's

attention to that particular portion of the e-mails, the full e-mail, then the one I am looking up at the top is the reverse of that.

MR. BANES: Okay, Your Honor.

10:17:33 BY MR. BANES:

**Q.** Well, take a look at the February 4th part of the e-mail, Mr. Tweed.

Do you see where it says, Thomas, I am a current client of ADP Total Source with a wage and hour summons from the U.S. District Court in Texas. They recommended that I contact you."

10:17:46

Do you see that part?

**A.** Yes, I do, sir.

**Q.** Did you know that this referral came from ADP?

10:17:55 **A.** Absolutely not.

**Q.** Now, do you see that there is -- that Mr. --

MR. BANES: Is there any objection if I represent that Mr. Rebel is a partner at Fisher & Phillips?

10:18:09 MR. SCHEXNAYDER: My objection, Your Honor, is this witness testifying about this e-mail when there is no predicate that he has ever seen it before or that he had anything to do with it?

THE COURT: Well, the questions that have been asked have been asked and answered.

10:18:20

The question to you now, is there any objection to Mr. Rebel being referred to as a partner of -- of Fisher?

MR. SCHEXNAYDER: No objection to that, Your Honor.

10:18:34

THE COURT: Very well.

BY MR. BANES:

**Q.** So you notice that Mr. Rapollo's copied on this e-mail?

10:18:44 **A.** Yes.

**Q.** All right. Now -- so did you know that this -- that this referral came from ADP -- or that Ms. -- the referral of Ms. Radel came from ADP to begin with?

MR. SCHEXNAYDER: Object again, Your Honor. I think he is mischaracterizing -- when he says "referral," I don't even know what he is talking about. He is putting words in the witness's mouth.

10:18:57

THE COURT: Sustained as to the counsel testifying.

10:19:07 Ask questions.

MR. BANES: Okay, Your Honor.

BY MR. BANES:

**Q.** All right. What is the subject line of the e-mail, Mr. Tweed?

10:19:16 **A.** The subject line says, "Referral from ADP Total

Source."

**Q.** And what does Ms. Radel say in the second sentence of the e-mail on February 4th?

THE COURT: Just a moment.

10:19:32 MR. SCHEXNAYDER: Your Honor, he is getting around the hearsay objection by having the witness read from the document.

THE COURT: Do you have a hearsay objection?

MR. SCHEXNAYDER: I do.

10:19:38 THE COURT: The hearsay objection is sustained.

Counsel, this document is not in evidence, and to the extent that you have specific questions as to this witness's personal knowledge, ask those questions.

MR. BANES: Okay, Your Honor.

10:19:52 BY MR. BANES:

**Q.** Did you know of AD -- well, all right. I'll just -- did you know anything about ADP and its involvement prior to the conflict waiver?

**A.** No.

10:20:49 MR. BANES: Your Honor, I would like to offer Exhibit 42.

MR. SCHEXNAYDER: Objection; hearsay.

THE COURT: Sustained.

MR. BANES: Your Honor, can I put on the record

10:21:11 my offer of proof for that?

THE COURT: Yes, sir.

MR. BANES: This is a business record from Fisher & Phillips that was produced to us. Marcia Radel was in this case as a defendant -- as a co-defendant. And this -- you know, this satisfies both the admission -- you know, admission of a party opponent and it satisfies the element of -- of business -- it's a -- it fits the business records exception.

THE COURT: Second, in regards to your response --

MR. BANES: Hearsay clause.

THE COURT: -- this has not been proven up as a business record before me. I haven't heard any testimony along those lines other than what you have just stated now.

Secondly, as to admission by a party opponent, I hadn't heard any details which would suggest that it's the admissions of a party opponent.

So the objection being sustained is correct.

Next question. Your next question.

BY MR. BANES:

**Q.** Okay. Mr. Tweed, can you turn to Exhibit 46, please?

Sir, can you identify what this document is?

**A.** This document is from Stephen Ropollo to someone

named Michelle Bennett. This is a reference to Veritas.

**Q.** All right. Now, the attachment says "Summons, Mason." Was Mason one of the cases that was at issue here?

10:23:47 **A.** It was Mason, Ozen, Emerson, and Bellard, from what I remember, and then Walker.

**Q.** All right. So, was Mason one of the first cases -- was that -- Mason and Ozen, were those the first cases filed?

10:24:01 **A.** I believe so, yes.

**Q.** Alleging the day rate issue?

**A.** Yes.

**Q.** All right. Now, it says on this document, "The new client here is E & L Transfer, L.L.C. We will also be

10:24:14 representing Edward Tweed, the owner of E & L. Need to include him in the conflicts."

MR. SCHEXNAYDER: I object to any testimony about this, hearsay.

MR. BANES: Your Honor, this is an admission by

10:24:24 a party opponent. Mr. Ropollo is the managing partner of -- of Fisher & Phillips.

THE COURT: That hadn't been established yet, Counsel. You -- you tell me this by way of responding to the objection, but none of that has been established

10:24:42 through the witness on the stand.

MR. BANES: Okay, Your Honor. I'll -- let me fix that right quick.

BY MR. BANES:

**Q.** Mr. Tweed, who is Mr. Ropollo?

10:24:50 **A.** To my understanding, he's the managing partner of Fisher & Phillips.

**Q.** All right. And who was Ms. Wynne?

**A.** Ms. Wynne is the attorney who solicited me.

**Q.** Now, earlier you testified that you believe that

10:25:07 Fisher & Phillips was representing your interest in all of these other day rate cases prior to Walker, including Mason and Ozen.

**A.** Yes.

**Q.** All right. Now, is the --

10:25:25 MR. BANES: So, we would renew -- we would renew the question, Your Honor. It says, "The new client here is E & L Transfer" --

THE COURT: And direct my attention. You are in Exhibit 43. Where are you directing --

10:25:38 MR. BANES: No, Your Honor. Exhibit 46.

THE COURT: I'm sorry. In Exhibit 46, where are you directing my attention to specifically?

MR. BANES: It says the new client -- it is from Mr. Ropollo, who is the managing partner at Fisher &

10:25:49 Phillips, and it says, "The new client here is E & L

Transfer, L.L.C. We will also be" --

THE COURT: What page?

MR. BANES: Page FP745.

THE COURT: 745. Very well.

10:26:00 MR. BANES: All right.

THE COURT: Very well. What is your question?

BY MR. BANES:

**Q.** All right. It says here, "The new client here is E & L Transfer, L.L.C. We will also be representing Edward J. Tweed, the owner of E & L. Need to include him in the conflicts."

10:26:08

THE COURT: Okay.

BY MR. BANES:

**Q.** Did you understand that your interests were being represented as well?

10:26:17

THE COURT: Just a moment.

Your objection?

MR. SCHEXNAYDER: Objection; hearsay.

THE COURT: In regards to this witness's knowledge of this e-mail, it does not indicate on its face that he received it or he was aware of it. So, how is it that he is responding to something that on its face shows that he was not aware of?

10:26:25

MR. BANES: Your Honor, this is a written -- this is a written recitation by Fisher & Phillips that they

10:26:42

are representing Mr. Tweed.

THE COURT: I agree.

MR. BANES: So --

THE COURT: My question to you, on the face of it, it does not even indicate that he is aware that this e-mail existed. Doesn't show him as a recipient or sender of the e-mail.

MR. BANES: Right, Your Honor.

THE COURT: Okay.

MR. BANES: I am not asking him if he did that.

THE COURT: Well, ask him that question without referencing the e-mail that he is unaware of.

MR. BANES: Well, it is important -- Your Honor, part of this case -- the importance of this is the failure to disclose and then the reversal of how they represented themselves to Mr. Tweed later versus earlier.

So earlier, Mr. Tweed was under the impression that they were representing his interests as well as he has already testified. And then, you know, they -- they take a contrary position later. But this is an admission at that time that they are representing him.

THE COURT: And my question to you, how is he aware of this admission in an e-mail that from its face he has no knowledge of?

MR. BANES: Well, he doesn't -- that's --

that's the point, is that he -- they didn't disclose this to him, you know, but that doesn't make the document inadmissible. It makes the document admissible because it's an admission by a party opponent that they did represent him and put them in their conflicts database.

10:28:01

THE COURT: The way that you pose your question presupposes that he has knowledge of the contents of the e-mail that you haven't demonstrated to this Court he had any knowledge of. Your question is based upon the e-mail.

10:28:18 MR. BANES: No, Your Honor. That is not the question.

THE COURT: That was exactly the question. You read a portion of the e-mail to him and then asked him a question.

10:28:26 MR. BANES: Well, I did, but --

THE COURT: The objection has been sustained. Ask your next question --

MR. BANES: All right.

THE COURT: -- Counselor.

10:28:33 BY MR. BANES:

**Q.** Let me ask it this way: Mr. Tweed, they're saying in here that they need to include you in their conflicts database as a client.

MR. SCHEXNAYDER: Same objection.

10:28:44 BY MR. BANES:

**Q.** Was that your -- absent this e-mail was that your understanding as well at the time?

THE COURT: Just a moment.

Your objection.

10:28:52 MR. SCHEXNAYDER: The first part of that question does refer back to this document.

THE COURT: Sustained as to the first part of your question.

MR. BANES: All right.

10:28:59 BY MR. BANES:

**Q.** What -- okay. Was it your understanding at the time that you were being represented by Fisher & Phillips, too?

**A.** It was always my belief that I was being represented.

**Q.** All right. On all of the cases, Ozen --

10:29:13 **A.** Yes.

**Q.** Mason, Bellard, and Emerson?

**A.** Yes.

**Q.** All right.

MR. BANES: Your Honor, I would like to move 46

10:29:23 for admission.

MR. SCHEXNAYDER: Objection; hearsay, lack of predicate.

THE COURT: How do you get over the hearsay objection on Exhibit 46 at this time?

10:29:34 MR. BANES: Well, Your Honor, this is an

admission by a party opponent.

THE COURT: What's the admission?

MR. BANES: The admission is that they are representing -- that they are including Mr. -- Mr. Tweed in their conflicts database as a client and E & L Transfer as well, and that they are representing them and that -- you know, the case -- you know, this case is about --

10:29:46

THE COURT: I got that. I'm just -- so, the -- the admission of the party opponent is the second paragraph that you're referring to?

10:30:05

MR. BANES: Yes, Your Honor.

THE COURT: Counselor.

MR. SCHEXNAYDER: We haven't denied that fact, Your Honor, so it is not an admission of anything.

10:30:17

THE COURT: The objection is overruled. 46 is admitted.

Counsel, is this a good time to take a break?

MR. BANES: Yes, Your Honor.

10:30:26

THE COURT: We will resume at 10:45.

THE LAW CLERK: All rise.

(Proceedings recessed from 10:30 a.m. to 10:44 a.m.)

THE LAW CLERK: All rise.

THE COURT: Mr. Tweed. Thank you. Please be seated. Pull your mic down a little bit. Thank you.

10:44:51

Counsel.

MR. BANES: Thank you, Your Honor.

BY MR. BANES:

**Q.** Mr. Tweed, can you please turn to Exhibit 48?

10:45:17 THE COURT: And, Counsel, pull your mic a little bit closer to you. Thank you.

MR. BANES: All right.

BY MR. BANES:

**Q.** Sir, can you identify this document for the record?

10:45:37 **A.** It's attorney/client communication, privileged and confidential, from Phillips to Marcia Radel.

**Q.** Who signed this document?

**A.** I -- I don't recall ever signing this document, no.

**Q.** But who did -- who did sign it? Who is it signed --

10:46:04 **A.** Well, it was sent to Marcia Radel. So...

**Q.** On page FPA20, who did sign it?

**A.** Page 20? Stephen Ropollo.

**Q.** So, on the first page of it, it says, "This will confirm that you wish to retain Fisher & Phillips to

10:46:26 represent Veritas Personnel Services, Incorporated, E & L Transfer, L.L.C., and Edward J. Tweed in connection with the referenced cases which we understand involve the same allegations with the same set of facts but different Plaintiffs and different Defendants."

10:46:37 Was that your understanding of these

cases?

**A.** It was my understanding that they were all the same type of cases, yes.

**Q.** Did you also believe that Fisher & Phillips was representing your interests as well in these cases?

10:46:48

**A.** Yes.

MR. BANES: Move to admit Exhibit 48, Your Honor.

MR. SCHEXNAYDER: No objection.

10:47:06

THE COURT: Defendant's -- I'm sorry. Plaintiff's Exhibit --

MR. BANES: Plaintiff's exhibit. I'm sorry.

THE COURT: -- 48 is admitted without objection.

10:47:57

BY MR. BANES:

**Q.** Turn to Exhibit 49, Mr. Tweed. Mr. Tweed, I'm just going to ask you, did you ever -- have you ever seen this e-mail before?

**A.** No.

10:48:30

**Q.** You weren't copied on it at the time?

**A.** No. I am not copied on this, no.

**Q.** All right.

MR. BANES: Move to admit Exhibit 49.

MR. SCHEXNAYDER: Object; hearsay.

10:48:51

THE COURT: Sustained. The witness just said

he wasn't familiar with it.

MR. BANES: I understand that, Your Honor. We will fix that later.

BY MR. BANES:

10:49:29 **Q.** Turn to Exhibit 15, Mr. Tweed. Can you identify what this series of documents is, sir?

**A.** It looks like it's a document from ADP Total Source. Yes.

**Q.** Exhibit 15?

10:50:12 **A.** Exhibit 15 is a document -- it's ADP Total Source and its clients wholly subscribe to the principles of equal employment opportunity.

**Q.** I think that is one of the documents in here.

But let me just ask it this way: Is this

10:50:25 Mr. Walker's personnel file?

**A.** Yes.

**Q.** All right. Now, who maintained these documents?

**A.** Veritas.

**Q.** Did you maintain them at E & L?

10:50:34 **A.** No.

MR. BANES: Move to admit Exhibit 15, sir.

MR. SCHEXNAYDER: No objection.

THE COURT: Plaintiff's 15 is admitted without objection.

10:50:58 BY MR. BANES:

**Q.** Take a look at Exhibit 11, Mr. Tweed.

Can you identify this document for the record?

**A.** It appears to me that it's a -- it's the lawsuit that was filed from -- by Emerson against Veritas.

10:51:24

**Q.** So this was the Emerson case?

**A.** Yes.

**Q.** When was this filed? It's on the last page, sir.

**A.** The 18th day of April, 2014.

10:51:54

**Q.** Now, you weren't sued in this case, were you?

**A.** My name doesn't appear here, no.

**Q.** Did you believe that your interest -- that Fisher & Phillips was representing your interests as well in this lawsuit?

10:52:08

MR. SCHEXNAYDER: Objection.

**A.** Yes.

THE COURT: Just a moment.

MR. SCHEXNAYDER: Mischaracterizes the facts, the testimony.

10:52:17

THE COURT: Counsel, I am not following your objection.

MR. SCHEXNAYDER: Well, he just said he wasn't a party. And then he just asked, Was the firm representing his interests in it? So I think that is misleading.

10:52:26

THE COURT: Rephrase your question, Counselor.

MR. BANES: All right.

BY MR. BANES:

**Q.** Mr. Tweed, did you have potential liability in this lawsuit, too?

10:52:35 MR. SCHEXNAYDER: Objection; calls for a legal conclusion.

BY MR. BANES:

**Q.** Well, let me --

THE COURT: Sustained.

10:52:39 BY MR. BANES:

**Q.** -- ask it this way: Did you believe -- you testified already that you believed that Fisher & Phillips was representing your interests in all these cases.

**A.** Yes.

10:52:47 **Q.** Did you think that this was one of -- is this one of the cases where you thought Fisher & Phillips was representing your interests?

**A.** Yes.

**Q.** Why do you think that? Why did you think that?

10:53:03 **A.** Because I had a contract with Marcia Radel from Veritas to indemnify me from any legal action.

**Q.** And did she tell you that she was doing that?

**A.** Yes.

**Q.** Did she tell you that she had hired Fisher & Phillips to do that?

10:53:16

**A.** Yes.

**Q.** Did she tell you that they were representing your interests as well?

**A.** Yes.

10:53:29 **Q.** Take a look at Exhibit 13.

Can you identify this document for the record, sir?

**A.** This appears to be a lawsuit filed by Dwight Bellard against Veritas Personnel Services.

10:54:03 **Q.** This was the same type of lawsuit as Mason and Ozen and Emerson?

**A.** Yes.

**Q.** Did you believe that Fisher & Phillips was representing your interests in this lawsuit as well?

10:54:18 **A.** Yes.

**Q.** Why did you think that?

**A.** Because Marcia Radel told me that they were representing Veritas and E & L in all of these similar suits.

10:54:51 **Q.** Taking a look -- now, did Ms. Radel indemnify you and E & L on all these other suits prior to Walker?

**A.** Yes.

MR. SCHEXNAYDER: I object.

THE COURT: Just a moment.

10:55:01 MR. SCHEXNAYDER: Calls for a legal conclusion.

THE COURT: Overruled.

BY MR. BANES:

**Q.** All right. Let's clear that up.

How did she indemnify on those prior cases?

**A.** I was never called to court. I never paid any fees. I never paid any settlement. She just took care of all that.

**Q.** So you understood that she was taking care of all that on all those cases?

**A.** Yes.

**Q.** Did you expect her to do the same on Walker?

**A.** Yes.

**Q.** Now, taking a look back at Exhibit 16, the conflict waiver, all this history of indemnity that had happened on all of these other cases, is any of that discussed in this document?

**A.** No.

**Q.** Did they -- are any of the advantages and disadvantages of that prior indemnify discussed in here?

**A.** No.

**Q.** Is there any attempt to justify why it wouldn't -- why it shouldn't happen in Walker?

**A.** No.

**Q.** Did Fisher & Phillips ever try to explain to you why

Walker shouldn't be indemnified as the prior ones?

**A.** Absolutely not.

MR. BANES: Move to admit those documents I just went through, Your Honor. I think it was 11 --

10:56:35 THE COURT: Well, let's take them one at a time, Counsel.

MR. BANES: Let's start with an offer of Exhibit 11, Your Honor.

MR. SCHEXNAYDER: No objection.

10:56:42 THE COURT: Plaintiff's 11 is admitted without objection.

MR. BANES: Exhibit 12.

MR. SCHEXNAYDER: I don't think there was any testimony about 12.

10:56:50 MR. BANES: Oh, wait.

Well, we talked about the answer. Is there any objection to 12 and 13?

MR. SCHEXNAYDER: No, no objection.

THE COURT: To either?

10:57:04 MR. SCHEXNAYDER: Either.

THE COURT: Plaintiff's 12 and 13 are admitted without objection.

MR. BANES: And then 14, I would offer 14.

MR. SCHEXNAYDER: No objection.

10:57:24 THE COURT: Plaintiff's 14 is admitted without

objection.

BY MR. BANES:

**Q.** All right. Turn to -- Mr. Tweed, earlier we were talking about the -- what was intended with the agreement and what it said between you and Veritas.

10:57:54

Do you remember that testimony?

**A.** Right.

**Q.** I am going to go through a few documents to actually see how it operated in practice. So if you could turn to Exhibit 23.

10:58:06

Can you identify this document for the record?

**A.** This is a -- a recruitment document that Marcia was working on with her manager in Lubbock, Texas.

**Q.** All right. Now, she mentions Nora there. Is that Nora Gonzalez?

10:58:31

**A.** That would be Nora Gonzalez.

**Q.** She was the HR director for Veritas?

**A.** Yes, she was.

**Q.** All right. Now -- so was one -- when we were looking at the agreement, we noticed one of the areas was recruitment that Veritas was responsible for with respect to the employees. Is this document consistent with that?

10:58:42

**A.** Yes.

MR. BANES: Move to admitted Exhibit 23, Your

10:58:54

Honor.

MR. SCHEXNAYDER: No objection.

THE COURT: Plaintiff's 123 is admitted without objection.

10:59:12 BY MR. BANES:

**Q.** Turn to Exhibit 24. Earlier, Mr. Tweed, you said that you -- you testified that you had no background in HR, human resources, and that you relied on Veritas for that. What is -- what is the document in Exhibit 24?

10:59:27 **A.** It's a -- it's a document Marcia sent to me saying that it would be okay for us to -- to give the employees some type of -- give our employees some type of incentives if they helped in reducing our expense with our insurance.

**Q.** Is Ms. Radel advising you on pay for the employees?

11:00:01 **A.** She is giving me -- this is Marcia giving me permission to address her employees, basically.

**Q.** Is this one of her roles to -- to advise you on how to compensate specially or generally the employees?

**A.** Yes.

11:00:17 MR. BANES: Move to admit Exhibit 24, Your Honor.

MR. SCHEXNAYDER: No objection.

THE COURT: 24 is admitted.

And, Counsel --

11:00:25 MR. BANES: Yes, Your Honor.

THE COURT: -- respectfully, for both of you, when you address the Court, please stand. When you -- when you address the Court and you're not standing, it's as if you're sitting there with a baseball cap on. I take a negative impression from it. I know it is very old fashioned, but it is part of my procedures.

MR. BANES: I don't have any problem with that, Your Honor. I'm sorry.

THE COURT: Very well.

BY MR. BANES:

**Q.** Turn to Exhibit 29, Mr. Tweed.

Can you identify this document for the record, sir?

**A.** This is a document to her managers.

**Q.** "To her managers" meaning Ms. Radel's?

**A.** This is -- this is -- this is from Marcia Radel, the president of HireGround, she shows herself here as, which is a company she owns in California, to her human resources and the managers in Texas that she was trying -- she had tried for a couple of weeks to test the -- the difficulty the managers were having communicating with her because of the difference in the hours of the day, the time zones.

**Q.** Well, now -- so Marcia Radel said -- can you read the e-mail from -- the first paragraph of the e-mail from

Marcia Radel on May 15th, 2015 there halfway down?

**A.** Halfway down. "Starting on Monday, May 18th, Veritas will have a representative at our office at 8:00 a.m. in order to assist you with any HR issues you are having."

11:03:11 **Q.** So these are -- this is Ms. Radel's communication to the Veritas managers for the employees?

**A.** Yes.

**Q.** Was this her role in this whole company?

**A.** Absolutely.

11:03:25 **Q.** Was that your understanding underneath the agreement between Veritas and E & L?

**A.** Yes.

**Q.** All right. Now, turn --

MR. BANES: Your Honor, move to admit Exhibit 29 for the record. 11:03:49

THE COURT: Any objection?

MR. SCHEXNAYDER: No objection, Your Honor.

THE COURT: Plaintiff's 29 is admitted without objection.

11:03:57 BY MR. BANES:

**Q.** Turn to Exhibit 30, Mr. Tweed, please.

Can you identify this document for the record, Mr. Tweed?

**A.** This appears to be a document from Marcia to her manager, Clint Straitwell, and it looks to me like -- it 11:04:33

looks to me like she was discussing some -- trying to get Clint to be clear on how he's tracking the hours for the drivers in Beaumont.

**Q.** And was -- Mr. Straitwell, was he an employee of Ms. Radel?

**A.** Yes.

**Q.** And she was telling him how to track hours for the employees, in this e-mail?

**A.** Yes.

**Q.** Was that one of her jobs?

**A.** Yes.

MR. BANES: Move to admit Exhibit 30, Your Honor.

MR. SCHEXNAYDER: No objection.

THE COURT: Plaintiff's 30 is admitted without objection.

Counsel --

MR. BANES: I'm sorry, Your Honor.

THE COURT: -- I have another issue, too, and perhaps you're going to be able to enlighten me. I'm trying to follow the admission of certain exhibits. Obviously, this is your case in chief, and you're making the record that you deem necessary. But just trying to track the relevance of some of these objections to the causes of action. I thought I was in here on whether or

not a law firm had breached its fiduciary duties to one of its clients and ultimately -- and perhaps alternately whether or not there was a breach of contract.

Looking at exhibit -- well, let's start with 15, which is a personnel file of an underlying employee; Exhibit 14, which is the order of dismissal in a lawsuit; and now in what was just admitted, Exhibit 30, a short e-mail regarding tracking the hours of a driver.

I am not -- I am unclear, and perhaps as you can connect the dots in this, a picture will emerge to the Court which points out the relevance of this in filling -- or answering the question as to whether or not this defendant law firm breached its duty to its client.

So you have four big volumes over here, and I am looking for enlightenment on those questions.

MR. BANES: Yes, Your Honor. We had to set a predicate because of the way the case is. We had to set a predicate about, you know, what Mr. Tweed understood the obligations were with Veritas before we could launch into the documents that lead right up to -- between -- with the law firm that lead up to the execution of the conflict waiver. Because you will see as you get -- as we get into them that what Fisher & Phillips' representations to Mr. Tweed were, and what they accepted as true without inquiry, was just not the truth.

So it's -- that's the important point of going through these things and actually understanding them.

THE COURT: Yes, sir. Thank you.

BY MR. BANES:

11:08:53 **Q.** Okay. Mr. Tweed, turn to Exhibit 54.

Okay. Mr. Tweed -- actually, skip that one, sir. Turn to Exhibit 55.

Can you identify Exhibit 55 for the record, sir?

11:10:04 **A.** It looks like a check for -- from Veritas to one of our employees, Crystal Ozen.

**Q.** You testified earlier that Ms. -- that Veritas handled the settlements and the attorneys' fees for the Ozen and Mason matter?

11:10:29 **A.** Yes.

**Q.** All right. Now, did you pay any portion of those?

**A.** No.

**Q.** So 55 is a check by Veritas.

56, can you identify what 56 is?

11:10:41 **A.** 56 appears to be a check for legal expenses for -- Veritas paid to Ross Law Group.

**Q.** Well, there is a -- there is an e-mail -- there is a check before that, too.

**A.** We have got a check here for Crystal Ozen, and the next check on page 420 is to Ross Law Group.

11:11:05

**Q.** Okay. So, turn to Tab 57, sir.

Can you identify that document for the record?

**A.** It appears to be a settlement agreement and general release from Crystal Ozen and Veritas Personnel.

11:11:30

**Q.** And Exhibit 58, can you identify that document?

**A.** It's a settlement agreement and release for Mr. Mason -- or Mrs. Mason. I don't know who -- Mason and Veritas.

11:12:01

**Q.** All right. Now, did you have to contribute anything to any of these lawsuits?

**A.** No.

MR. BANES: Move to admit Exhibits 54 -- well, offer Exhibit 54, Your Honor.

11:12:15

THE COURT: Any objection?

MR. SCHEXNAYDER: Yes. Hearsay.

MR. BANES: I didn't mean to offer 54. I'll withdraw that, Your Honor. 55 is what I meant to offer.

MR. SCHEXNAYDER: No objection.

11:12:41

THE COURT: Plaintiff's 55 is admitted without objection.

MR. BANES: Offer Exhibit 56, Your Honor.

MR. SCHEXNAYDER: No objection.

THE COURT: Plaintiff's Exhibit 56 is admitted without objection.

11:13:02

MR. BANES: Offer Exhibit 57.

MR. SCHEXNAYDER: No objection.

THE COURT: Plaintiff's 57 is admitted without objection.

11:13:09 MR. BANES: Offer Exhibit 58, Your Honor.

MR. SCHEXNAYDER: No objection.

THE COURT: Plaintiff's 58 is admitted without objection.

BY MR. BANES:

11:13:56 **Q.** Turn to Exhibit 105, Mr. Tweed.

**A.** What book is that in?

**Q.** It's in Book 2.

Mr. Tweed, can you identify Exhibit 105 for the record?

11:14:48 **A.** This appears to be an e-mail between Alia Wynne and Dave Molten, copy-copy Stephen Ropollo, attachments with regard to the settlement of -- settlement agreement and release of Bernard and Bell and Cruz.

**Q.** Bellard, Tennard, Cruz and Bell?

11:15:20 **A.** Yes.

**Q.** All right. Now, did you have to contribute anything to the legal fees or to the settlement in any of these cases?

**A.** No.

11:15:25 **Q.** All right. Now, take a look at Exhibit 106.

Can you identify that for the record?

**A.** It's a settlement agreement and release for Bellard to Veritas.

**Q.** And take a look at Exhibit 107.

11:15:56 Can you identify that for the record, sir?

**A.** Settlement agreement for Edrin Bell.

**Q.** Now, take a look and identify Exhibit 108, sir.

**A.** This is a settlement for Cruz.

**Q.** And then take a look at Exhibit 109 and identify

11:16:26 that.

**A.** This appears to be a settlement agreement for Tennard.

MR. BANES: All right. Now move to admit these documents, Your Honor. Let's start one at a time. Exhibit

11:16:43 106 is offered.

THE COURT: Will you be offering 106 through 109?

MR. BANES: Yes, Your Honor.

MR. SCHEXNAYDER: No objection.

11:16:51 THE COURT: Plaintiff's 106, 107, 108 and 109 are admitted without objection.

MR. BANES: As well as 105.

MR. SCHEXNAYDER: No objection.

THE COURT: Plaintiff's 105 is admitted without

11:17:12 objection.

BY MR. BANES:

**Q.** Now, did you -- you testified you didn't have to contribute anything to any of these lawsuits?

**A.** No, sir.

11:17:18 **Q.** And did you understand that your interests were being represented in these lawsuits as well?

**A.** Yes.

**Q.** Were these lawsuits resolved?

**A.** Yes.

11:17:34 **Q.** Did Ms. Radel ever seek any contribution from you?

**A.** No.

**Q.** All right. Take a look at Exhibit 111.

Can you identify this document for the record, sir?

11:18:03 **A.** It's a settlement -- a copy of settlement agreements and releases for Bell, Cruz and Tennard.

**Q.** It says, "The settlement payments are due to the opposing counsel within nine days. Please send them directly to opposing counsel."

11:18:17 Are you copied on this?

**A.** No.

MR. BANES: I move to admit Exhibit 111, sir -- Your Honor.

MR. SCHEXNAYDER: No objection.

11:18:30 THE COURT: Plaintiff's 111 is admitted without

objection.

BY MR. BANES:

**Q.** Turning back to -- let's turn back to Exhibit 16 for a moment, Mr. Tweed. It is in Volume 1.

11:19:18 **A.** Yeah.

**Q.** The fact that Ms. Radel and Veritas had indemnified you before on all those prior cases, prior to Walker, is that referenced anywhere in the conflict waiver?

**A.** No.

11:19:28 **Q.** Was that ever discussed with you, the implications of that?

**A.** No.

**Q.** Did they ever try to distinguish the Walker case with you, other than saying that only you were sued?

11:19:39 **A.** No.

**Q.** Mr. Tweed, can you please turn to Exhibit 141? It is in book -- it is in Book 3.

MR. SCHEXNAYDER: 140...

MR. BANES: 141.

11:21:21 **A.** Okay.

BY MR. BANES:

**Q.** Okay. Mr. Tweed, in Exhibit 141, can you, please, turn to page number 12082?

**A.** I thought you said 143.

11:21:32 **Q.** 141.

11:21:56
11:22:15
11:22:30
11:23:30
11:23:50

**A.** 141? 141, page what?
**Q.** Page FP1 -- 012082.
**A.** Okay.
**Q.** All right. Now, at this point did you know about -- had anyone talked to you about the Walker suit, as of August 31st of 2015?
**A.** No. It was in September.
**Q.** All right. Now, the subject line here says "Bellard versus Veritas," but take a look at the last paragraph that starts "Finally," on this page. Can you read that out loud?
**A.** It says, "Finally you may want to notify Ed Tweed that he should retain counsel" --
MR. SCHEXNAYDER: Excuse me, Your Honor. I object on hearsay. He is testifying about a document that hasn't been admitted.
THE COURT: Sustained.
BY MR. BANES:
**Q.** Mr. Tweed, take a look at -- take a look at FP0012081. On September 1st there is an e-mail from Ms. Wynne to Ms. Radel, and it's copy to Mr. Ropollo, and it says in the second sentence, "Steve suggested that Ed" --
MR. SCHEXNAYDER: Excuse me, Your Honor.
THE COURT: Just a moment.

MR. SCHEXNAYDER: Same objection.

THE COURT: Let me hear the completion of the question first.

BY MR. BANES:

11:23:55 **Q.** "Steve suggested that Ed might mistakenly believe that Veritas is going to handle this lawsuit because it handled the previous FLSA actions."

Mr. Tweed, did anyone raise to you anything about Veritas not covering the Walker lawsuit at

11:24:11 this time?

**A.** No.

**Q.** Had you suggested to anybody or discussed with Ms. Radel the idea that Veritas might not cover this -- the Walker lawsuit as it had the previous lawsuits?

11:24:35 **A.** No.

**Q.** Did you know that Ms. Wynne was -- or that Fisher & Phillips was discussing with Ms. Radel that this lawsuit might not be -- the Walker lawsuit might not be covered by her?

11:24:52 **A.** No.

**Q.** Turn to FP012078, Mr. Tweed. There is a September 9th, 2015 e-mail there. Do you see that?

**A.** Yes.

**Q.** You are not copied on this either, are you?

11:25:25 **A.** No.

**Q.** All right. Now, it says, "Steve, just spoke with Marcia. She seems to be considering being involved in the E & L lawsuit. Basically she wants us to tell her if she should agree to cover the lawsuit like she did with the previous E & L ones."

11:25:40

Now, did Fisher & Phillips ever tell you prior to the conflict waiver that they were advising Ms. Radel on whether to cover the Walker lawsuit?

**A.** No.

11:25:55

**Q.** You heard Mr. Schexnayder during his opening say that it was your idea for the apportionment and not to -- you know, not -- for Veritas to not fully cover the lawsuit.

Did that cover -- did that ever come from you?

11:26:12

**A.** That's ridiculous.

**Q.** All right. Now, Ms. Wynne goes on and says, "She said she is not contractually obligated to do so. I told her I do not see a legal obligation to become involved at this point but that it is very likely that Veritas will be brought in regardless."

11:26:30

Did you know that Fisher & Phillips was advising Ms. Radel that they didn't see an obligation for her to get involved --

**A.** No.

11:26:38

**Q.** -- at all at this point?

MR. SCHEXNAYDER: Your Honor, I object to his testifying as to what this document says.

THE COURT: Sustained.

And, Counsel, this document is not in evidence, and to the extent that you are relying upon factual statements in it, you are getting around offering it and having it tested as to whether or not there is objection to it. You can ask this witness about his personal knowledge.

11:26:46

MR. BANES: Yes, Your Honor.

11:27:00

THE COURT: All right.

MR. BANES: All I am asking right now -- I mean, we can get -- we will get it in through another witness, but all I need to ask him right now is if he was aware of these things.

11:27:08

THE COURT: Well, just ask him that. By reading from the document, you're reading into the record --

MR. BANES: Oh.

THE COURT: -- a document that is not in evidence.

11:27:14

MR. BANES: Okay, Your Honor.

THE COURT: All right.

MR. BANES: All right.

BY MR. BANES:

11:27:18

**Q.** All right. Mr. Tweed, I don't want to read it. So, go to -- go to the part where it says we talked about it. Do you see that in that first paragraph there at FP012078?

**A.** So, am I supposed to read it?

11:27:46 THE COURT: Just a moment.

THE WITNESS: I'm sorry.

MR. SCHEXNAYDER: I don't know what the question is. I guess I better wait.

THE WITNESS: Yeah. What is the question?

11:27:52 MR. BANES: I don't have a question, Your Honor.

**A.** Oh, yeah, I am at the part --

BY MR. BANES:

**Q.** All right. Just read that to yourself, sir.

11:27:58 **A.** Okay.

**Q.** All right. Now, did you -- in your view was Walker any different than Bellard?

**A.** No.

**Q.** All right. Now, did you think that violations that predated January 20 -- did you think that you only had obligations for those that predated 2015?

11:28:27

**A.** No.

**Q.** Did -- did anyone from Fisher & Phillips ever speak to you prior to the conflict waiver to learn your story about, you know, what actually happened in 2015?

11:28:43

**A.** No.

**Q.** And it was as if -- I mean, you have already testified about what was actually done. Did -- did you feel that you were responsible for 2015?

11:28:59 **A.** No.

**Q.** Why not?

**A.** Because I had an agreement with Marcia Radel, a contractual agreement, saying that she would indemnify me from all legal actions and costs and expenses incurred in any legal action. 11:29:14

**Q.** Did you think that any of -- those things that were being alleged, did you think that in the lawsuit, the Walker suit, did you think that you were responsible for those things?

11:29:24 **A.** Absolutely not.

**Q.** And why was that?

**A.** Because I did nothing ever different. There was nothing different. They were all about Marcia's -- what she explained to me as she received bad information when she set up the payroll. 11:29:40 She never told me who, what, where, any of that, even who was -- who was the bad representation.

**Q.** Looking back at Exhibit 16, sir, with respect to -- with respect to the advice that's being given in this document, 141, is any of this that Fisher & Phillips is 11:30:37

talking about with Ms. -- with Ms. Radel, is any of that covered in the conflict waiver?

MR. SCHEXNAYDER: Excuse me, Your Honor. He is now referring back to the same document and asking him to testify about it. Hearsay.

11:30:56

MR. BANES: Well, I am not asking about him to testify about this document. I'm just asking him to say -- you know, in the opening statement, Your Honor, Mr. Schexnayder said that he could prove a conflict waiver both orally and with the written conflict waiver itself. I don't necessarily agree with that, but I want to cover both bases.

11:31:10

So with respect to what was disclosed to Mr. Tweed, these provide context of what Fisher & Phillips knew. I will establish later and admit it through Mr. Ropollo or someone else, but for right now I need to establish with Mr. Tweed whether he was ever told these things.

11:31:24

THE COURT: Why don't you just simply ask him what he was told without referencing the document?

11:31:35

MR. BANES: Well --

THE COURT: What he was told has nothing to do with the document.

MR. BANES: Well, okay. All right, Your Honor. I think the -- I think the document --

11:31:43

THE COURT: Counsel.

MR. BANES: Oh, I'm sorry, Your Honor. I think the documents give context, but --

THE COURT: If he was not aware of the document and cannot have the document introduced through him, it provides no context for his answer. Ask him about his personal knowledge.

MR. BANES: All right. All right, Your Honor.

BY MR. BANES:

11:32:05 **Q.** All right. Mr. -- all right. Mr. Tweed, did you know that Marcia was asking Fisher & Phillips -- was seeking their advice about whether she should cover the Walker lawsuit?

**A.** I didn't even know who Fisher & Phillips was.

11:32:26 **Q.** All right. Is that a yes?

**A.** What's your question one more time?

**Q.** Did you know that Ms. Radel was seeking advice from Fisher & Phillips --

**A.** No.

11:32:34 **Q.** -- about whether to -- whether to cover the Walker lawsuit?

**A.** No.

**Q.** All right. Mr. Tweed, turn to Exhibit 135.

Now, Mr. Tweed, can you identify this document for the record, please?

11:33:18

**A.** It's a document from Stephen Ropollo to Alia Wynne, subject Veritas.
**Q.** This is on September 11th, 2015?
**A.** Yes.
11:33:41 **Q.** Now, Mr. Tweed, I just have a couple of questions.
Did you -- did you speak to Ms. -- Ms. Radel about apportioning responsibility prior to your discussion with Ms. Wynne on the 16th of September?
**A.** I explained to Marcia that I take responsibility
11:34:04 after January of 2016.
**Q.** All right. But you didn't -- it says in here, "Ed has agreed to be responsible for any post January 1 liability if Marcia covered litigation costs."
**A.** No.
11:34:16 **Q.** Was that your agreement?
**A.** No.
**Q.** Did she discuss that with you?
**A.** She alluded to that, you know, she would be interested in me helping her out because she was in
11:34:25 financial problems.
**Q.** All right. Now, did you actually agree to that at this point?
**A.** No.
**Q.** Now, did you ever -- did you ever -- or turn to --
11:35:45 all right. Actually, before I go there, sir, just look

back at 135.

The second -- the second sentence there -- or the third sentence says, "At the end of this year, E & L and Veritas will amicably part ways."

11:36:04 Had you discussed that with Ms. Radel at that point, on September 11th of 2015, that you were going to be --

**A.** No. I never told -- I never told Marcia that we had intended to terminate her; however, we -- we were planning

11:36:21 on terminating her.

**Q.** Did she tell you that she wanted -- was planning on shutting Veritas down?

**A.** No.

**Q.** So as of this point, September 11th, none of this was

11:36:35 discussed at that point?

**A.** Right.

**Q.** All right. Now, Mr. Tweed, take a look at the document Exhibit 85.

**A.** All right.

11:38:25 **Q.** Okay. Mr. Tweed, did you ever see this document?

**A.** Well, it -- I know it was sent to Marcia. I don't see where it was sent to me.

**Q.** But you don't remember ever seeing this?

**A.** No.

11:38:54 **Q.** Was it ever -- was this option ever discussed with

you in terms of Ms. -- or Veritas paying all litigation costs if you agreed to certain other concession?

MR. SCHEXNAYDER: Objection; hearsay.

THE COURT: Overruled as to hearsay.

11:39:29 THE WITNESS: Could you restate the question for me, please?

BY MR. BANES:

**Q.** Was the option for Veritas to pay all litigation costs if you had other concessions, was that ever discussed with you by Fisher & Phillips? 11:39:37

**A.** No.

**Q.** Was it ever presented to you as an option?

**A.** No.

**Q.** Did you know that Fisher & Phillips was advising Ms. Radel on that prior to speaking with you? 11:39:51

**A.** No.

**Q.** Did they disclose that when they talked to you?

**A.** No.

**Q.** Turn to Exhibit 84, Mr. Tweed.

11:40:47 Did you ever see this document, sir?

**A.** No.

**Q.** Was it discussed with you at that time whether -- adding you to make sure that you were jointly and severally liable on the fees? Was that discussed with you at the time? 11:41:06

**A.** No. Is that the mucking up thing? Is that what you're talking about?
**Q.** Yeah. It's the -- yes.
**A.** No. I never heard anything about mucking anything up.
**Q.** Well, did you -- did you hear about -- did you hear that -- that making you jointly and severally liable for fees was being discussed at that time?
**A.** No.
**Q.** Did they discuss that with you at the time?
**A.** No.
**Q.** By "they" I mean Fisher & Phillips.
**A.** That's correct.
**Q.** Turn to Exhibit 64, Mr. Tweed -- 164. Sorry.
**A.** What book is that, please?
**Q.** It's in Book 3.
Can you identify this document for the record, Mr. Tweed?
**A.** It appears to be a document from Alia Wynne of Fisher Ropollo [sic] to Marcia Radel.
**Q.** Did you ever see this document at the time?
**A.** No.
**Q.** Did you know that Veritas had been named as a defendant prior to speaking with Ms. Wynne on the 16th of September --

**A.** No.

**Q.** -- '15?

THE COURT: Mr. Tweed, again, let him finish his question.

11:43:40 THE WITNESS: I'm sorry, sir -- Your Honor.

BY MR. BANES:

**Q.** So just -- is it still a "no" at the end of that question, sir?

**A.** It's a "no."

11:43:49 **Q.** Let me ask it again.

**A.** Okay.

**Q.** All right?

Did you know that Veritas had been named as a defendant at the time you spoke with Ms. Wynne on the

11:43:58 16th of September of '15?

**A.** No. That's exactly the reason that she told me that I needed to retain them.

**Q.** So -- and so what did she say about that?

**A.** She told me that I --

11:44:12 **Q.** What did Ms. -- excuse me. Strike that.

What did Ms. Wynne say about -- what did Ms. Wynne say about that?

**A.** She told me that she was contacting me to advise me that I needed to find legal representation or a lawyer

11:44:28 because Marcia was not included in the lawsuit, that I was

being sued along with E & L Transfer solely.

**Q.** So she told you that on the -- Ms. Wynne told you that on the 16th of September?

**A.** Right.

11:45:32 **Q.** Okay. Mr. Tweed, can you turn to Exhibit 137?

All right. Mr. Tweed, did Ms. Wynne tell you that she had reviewed the agreement between E & L and Veritas prior to speaking with you on the 16th?

**A.** No.

11:46:19 **Q.** Did she tell you what she had found in that agreement?

**A.** No.

**Q.** Looking at Exhibit 16 -- looking back at Exhibit 16, is any of what's contained in Exhibit 137 discussed or

11:46:34 talked about in Exhibit 16?

**A.** No.

THE COURT: Just a moment.

MR. SCHEXNAYDER: Well, hearsay. He is referencing a document that hasn't been admitted.

11:46:53 THE COURT: I'm not sure the utility -- you're doing this for me, and I'm not sure of the utility of asking the witness about documents he purports to have never seen, comparing them to other documents in that regard. This witness has personal knowledge of certain

11:47:13 things or he doesn't. That's what I am interested in.

So when you're asking him about things he hasn't seen and isn't his opinion here sitting on the stand, that doesn't do anything for me by way of advancing your burden of proof. So --

11:47:27 MR. BANES: Well, I understand that, Your Honor. I'm just trying to establish for the record that Mr. Tweed wasn't told any of these things. So I have to do that much.

THE COURT: And you can -- and I pointed this 11:47:38 out, but you can ask him that question, as to what he was told, when he was told. When you reference a document in that regard and you read from it or you have him to read from it, you're circumventing the hearsay rule or a potential challenge to the document being admitted in 11:47:57 evidence.

MR. BANES: Okay, Your Honor. I understand that. But at the same time, I have to -- I mean, I can -- I can -- you know, if we were before a jury, I would be handling this a little bit differently. But, you know, 11:48:12 I -- we will ultimately be able to establish that this document is authentic.

THE COURT: You picked the order of your witnesses and you have picked the order of your presentation.

11:48:22 MR. BANES: Right.

THE COURT: And to the extent that you have picked this order where this evidence that you want to reference is not in evidence, it's of no utility to me. You have to have it in evidence before I can consider it in any proper and meaningful way, sir.

11:48:35

MR. BANES: I understand that, Your Honor.

THE COURT: All right.

BY MR. BANES:

**Q.** Let's just ask it this way: Turning back to Exhibit 16, Mr. Tweed, which is in Binder 1, is anything -- of all the matters that we have discussed with respect to the agreement between Veritas and -- and E & L, were any of those issues that are contained in there discussed with you specific to that agreement by Fisher & Phillips prior to the conflict waiver?

11:48:51

11:49:19

**A.** No.

**Q.** Okay. Turn to Exhibit 173, Mr. Tweed.

Okay. Mr. Tweed, September 16th, you have testified that that was the conversation you had with Ms. Wynne.

11:52:28

All right. Now, was that the only conversation that you had with anyone from Fisher & Phillips prior to the conflict waiver being executed?

**A.** Yes.

**Q.** Did Mr. Ropollo call you and talk to you at all?

11:52:44

**A.** No.

**Q.** All right. Now, I want you to -- I want you to tell the Court exactly what Ms. Wynne said to you on September 16th.

11:52:57 **A.** Ms. Wynne explained to me that -- that I -- that I was in -- I was failing to comply with the responsible letter for a lawsuit from Mr. Walker, that I was the only party, me and my company, me personally and my company, who were being held responsible for the lawsuit and that

11:53:22 Marcia and Veritas, because they were not named, are not considering being part of the lawsuit, that I needed my own counseling. I needed specific counseling.

**Q.** All right. Did they -- did they say that you could go get any counsel for this?

11:53:40 **A.** She told me that it would be smart for me if I signed their agreement and let them represent me because -- that they had already done similar cases for me on the other clients and settled them.

**Q.** All right. Now, what was the -- now, did you -- had

11:54:03 you talked to her prior to that?

**A.** No.

**Q.** Had you talked to anyone at Fisher & Phillips prior to that?

**A.** No.

11:54:08 **Q.** Had you talked to Ms. Radel about any apportionment

of any fees or damages --

**A.** No.

**Q.** -- for the case?

All right. Now -- so how was that raised to you? How was apportionment raised to you?

11:54:18

**A.** She told me that Marcia had contacted her to let her know that -- that she had -- she should call me and arrange to see if I had interest in them covering -- representing me because they had all of this background information from the other suits.

11:54:38

**Q.** Now, did you -- did you express to her that -- some surprise about that?

**A.** Yeah. I told her specifically, I said that, "I have a contract with Marcia to indemnify me from lawsuits. That is the only purpose of having her here."

11:54:57

**Q.** And what did she -- what did Ms. Wynne say to you at that point?

**A.** She said, "Well, the problem is is that she wasn't named in this lawsuit, Marcia or her company."

11:55:09

**Q.** And what did she -- what did she say the implications of that were?

**A.** She said that, "You're going to be sued. It's possibly going to be a class action, and it will probably destroy your company."

11:55:23

**Q.** And was she harsh with you when you disagreed with

her about any of that?
**A.** She was -- she was extremely aggressive.
**Q.** Did she make you feel like you had any other option?
**A.** She made me feel like I was an idiot.
11:55:41 **Q.** Did she discuss any other options or alternatives with you?
**A.** No.
**Q.** After the conflict waiver was sent to you, did anyone talk to you at that point from Fisher & Phillips?
11:55:57 **A.** No.
**Q.** Why did you sign the conflict waiver?
**A.** Because I thought that -- I listened to Ms. Alia Wynne -- that was my only option and that the window was getting smaller for me to respond and that I was in a lot of trouble.
11:56:18 **Q.** All right. Let's take a look at Exhibit 16 for a moment, sir.

THE COURT: Before we take a look at Exhibit 16, we're approaching the lunch hour. Is this a good time to stop, you think?
11:57:14

MR. BANES: This is probably a good time to stop, Your Honor.

THE COURT: Counsel, we have reached our lunch break. Before we take a break, is there anything we need to take care of before we recess?
11:57:28

MR. BANES: I don't think so, Your Honor.

MR. SCHEXNAYDER: No, Your Honor.

THE COURT: Very well. Back at 1:00.

THE LAW CLERK: All rise.

11:57:36 (Proceedings recessed from 11:57 a.m. to 12:59 p.m.)

THE LAW CLERK: All rise.

THE COURT: Thank you. Please be seated.

Counselor.

MR. BANES: Thank you, Your Honor.

01:00:06 BY MR. BANES:

**Q.** Mr. Tweed, we were about to go into Exhibit 16.

MR. BANES: Can you pull that up for us?

BY MR. BANES:

**Q.** Okay. Mr. Tweed, can you turn to page 2 of the document?

01:00:40

Now, take a look at the part that says "Apportionment of fees and damages related to the lawsuits," sir. Do you see that part?

**A.** Uh-huh. Yes.

01:01:17 **Q.** Take a look at that and just read that for a minute.

**A.** Okay.

**Q.** All right. Now, who came up with that apportionment?

**A.** It appears to me Veritas and Fisher & Phillips.

**Q.** Now, did you have any input into that before it being put on paper like this?

01:02:27

**A.** No.

**Q.** Did the idea come from you?

**A.** No.

**Q.** All right. Now, as far as the potential conflicts go, just take a look at potential conflicts 1 through 5 on pages 2 through 3, sir.

01:02:38

Mr. Tweed, with respect to potential conflict numbers 1 through 5, were any other conflicts disclosed to you by Fisher & Phillips other than what's in the document here?

01:04:27

**A.** No.

**Q.** Were they described to you in any other way than is portrayed in this document?

**A.** No.

01:04:34

**Q.** Was anything oral said to you in addition that might elaborate further on these conflicts?

**A.** No.

**Q.** With respect to -- turn to page 4, sir, and take a look at paragraph 2 there, the consequences -- that starts "The consequences."

01:05:12

**A.** Okay.

**Q.** Were any other consequences discussed with you prior to executing the conflict waiver?

**A.** No.

01:05:49

**Q.** Look at the advantages of joint representation.

Let me know when you're done with that, sir.

**A.** I am finished.

**Q.** All right. Were any other advantages disclosed to you other than the cost savings or the other things in that paragraph?

**A.** No. No advantages.

**Q.** All right.

Were there any oral disclosures of any kind that would have supplemented this other than that conversation you had with Ms. Wynne on September 16th?

**A.** No.

**Q.** Take a look at page 5, sir.

Now, how did you sign this document? In what capacity?

**A.** As the -- as an officer of E & L.

**Q.** Did you also sign it individually?

**A.** Yes.

**Q.** Now, how did Ms. Radel sign it on this?

**A.** She signed it on -- she looks like she signed it for Veritas Personnel.

**Q.** So Ms. Radel individually wasn't a party to this?

**A.** Doesn't appear to be.

**Q.** Was the fact that she wasn't individually a party discussed with you at the time?

**A.** No.

**Q.** Were any advantages or disadvantages of her absence from the agreement individually discussed with you?

**A.** No.

01:08:18 **Q.** Were any consequences for her not being a party -- for Ms. Radel not being a party individually to the agreement discussed with you?

**A.** No.

**Q.** Did Ms. Wynne say anything about Ms. Radel's 01:08:35 liability in your conversation with her on September 16th?

**A.** No.

**Q.** She didn't say anything about that?

**A.** She said that Mrs. Radel -- Mrs. Radel had no responsibility because she wasn't named, that I was 01:08:56 totally responsible.

**Q.** All right. Other than that did she discuss the implications of her not being a party to the conflict waiver?

**A.** No.

01:09:33 **Q.** Mr. Tweed, ultimately Fisher & Phillips withdrew from the representation of both you and Ms. Radel.

Do you remember that?

**A.** I know it happened. I am not real sure of the time frame, but I know it happened, yes.

01:09:47 **Q.** Do you know -- sitting here today, do you know why

they told you that they were doing that?

**A.** No.

**Q.** All right. Let's take a look at Exhibit 119 first. It's in -- it is in Book 2, sir.

01:10:45 First of all, can you identify this document for the record, Exhibit 119, sir?

**A.** It looks like it's a document from Alia to Marcia and copied me, Steve Ropollo and Kristin Graner.

**Q.** Prior to getting this document, did you know that Veritas was going to dissolve itself? 01:11:16

**A.** No.

**Q.** Had that been discussed with you by anybody?

**A.** No.

**Q.** Was there any subsequent discussion with you about what implications that might have on you, E & L and the lawsuit? 01:11:28

**A.** No.

**Q.** When this was disclosed to you, did anyone come to you and ask you for a new conflict waiver of any kind?

01:11:59 **A.** No.

**Q.** Did you get the impression at this point that Ms. -- well, did you understand at this point that Ms. -- or Veritas wasn't going to hold up their end of the agreement, the -- or the apportionment in the conflict waiver? 01:12:25

**A.** Did I? No. I did not think that.
**Q.** Did anyone tell you that they were -- that they were going to breach it at that point?
**A.** No. No.
01:12:42 **Q.** All right.
MR. BANES: Now, move to admit Exhibit 119, Your Honor. I am offering 119.
MR. SCHEXNAYDER: I'm sorry, Judge. No objection.
01:12:58 THE COURT: Plaintiff's 119 is admitted without objection.
BY MR. BANES:
**Q.** Mr. Tweed, at this point in the litigation, did anyone from Fisher & Phillips mention anything about ADP
01:13:35 to you at this point?
**A.** No.
**Q.** Did anyone talk to you about implications of Ms. -- of Veritas dissolving?
**A.** No.
01:13:46 **Q.** What was the next communication you remember getting from them about this issue?
**A.** I -- I don't recall any discussions. I don't recall.
**Q.** Well, they didn't call you and talk to you about it?
**A.** No.
01:14:07 **Q.** All right. Now, at some point did you get an e-mail

 from Ms. Wynne saying that they were going to withdraw?
**A.** I -- to be honest with you, I don't know what happened, how I found out that they were going to withdraw.
01:14:26 **Q.** All right. Let's take a look at Exhibit 124 --
**A.** Okay.
**Q.** -- Plaintiff's Exhibit 124.
And just take a look at that, sir, and then we will talk about it.
01:15:46 **A.** Okay. I have read through it.
**Q.** Do you remember getting this e-mail, sir?
**A.** I know what I do remember is that -- I remember hearing that they were withdrawing because Marcia refused to pay their invoices.
01:16:02 **Q.** Okay. All right. So who -- who told you that?
**A.** I'm not sure.
**Q.** All right. Do you know if Ms. Wynne told you that?
**A.** Well, she was the only person I -- that I -- that I know that I ever talked to there.
01:16:23 **Q.** All right. So, do you think it came to her -- from her?
**A.** I would think it would have had to have come from her.
**Q.** All right. Now, it says in the third paragraph, "We
01:16:34 have become aware that Veritas due to its financial

condition may not be able to meet the financial obligations that were agreed to in the September 28th letter."

**A.** Right.

01:16:42 **Q.** Was this the first notice that you received that Veritas might breach the agreement that was reached in the conflict waiver?

**A.** Yeah. Even if -- that's even if I ever got this letter. I mean, it doesn't show that -- it shows my name

01:16:56 on it, but -- it shows it's from Alia. I mean, her card is behind it, so...

**Q.** At this point did you -- is this when Fisher & Phillips started moving to withdraw?

**A.** Yeah. I was notified that I would have to find a

01:17:14 different attorney.

**Q.** All right. And that's what you did?

**A.** Yes.

**Q.** All right. Now, let's go back to one document before we head off -- go on that, sir.

01:17:52 MR. BANES: Is a copy of you all's exhibits up there?

MR. SCHEXNAYDER: I don't know. Take one up.

MR. BANES: Thank you.

Your Honor, may I approach.

01:18:06 THE COURT: The witness?

MR. BANES: Yes, Your Honor.

THE COURT: You may.

BY MR. BANES:

**Q.** Sir, can you turn to Defendant's Exhibit 9? Take a look at this document, sir, and I am going to ask you to identify it for the record.

01:18:38

**A.** Take a --

**Q.** Take a look at it, sir.

**A.** It's -- I'm sorry. It's an engagement letter between me and Fisher & Phillips. It appears to be.

01:18:55

**Q.** Now, turn to the last page of it.

Is that your signature at the bottom?

**A.** Yes.

**Q.** All right. Now, turn to the -- turn to the first page of the document, paragraph 3.

01:19:12

**A.** Okay.

**Q.** It says in there, "Because you and" -- "you and E & L are new clients."

What did you take that to mean at the time?

01:19:25

**A.** I took it to mean that I was now a new paying client.

**Q.** And did you think that you were a new client of Fisher & Phillips at that time?

**A.** Well, they had been representing me all along, so I just thought that now I had to start paying them for what

01:19:37

they have been doing over -- for the other cases.
**Q.** And you felt that based on the communication you had with Ms. Wynne before?
**A.** Yeah. I never had to pay for this before, and then all of a sudden, she said that I would have to give her a retainer of -- I think -- I thought it was $15,000. So, the first check I think was 7500.
**Q.** Now, take a look at Exhibit 198, sir.
MR. SCHEXNAYDER: 198?
MR. BANES: Plaintiff's Exhibit 198.
Oh, Your Honor, I am going to move to admit Defendant's Exhibit 9.
MR. SCHEXNAYDER: No objection.
THE COURT: Defendant's 9 is admitted without objection.
BY MR. BANES:
**Q.** Mr. Tweed, can you tell me what these documents are in Exhibit 198?
**A.** In --
**Q.** Oh, Book 4.
**A.** Okay. Make some room here. Book 5, 198.
**Q.** Now, what are these documents in here?
**A.** These are -- this looks like billing, the billing from Steve Ropollo of Fisher & Phillips to me.
**Q.** Does this -- taking a look back at the -- the last

 few -- the last three pages of this tab, are those the checks that you sent and were cashed by Fisher & Phillips?

**A.** Yes.

**Q.** All right. So this comprises the sum that you paid them during their representation of you on the Walker case?

01:22:23

**A.** Yes.

**Q.** All right. Now, did -- did Fisher & Phillips tell you that they -- that you owed them anything else?

01:22:35 **A.** I don't believe so, no.

**Q.** All right. Now, after you -- now, who did you engage as new counsel when -- when Fisher & Phillips withdrew?

**A.** I contacted you, Bryant Banes, off of advice from my California lawyer.

01:23:03 **Q.** Okay. Now, take a look at exhibit -- now, did you -- did you incur attorneys' fees and expenses on the lawsuit against the plaintiffs, with me? Did you have to pay me money?

**A.** Did I have to pay -- who was that?

01:23:30 **Q.** Did you have to pay -- did you retain my firm and pay us for representing you in the -- in the lawsuit against -- versus the plaintiffs in the Walker suit?

**A.** I paid -- I paid you for representation in the lawsuit, yes.

01:23:46 **Q.** All right. So we represented you in E & L -- we

represented E & L and Tweed in that lawsuit?

**A.** Yes.

**Q.** And we billed you for that?

**A.** Yes, you did.

01:23:56 **Q.** Now, can you look at Exhibit 202, sir?

**A.** Okay.

**Q.** Now, does this represent the billings to you from our representation of you versus the plaintiffs in the Walker suit?

01:24:26 **A.** Yeah. B.S.B. is Bryant Banes. Yeah.

**Q.** Okay. And then Exhibit 203, does that represent the expenses, pay for the same matter?

**A.** Yeah.

**Q.** All right. Now, did you also -- when -- now,

01:25:00 ultimately, the Walker suit was settled with respect to the plaintiffs.

Do you remember that?

**A.** Right.

MR. BANES: Now, Your Honor, I move -- move to

01:25:26 admit Exhibits 200 and 201 -- or, excuse me, 202 and 203. I'm sorry.

MR. SCHEXNAYDER: No objection.

THE COURT: And, Counsel, just so you know, on the exhibit list that I have, those are not listed on your

01:25:51 exhibit list. So these are exhibits that were later added?

MR. BANES: Yes, Your Honor. That's accurate. Sorry about that. I should have had those on there.

THE COURT: So 202 and 203 is what you said?

MR. BANES: Yes, Your Honor.

01:26:08 THE COURT: Plaintiff's 202 and 203 are admitted without objection.

MR. BANES: And we also offer Exhibit 198, Your Honor.

THE COURT: Any objection?

01:26:29 MR. SCHNEXNAYDER: No objection.

THE COURT: Plaintiff's 198 is admitted without objection.

THE WITNESS: Your Honor, could I ask a question? Is it responsible for me to keep this jacket on?

01:27:09 It's like -- I am roasting up here under these lights.

THE COURT: You may remove your jacket.

THE WITNESS: Thank you, sir. Thank you, sir.

BY MR. BANES:

**Q.** Okay. Sir, take a look at Exhibit 197.

01:27:44 Was this -- can you identify this document for the record, sir?

**A.** This is a confidential settlement agreement and release.

**Q.** All right. Now --

01:28:02 **A.** Go ahead. I'm sorry.

**Q.** -- does this document represent the sum you had to pay the plaintiffs in the Walker lawsuit?
**A.** Yes.
**Q.** Did the last three pages -- does that represent the sums actually paid to the plaintiffs by you in the e-mail?
01:28:25
**A.** Yes.
**Q.** Okay. Now, turn to page -- turn to paragraph 9 of the agreement, Mr. Tweed, on page 4.
**A.** Okay.
01:29:03
**Q.** All right. Take a look at the last sentence of that paragraph.
**A.** The one that says "Walker is hereby advised"?
**Q.** It says, "This settlement, release, waiver and discharge..." it's paragraph 9 on page 4.
01:29:23
**A.** Okay. So, "This settlement, release, waiver and discharge of claims does not include any claims Radel or Veritas may have against Fisher & Phillips."
**Q.** So you didn't -- so by signing this, you didn't intend to release Fisher & Phillips from any claims that you had against them?
01:29:40
MR. SCHEXNAYDER: Objection, Your Honor. It mischaracterizes the document. It is talking about Radel and Veritas, not him.
MR. BANES: Well, it talks about -- oh, I'm sorry. Strike that whole line of questioning, Your Honor.
01:29:51

BY MR. BANES:

**Q.** Turn to paragraph 8.

THE COURT: Now, what exhibit are you looking at again, for the record?

01:30:06 MR. BANES: I am looking at Exhibit 197, Your Honor, paragraph 8.

THE COURT: All right.

MR. BANES: I was looking at the wrong paragraph. I'm sorry.

01:30:12 BY MR. BANES:

**Q.** So take a look at paragraph 8.

**A.** Okay.

**Q.** All right. So the last sentence of paragraph 8, did you -- what is that -- what does that provision do?

01:31:01 **A.** It says, "The settlement, release, waiver and discharge of claims does not include any claims by E & L, Mr. Tweed against Fisher & Phillips, including any that are a derivative or related to claims or cross-claims against others in the agreement by E & L, and Mr. Tweed's 01:31:20 lawsuit against Fisher & Phillips survives this agreement."

**Q.** Now, at the time you signed this agreement, did you know about any contribution to Radel or Veritas by ADP?

**A.** Absolutely not.

01:31:36 **Q.** Did Fisher & Phillips tell you anything about that?

**A.** No. They did not.
**Q.** Mr. Tweed, turning back to Exhibit 16 again in Book 1.
**A.** Okay.
01:32:46 **Q.** Did you ever seek any legal advice on that agreement?
**A.** No.
**Q.** Why not?
**A.** Well, I had never had any reason to believe that anybody was going to be dishonest with me. They had 01:33:03 been -- they had been working on these cases, all identical, over and over again for over a period of time that I expected that everybody was going to be honest and up -- onboard.
**Q.** Do you -- did you feel like you could go to talk to 01:33:21 another lawyer?
**A.** I was told that I didn't have time. The time was of an essence. Nobody would be able to get up to speed in time to protect me in this lawsuit, especially since Veritas wasn't going to be involved, that I would be all 01:33:36 alone and have to start all over again.
**Q.** And who told you that?
**A.** Alia.
**Q.** Ms. Wynne?
**A.** Uh-huh.
01:33:45 THE COURT: "Uh-huh," is that a "yes" or a

"no"?

THE WITNESS: Yes. Yes, sir. Yes, Your Honor.

MR. BANES: Give me a few minutes, Your Honor. I might be finishing up with Mr. Tweed.

01:35:32 I was going to offer -- Exhibit 199 are the documents released from ADP, deposition on written questions. So I was going to introduce that -- or offer that for admission.

THE COURT: You were going to do it, or are you

01:35:47 doing it?

MR. BANES: I am doing that.

THE COURT: Counsel, any objection to Plaintiff's 199?

MR. BANES: 199, Your Honor.

01:36:02 THE COURT: 199. Yes.

MR. SCHEXNAYDER: Yes, sir. I object on hearsay.

THE COURT: 199, I am not -- I am unclear as to what this is. I am looking at --

01:37:04 MR. BANES: This is a deposition on written questions to ADP, Your Honor.

THE COURT: Just a moment.

MR. BANES: I'm sorry, Your Honor.

THE COURT: I see United States District Court

01:37:11 for the subpoena. Then starting after the subpoena, it

starts with exhibit, definitions, and it moves into documents requested. And then it has an Exhibit A that contains e-mails, correspondence, and it appears to be payroll or checks and more invoicing and billing, summons and Plaintiff's original complaint and a host of documents. There is not -- the reason I want to make that comment is because it is a host of documents, not one class of documents. So, in regards to the hearsay objection, Counsel, what say you?

01:37:55

01:38:17

MR. BANES: Well, it's records of regularly conducted business activity by ADP, Your Honor. This document was done through a notice of intention to take deposition on written questions. Mr. Schexnayder was given an opportunity to depose them and talk to them as well. They have sworn that these documents are their internal documents relevant to the issues that are in this. There is no dispute over that. And there was no objection in the pretrial order about the -- or about the authenticity of these documents as business records from ADP.

01:38:33

01:38:49

So they're authentic, and they -- they're -- you know, they're sworn, and they're proper -- properly before the Court in terms of under Rule 31.

THE COURT: Counsel, what say you in that Mr. Banes has pointed out that prior to today you had not registered any objection?

01:39:10

MR. SCHEXNAYDER: Your Honor, this is not presented as a deposition by written questions. There is no sworn statement anywhere in here by the witness.

THE COURT: It says notice -- the third --

01:39:33 MR. BANES: That is on page --

THE COURT: Yeah, notice of intention to take deposition by written questions.

MR. SCHEXNAYDER: Right.

THE COURT: And then it goes into the very next 01:39:45 page, which is the subpoena. I don't see the questions for the deposition on written questions.

MR. SCHEXNAYDER: That is my point. There is no answers either.

MR. BANES: They're on page -- as you go into 01:39:57 the document, Your Honor, there's -- there's the --

THE COURT: I see the definitions. Documents requested, is that what you're referring to?

MR. BANES: No, Your Honor. It is after that. There is the -- when you get to Exhibit A --

01:40:19 THE COURT: So this is out of order.

MR. BANES: A little bit. That's -- the direct questions to be propounded by the witness are right here. And then there's --

THE COURT: Yes. Okay. I see the 01:40:33 deposition -- direct questions to be propounded to the

witness several pages into the document.

MR. BANES: Yes, Your Honor. And then there is a letter from the general counsel of ADP that's attached to that and incorporated in that that explains the responses to the requests.

MR. SCHEXNAYDER: May I respond, Your Honor?

THE COURT: Yes, sir.

MR. SCHEXNAYDER: That letter he is referencing clearly is not one of the business records to begin with. That is a separate piece of correspondence. That is hearsay. And we don't have any indication which of these documents was actually attached to the deposition by written questions due to the fact that there are documents before and after those questions and answers.

And lastly, I would say he didn't identify this particular custodian of records as a witness on his witness list, and that's how he is trying to get it in through a witness who is not here.

And lastly, I don't see the relevance of all of these documents to this case, and he hasn't proved it up through Mr. Tweed.

THE COURT: Okay. The problem that I have with this document, as you have correctly pointed out, is it is out of order. So in regards to the deposition on written questions, as counsel has pointed out, it does not indicate

to me what documents she attached to her response because there are documents before and after. And obviously, in regards to the letter dated October the 4th, 2018, the letter from the counsel, I would assume that that wasn't part of the production coming back from the deposition on written questions. Or was it?

MR. BANES: No, sir. This -- this was all together, and I -- even though it is in this order, this is the order I got it in. So, it was -- the deposition -- the direct questions propounded by the witness and then the -- the ADP document behind it is exactly the order. And it -- if you look at the documents, they go -- they reference --

THE COURT: Well, I am looking at Bates number starting at Number 1 after the letter.

MR. BANES: Yes, Your Honor.

THE COURT: Okay.

MR. BANES: Those are the documents themselves that are referenced in there.

THE COURT: Okay. Well, the letter dated October the 4th doesn't even have a Bates number, which indicates to me it is a different part or not part of the production.

MR. BANES: No. It was -- it was behind the direct questions, because it delineates which documents or what and how they respond to the questions.

THE COURT: That doesn't make any sense to me, Counsel.

MR. BANES: Well --

THE COURT: And maybe it is because it is out of order. But I see the notice of delivery, the notice of intent. I see the subpoena. Then I see the exhibit, documents requested. Then I see Exhibit A. Then I see the direct questions to be propounded to the witness.

01:43:15

So the documents from Exhibit A up to the page that has direct questions to be propounded to the witness, it seems that that was not part of the production but was sent to the custodian of records to be responding to at a minimum, and then after that --

01:43:58

MR. BANES: Well --

THE COURT: Counsel, let me finish.

01:44:13

MR. BANES: Oh, I'm sorry, Your Honor.

THE COURT: After the direct question, there is a letter. After those two pages, there is a Bates number. In my experience, the Bates numbers typically are the documents that are produced. The first Bates number is 1.

01:44:29

MR. BANES: Yes, Your Honor.

THE COURT: To the extent that that was part of the production, she would -- the custodian would have stamped the letter dated October the 4th as part of the production. That wasn't done. So that indicates to me it

01:44:43

is not part of the production from what I'm just looking at here. The Bates numbers go on 1 through 83. So, it appears to me that it's the documents that are stamped 1 through 83 which are part of the response to the deposition on written questions.

01:45:07

MR. BANES: Well, that's -- okay, Your Honor. I mean, this -- this was produced to me this way. So, it was purported to be part of it. But we don't really need the letter, you know.

01:45:24 THE COURT: Well, I tell you what, let's do this. On the next break, why don't you go through Plaintiff's Exhibit 199 and give me a better idea of what you're offering. Because as it is now, I am going to sustain the objection. I suspect that on the deposition to

01:45:42 written questions that there are documents or a production that I will allow in evidence, but from what I am looking at right now, I can't make heads or tails as to what she included in the production versus what has just been thrown together in this exhibit through either --

01:46:04 MR. BANES: Well, Your Honor, the request actually refer -- the letter actually refers to the requests, and it delineates which documents are responsive to what. So, it does say Request Number 1 through Number 5.

01:46:17 THE COURT: Show me in your request where you

asked for a letter from counsel for them to do that.

MR. BANES: Well, I didn't ask for that.

THE COURT: Okay. Well, then, why would that be responsive to anything you have asked for?

01:46:28 MR. BANES: Well, that's just how they did it, Your Honor.

THE COURT: Okay. Well, they did it incorrectly. So what I am looking at does not indicate to me that all of these documents were included in the 01:46:47 response, and as such, I am going to sustain the objection. I am going to give you the opportunity over the next break to go through the document and make sure that it's in order. If you can do so, then I will re-entertain your offer of having that admitted. Simple. The way that it is 01:47:06 currently put together gives me no confidence that this reflects the production from the witness.

MR. BANES: Okay, Your Honor.

THE COURT: Very well. What's next?

MR. BANES: Okay. That's all I have for 01:48:03 Mr. Tweed at this time. Oh, I'm sorry, Your Honor. That is all I have for Mr. Tweed at this time. I am going to reserve the right to recall him on rebuttal.

THE COURT: You pass the witness?

MR. BANES: But I pass the witness for now.

01:48:13 THE COURT: Any cross for this witness?

MR. SCHEXNAYDER: I do, Your Honor. May I proceed?

THE COURT: You may, sir.

MR. SCHEXNAYDER: All right.

01:48:18

**CROSS-EXAMINATION**

BY MR. SCHEXNAYDER:

**Q.** Mr. Tweed, do you still have my documents, which is in that small white binder?

**A.** Yes, sir.

01:48:25 **Q.** All right, sir. Before I get to that, I want to fill in some details about you.

How old are you, sir?

**A.** I am 63.

**Q.** Where did you grow up?

01:48:40 **A.** I grew up in a small town called East Stroudsburg, Pennsylvania.

**Q.** All right. What was your level of education?

THE COURT: Counsel, pull your mic down towards you, and that will help the court reporter. Thank you.

01:48:51 **A.** I graduated from high school and took a couple of classes of summer school.

BY MR. SCHEXNAYDER:

**Q.** All right. And have you been in the logistics business your entire career?

01:49:02 **A.** Yes.

**Q.** All right. And you have owned your own company for a substantial portion of that career?

**A.** Yes, 2004, as I stated earlier.

**Q.** All right. And as the owner of a small business -- would you describe it as a small business? Large business? Medium?

**A.** I don't describe it as any of that. I describe it as my business.

**Q.** All right. And I guess you would prepare corporate documents to create the legal entity that you are running as part of your business?

**A.** I had a lawyer do that for me in Sacramento, California.

**Q.** All right. Why Sacramento?

**A.** Because that is where I was living at the time.

**Q.** All right. So, you knew enough to go get a lawyer when you needed some help creating some legal corporate documents, right, sir?

**A.** No. I was told by FedEx Ground that I couldn't -- I couldn't purchase the -- the independent contractor truck unless I had a business name.

**Q.** Right. But you weren't going to go out and incorporate that business yourself. You went out and found a lawyer to do it for you; is that correct, sir?

**A.** No. I went over to the courthouse, and they told me

what to do.

**Q.** I thought you said you had a lawyer do that.

**A.** I went to the courthouse, and they told me what documents I had to draft. And then one of the guys at the Knights of the Columbus told me, you know, to -- to talk to a lawyer --

01:50:33

**Q.** Right.

**A.** -- about my business. Yeah.

**Q.** That is good and prudent practice, isn't it?

01:50:43

**A.** I think so, yeah.

**Q.** Right. And you have probably had other opportunities in your business to hire attorneys for various things, haven't you?

**A.** Have I hired attorneys? Not that I recall, no.

01:51:00

**Q.** Okay. So other than that attorney that you hired to form the corporate documents, is that the only lawyer other than Fisher & Phillips that you have ever hired?

**A.** Well, I was in court once before, but I did that pro se with my wife. We didn't hire a lawyer.

01:51:29

**Q.** What kind of case was that, sir?

**A.** It was a disgruntled employee case.

**Q.** Did that employee sue your law firm -- I mean, excuse me, your business?

**A.** No. They just -- they -- they were -- they requested an arbitration before an arbitrator challenging their

01:52:01

wages, I believe.
**Q.** And you represented yourself and your company in that case?
**A.** Yes.
01:52:15 **Q.** All right. How did it turn out?
**A.** There was like $400 or something that was disputed, and I paid it.
**Q.** As part of your business, are you required from time to time to review contracts?
01:52:34 **A.** Not that I'm aware of, no.
**Q.** Do you enter into contracts with logistics companies that you do subcontract work for?
**A.** I have a contract with DHL Express.
**Q.** All right. That particular contract, is that
01:52:53 something you reviewed before you signed it?
**A.** Not really, no.
**Q.** You just signed it?
**A.** Yeah. It was a bunch of legal jargon that I didn't understand, so I signed it.
01:53:05 **Q.** All right. And in terms of the customers that you service as part of your business, do you ever have them sign contracts?
**A.** No.
**Q.** Okay. And let's go to -- now we are going to go to
01:53:20 my white notebook, sir.

**A.** Okay.
**Q.** And if you could turn to document -- or Exhibit 8.
Are you there, sir?
**A.** Yes, sir.
01:53:42 **Q.** And just flip through the pages and let me know if you recognize this document.
**A.** Yes, I recognize it.
**Q.** What is it?
**A.** It's a -- it's a letter from Alia --
01:54:13 **Q.** I'm sorry, sir. I don't think we're on the same page.
**A.** I am on 7. I'm sorry.
**Q.** Right.
**A.** You're on 8.
01:54:18 **Q.** Tab 8.
**A.** I am on Tab 8. Right. This is the client agreement with Veritas.
**Q.** All right. And we see at the top it is dated May 5th, 2008?
01:54:29 **A.** Yeah.
**Q.** Do you know who prepared this document?
**A.** I am sure it was Marcia's attorney.
**Q.** Okay. And look at the last page, sir.
Is that your signature?
01:54:44 **A.** Yes.

**Q.** Dated May 5th, 2008?
**A.** Yes.
**Q.** Did you read this document before you signed it?
**A.** I probably read through it, yes.
01:54:57 **Q.** Do you think you understood it when you signed it?
**A.** Yes.
**Q.** All right. And just sort of -- in a layman's sort of overall big picture, what was this -- what were you hiring Veritas to do?
01:55:10 **A.** Well, I am real clear on what I hired her to do. I hired her to be the -- the employer of record, for the employees to be responsible to her, and for her to indemnify me from any lawsuits.
**Q.** And is that what this contract does?
01:55:34 **A.** Yes.
**Q.** By the way, we see at the top of the first page the client name is E & L Transfer, right, sir?
**A.** Yes.
**Q.** And so "client" in this document refers to your company?
01:55:40
**A.** Yes.
**Q.** Okay. So, let's drop down on that first page to paragraph 4.
Are you there?
01:55:46 **A.** Yes.

**Q.** And it says, "Client." That's you, right?
**A.** Okay.
**Q.** E & L, right?
**A.** It says "Client or Clients."
01:55:55 **Q.** Right. But it is defined up there client is E & L Transfer, right?
**A.** Okay.
**Q.** Do you agree with me?
**A.** Are we on 4?
01:56:03 **Q.** Yes, sir.
**A.** Okay.
**Q.** So I just want to clarify when it says "Client," it's talking about E & L Transfer?
**A.** Okay.
01:56:10 **Q.** You agree with me?
**A.** Yes.
**Q.** All right. It says, "Client entrusts its president or the client's equivalent." Who is the president of E & L Transfer?
01:56:20 **A.** I am.
**Q.** All right. It says, "Entrusts its president with the authority to contract on its behalf," right?
Am I right so far?
**A.** "With the authority to contract" -- yes.
01:56:34 **Q.** "And to directly control the status of each temporary

employee."

**A.** Yes.

**Q.** Have I read that correctly so far?

**A.** Yeah.

01:56:43 **Q.** "Such that he shall retain and direct the services of each employee."

Have I read that correct so far?

**A.** That's what it says, yeah.

**Q.** "Including employee supervision, work schedules, 01:56:59 workplace conditions, maintenance of employment records, and to remit payment for the services rendered."

Have I read that correctly so far?

**A.** Yes.

**Q.** So what this contract says, that's all your 01:57:11 responsibility, right?

MR. BANES: Objection; calls for a legal conclusion.

THE COURT: Counsel, I can't hear you.

MR. BANES: Oh, sorry, Your Honor. Objection; 01:57:19 calls for a legal conclusion.

MR. SCHEXNAYDER: I'm just asking for his understanding since he signed the document.

THE COURT: Phrase it that way.

MR. SCHEXNAYDER: All right.

01:57:27 BY MR. SCHEXNAYDER:

**Q.** All right. Did you understand this provision as saying these duties and responsibilities were -- belonged to E & L Transfer when you signed it?
**A.** No.
01:57:35 **Q.** All right. But you read this before you signed it, didn't you?
**A.** Yeah. I didn't read it like that, though.
**Q.** Okay. How do you read it?
**A.** I read it that this is what she would -- this is what her responsibility is. 01:57:45
**Q.** Okay. I am taking it you didn't have an attorney review this particular contract before you signed it?
**A.** No, I did not.
**Q.** Okay. Let's move to the second page, sir, and subparagraph 12. 01:58:06
Are you there?
**A.** Yeah.
**Q.** All right. Again, I am going to read it.
"Client" -- and you agree with me that on the first page, client is E & L Transfer, right, sir? 01:58:13
**A.** Right.
**Q.** "Client accepts the obligation to discuss all matters concerning employees, including, without limitation, employees' job assignments, wages and payroll procedures with Veritas and not with employees directly." 01:58:28

Did I read that correctly?

**A.** Yes.

**Q.** So, again, do you understand this means that E & L Transfer had those obligations?

01:58:38 **A.** I understood it to be that they have those rights.

**Q.** Well, it says, "Client accepts the obligation."

Do you see that, sir? The first four sentences -- first four words?

MR. BANES: Objection; argumentative.

01:58:52 THE COURT: Overruled.

**A.** It says, "Client accepts the obligations to discuss all matters concerning" --

BY MR. SCHEXNAYDER:

**Q.** That's right. And all I am saying is did you

01:59:03 understand that to mean E & L Transfer had that obligation?

**A.** I thought this was a contract between me and Veritas, and what they were saying there is the client has an obligation to discuss it with her.

01:59:17 **Q.** Okay. But "client" meaning E & L Transfer?

**A.** Yes. It's a client agreement. It is a two-party agreement.

**Q.** Okay, sir.

MR. SCHEXNAYDER: And by the way, I guess this

01:59:26 would probably be a good time for me to go ahead and

request to admit Exhibit 8 into evidence.

THE COURT: Any objection?

MR. BANES: No, Your Honor. It is already admitted, I think.

01:59:37 THE COURT: Plaintiff's -- I'm sorry. Defense 8 is not in evidence. You have no objection to it now; is that correct?

MR. BANES: No, Your Honor. But it is the same as Exhibit 4.

01:59:48 THE COURT: Plaintiff's Exhibit 8 -- I'm sorry. Defense 8 is admitted in evidence without objection.

BY MR. SCHEXNAYDER:

**Q.** All right, sir. Could I refer you now to subparagraph 13?

01:59:59 **A.** Okay.

**Q.** It says, "Client" -- again E & L Transfer, right, sir?

**A.** Yeah.

**Q.** -- "shall indemnify and hold Veritas, its 02:00:10 subsidiaries, affiliates and agents, including the employer of record, harmless from any and all claims and damages arising out of client's violation of employment laws, including, without limitation, OSHA and EEO and immigration laws."

02:00:27 Did I read that correctly, sir?

**A.** You did.

**Q.** So, is it your understanding that that provision actually requires E & L Transfer to indemnify Veritas?

**A.** This doesn't indemnify them from wages.

02:00:42 **Q.** Okay. But it does require an indemnification for these particular areas?

**A.** OSHA and equal opportunity, right. Yeah.

**Q.** Okay. So it would not be correct to characterize this document and this agreement as being solely one

02:00:55 sided, that Veritas always indemnifies E & L. In fact, there were indemnity obligations that went the other way, from E & L to Veritas.

MR. BANES: Objection; compound.

THE COURT: Break it up, Counselor.

02:01:05 MR. SCHEXNAYDER: Okay.

BY MR. SCHEXNAYDER:

**Q.** Do you agree that there are obligations in this contract where E & L is the party that has to indemnify Veritas?

02:01:17 **A.** I would say yes to that.

**Q.** All right, sir.

And if we could go to page 4, and I am going to refer you to paragraphs 22, 23, 24, and 25.

Now, I think you were asked about

02:01:39 paragraph 22 where it says, "Veritas agrees to indemnify

and defend client," et cetera, et cetera.

Do you recall that, sir?

**A.** Yes.

**Q.** All right. And the next paragraph, 23, also says, "Veritas agrees to indemnify and defend client," et cetera, right?

**A.** Yes.

**Q.** Okay. But 24 says, "Client agrees to indemnify and defend Veritas," et cetera, doesn't it, sir?

**A.** It says with regards to client's breach of any of its obligations.

**Q.** Right.

**A.** I didn't breach anybody's obligations.

**Q.** I am not saying you did. I am saying this at least has this language in it, that if that ever happened, you, E & L Transfer, would then have to indemnify Veritas.

**A.** Right.

**Q.** Agreed?

**A.** Yes.

**Q.** And 25 also has more language where client, E & L Transfer, has to agree and indemnify and defend Veritas for other types of claims.

Do you agree with that?

MR. BANES: Objection; vague.

THE COURT: Overruled.

If you understood the question, you can answer.

THE WITNESS: Okay.

**A.** It looks like -- what this is, is it's saying that -- this is Veritas employees. This looks like it is a result of the efforts or omissions of the Veritas employees.

**Q.** Right.

**A.** Right.

**Q.** So, you understood when you signed this document that there was some circumstances where Veritas might have to indemnify E & L, but there were other circumstances where it might be the opposite, right, sir?

**A.** Yes.

**Q.** Okay.

MR. SCHEXNAYDER: Your Honor, can I borrow that white flip chart over there?

THE COURT: Yes.

MR. SCHEXNAYDER: All right. We have been talking about a lot of dates, and I thought it might be helpful to try to just pin down a few of these. And I am going to start with a couple of dates that I am hoping the Court will take judicial notice of because these are pleadings in the Court's file.

The first date I want to ask the Court to

take judicial notice of is August 21, 2015, which was the date that Plaintiff, Matthew Walker, filed the first complaint in this case.

MR. BANES: No objection, Your Honor.

02:04:53 THE COURT: So noted.

MR. SCHEXNAYDER: All right. And rather than, again, try to introduce that particular document into evidence, I would ask the Court to take judicial notice that the only defendant in that pleading is E & L Transfer.

02:05:17 THE COURT: So noted.

MR. SCHEXNAYDER: The second pleading I would like the Court to take judicial notice of is on September 9, 2015, Plaintiff in the Walker case filed a first amended complaint in the collective action naming Veritas as an 02:05:41 additional defendant.

MR. BANES: No objection.

THE COURT: So noted.

BY MR. SCHEXNAYDER:

**Q.** Okay. Mr. Tweed, now I am going to refer you to one 02:06:07 of the big black binders, three of four. Three of four.

Are you there?

**A.** Yes, sir.

**Q.** Okay. And ask you to turn to Plaintiff's Exhibit 163.

02:06:42 Are you there, sir?

**A.** Yes.
**Q.** Could you flip through these documents, these two pages, and tell me if you recognize them?
**A.** I don't rec -- I don't recognize these documents, no.
02:07:36 **Q.** Okay. So let's just look at -- let's start with the second page. And let's make sure we're on the right document in the same notebook. The ones I have are FP6972 at the bottom and FP6973?
**A.** Oh, no, I'm sorry. We're not.
02:07:51 **Q.** Okay. I thought that might be -- so I am on Exhibit 163.
**A.** Okay. All right. So it looks like here September 9th. Okay.
**Q.** Do you recognize these e-mails?
02:08:40 **A.** I don't see that I was ever included in these e-mails, no.
**Q.** Okay. If you look on the second page, sir --
**A.** Okay. Wesley to Marcia, "Marcia, we were served papers last night with a lawsuit by Matthew Walker. They
02:08:55 are attached. Please follow up with Ed."
So, I see that Leslie received them, yeah.
**Q.** Who is Leslie?
**A.** Leslie is my wife.
**Q.** Okay. And do you see that she cc'd you?
02:09:07 **A.** Yes.

**Q.** Okay. So is it a fair statement, sir, that on September 5 either you or your wife Leslie were served with the Matthew Walker lawsuit?

MR. BANES: Objection; lack of foundation, Your Honor.

02:09:20

THE COURT: Just a moment.

MR. BANES: Ms. Tweed is not here.

THE WITNESS: Could you restate --

THE COURT: Just a moment.

02:09:28

THE WITNESS: I'm sorry.

THE COURT: Just -- I think the question was regarding the CC. I didn't hear his answer.

MR. SCHEXNAYDER: He acknowledged he was copied.

02:09:37

THE COURT: Ask again.

BY MR. SCHEXNAYDER:

**Q.** Were you copied on this e-mail dated September 5th, sir, 2015?

**A.** Yeah, I assume. That is my e-mail. I was copied, right.

02:09:45

THE COURT: All right. And your objection was lack of foundation?

MR. BANES: Well, my -- I don't think it's been asked if he actually received it. So --

02:09:55

THE COURT: Well, that objection is overruled.

BY MR. SCHEXNAYDER:

**Q.** All right, sir. Does this refresh your recollection that on September 5th, 2015, you and/or your wife were served with the Matthew Walker lawsuit?

02:10:06 **A.** Yes, I would say that.

**Q.** Would it also be accurate to say, sir, that at that time the only party that had been sued was E & L Transfer?

**A.** That's what I was told by Alia.

**Q.** Well, you actually saw it yourself when you were

02:10:38 served with the papers on September 5th, correct?

**A.** I was never served with the papers.

**Q.** It was your wife?

**A.** No. It shows you clearly here that they were served to my son.

02:10:47 **Q.** Okay. Who is your son?

**A.** Sean Tweed.

**Q.** Okay. Is he the agent of record?

**A.** Yeah.

**Q.** Okay. So, the agent of record for E & L, Tweed, was

02:11:05 served with a lawsuit on September 5th?

**A.** That's what this says.

**Q.** And, in fact, your wife is the one notifying Marcia Radel on September 5th of this fact, correct?

**A.** That's what it appears.

02:11:16 **Q.** Okay. So based on what we just talked about with the

Court that as of that date the only named defendant was E & L Transfer, you don't dispute that, do you?

**A.** No. That's what I was told.

**Q.** Okay. And you had every opportunity to review the lawsuit yourself, didn't you? I mean, your son got it.

02:11:32

**A.** My son was in Lubbock, I guess.

**Q.** Well, he could have faxed it to you. He could have e-mailed it to you.

MR. BANES: Objection; calls for speculation.

02:11:42

**A.** He could have done a lot of stuff.

THE COURT: Stop.

Overruled. This is cross.

And, Witness, make sure you listen to each question --

02:11:50

THE WITNESS: Uh-huh.

THE COURT: -- before you answer.

THE WITNESS: Uh-huh.

THE COURT: All right?

THE WITNESS: Yeah. Yes, sir. Go ahead.

02:11:54

BY MR. SCHEXNAYDER:

**Q.** That is my question.

Could he have communicated these papers to you, sent you copies through e-mail or fax?

**A.** He was a 24-year-old kid back then. He could have done a lot of things. There is times where I didn't see

02:12:07

him for months.
**Q.** Well, if you had picked up the phone and called your son and said, "Please send me these important legal documents," wouldn't he have done that?
02:12:19 **A.** Well, I would never have done that because they weren't important to me because I was indemnified by Veritas.
**Q.** Well, how did you know if you didn't even look at the lawsuit?
02:12:30 MR. SCHEXNAYDER: I'll fix that, Your Honor.
**A.** Because I didn't have any other clients.
BY MR. SCHEXNAYDER:
**Q.** Well, if you didn't even look at the lawsuit, sir, you didn't even know if it had anything to do with -- it 02:12:43 could have been a slip and fall on your premises. How did you even know what it was about?
**A.** I didn't until Alia called me.
**Q.** So instead of looking at the papers yourself that were in the possession of your son, you didn't do anything 02:12:57 until Alia called you?
**A.** I never -- I never --
**Q.** That is a yes or no, sir.
**A.** It's a -- okay. Ask the question one more time.
**Q.** You didn't do anything to familiarize yourself with 02:13:09 the lawsuit that was served on your son until Alia Wynne

called you on September 16?

**A.** That's my understanding, yes.

**Q.** So eleven days later, because this was September 5 and you didn't talk to her until September 16, you had no idea what this lawsuit was even about; is that correct?

02:13:23

**A.** Sounds correct to me. I never -- I never looked at any of these. I didn't even know Mason and Emerson and Bellard. I didn't even know who these people were. I had never read them. I never had anything to do with it. Ozen, Mason --

02:13:45

**Q.** And -- and you had never met Alia Wynne at all, had you?

**A.** No.

**Q.** If she had called you out of the blue, you wouldn't have known who she was or where she lived?

02:13:54

**A.** Well, she -- what I -- what I understand is she identified herself as a lawyer for Fisher & Phillips, and she was calling on behalf of Marcia Radel at Veritas.

**Q.** Okay. And you said that in that phone call she was very harsh with you. She was intimidating. She left you feeling you had no choice?

02:14:12

**A.** Yes.

**Q.** And this is a woman you never met before and only talked to her one time on the telephone?

**A.** I still haven't met her.

02:14:23

**Q.** Right. And based on that one phone call, you felt like you better just do what you were told?

**A.** Well, I figured she had been working with Marcia all this time. There had to be some reason that she was bringing this to my attention.

**Q.** Well, you talked to Marcia too, didn't you?

**A.** Not about me -- not about her not representing us.

**Q.** You never talked to Marcia about the Walker lawsuit and how it was going to all play out in terms of who was going to pay the legal fees?

**A.** Not until I heard from Alia.

MR. BANES: Objection, Your Honor. Can we kind of be specific as to time because that is important here?

THE COURT: That is your objection as to the -- vague?

MR. BANES: Yes.

THE COURT: Sustained.

BY MR. SCHEXNAYDER:

**Q.** All right, sir. Well, this might help you. If you could flip to Exhibit 177 in that same notebook.

Are you there, sir?

**A.** Yes.

**Q.** All right. And it looks like there is a couple of e-mails here dated September 18, 2015.

Do you agree with that?

**A.** That's September 18th there. That one is September 18. Okay.
**Q.** All right. And the one on the first page is an e-mail from you to Marcia Radel, copy to Leslie, on Friday, September 18, 2015, and the subject is "Attorneys' Fees," right, sir?
**A.** Yes.
**Q.** All right. And you're the one who authored and sent this e-mail, right?
**A.** Yes.
**Q.** And what does it say?
**A.** It says, "Marcia, Leslie and I feel it makes sense to work, as discussed, together. We discussed we would spend $7500 as a retainer to start with the fees, which we would be responsible for half. We also discussed responsibility for costs associated with findings after January 1st, 2016."
**Q.** Signed Ed Tweed?
**A.** Yes.
**Q.** All right. So, the first sentence says, "Marcia" -- so this is you to Marcia -- "Leslie and I feel it makes sense to work, as discussed, together," correct?
**A.** Right.
**Q.** Those are your words?
**A.** Yes.

**Q.** And you're referring to a discussion that you had with Marcia Radel?

**A.** Well, I think I am -- I think I am referring to a discussion I had with Alia.

02:17:07 **Q.** Well, you didn't say "Alia." You said "we discussed together." And this is only to Marcia Radel.

**A.** Well, I guess I wouldn't typically copy an attorney and -- on these -- on these types of communications.

**Q.** But that is your testimony, sir, your sworn testimony

02:17:24 under oath, that what you meant here was your discussion with Alia and not your discussion with Marcia directly?

**A.** I have got to tell you that I really don't have any idea.

**Q.** Well, that's -- okay. I'll take that.

02:17:36 But isn't it a reasonable interpretation that when you say "Leslie and I feel it makes sense to work, as discussed, together," you're talking about a discussion you had with Marcia?

**A.** Well, I don't think anything is reasonable after the

02:17:53 way that I was treated by your firm. Everything was smoke and mirrors. Never -- never anything factual.

**Q.** So even though Alia Wynne had browbeat you on the phone call just a couple days before, you sent this e-mail saying, This makes sense; let's work together?

02:18:28 That is your testimony?

**A.** You know, I am not -- just because somebody with the title of an attorney decides to attack me, I am not going to change my whole disposition. I am going to be courteous and respectful.

02:18:41 **Q.** Well, you also knew you could just say no --

**A.** But --

**Q.** -- didn't you, Mr. Tweed?

**A.** Well, I sure do now know that had I said no, I would never have been on the hook for half a million dollars.

02:18:55 **Q.** Really? You know that? If you had just said no, you know for a fact that Marcia Radel would have agreed to indemnify you 100 percent just because you said no?

Is that your testimony?

**A.** Yes.

02:19:08 **Q.** Did she tell you that?

**A.** I had a contract to tell her to do that.

**Q.** Well, we looked at that contract, sir, and didn't that contract have an indemnification going both ways?

**A.** Well, I don't think it had anything to do with the fair labor laws that she set up. 02:19:20

**Q.** So you are saying if you had simply said no to Marcia, just no, that Marcia would have rolled over and paid 1 00 percent of all the costs in this lawsuit?

That is your testimony?

02:19:30 **A.** My testimony is that Marcia decided to try to get out

of this because she was going -- she was going to plead bankruptcy because she saw that it became a class action. And in the interim, she was being paid by ADP for all of your legal fees without my knowledge.

02:19:49 **Q.** Sir --

MR. SCHEXNAYDER: I object as nonresponsive.

THE COURT: Overruled.

BY MR. SCHEXNAYDER:

**Q.** I just want to know if you're 100 percent confident 02:19:57 that Marcia Radel, if you had just said no, would have done all that.

**A.** If I would have got -- yeah, if I would have properly -- if I would have -- my answer is this: If I would have simply said no and gotten a firm that wasn't 02:20:13 working behind my back, they -- they would have handled this properly.

**Q.** So you understand that it might have required you to go hire another law firm?

**A.** I do now.

02:20:24 **Q.** Well, even back then, if you had said no to Marcia, you understand there is a chance that she was going to fight you on that issue and you might have had to hire a law firm?

**A.** Well, the double dealing came out afterwards when I 02:20:36 found out that you were -- your client, ADP, was paying

your services --

MR. SCHEXNAYDER: Object as nonresponsive.

**A.** -- and her services.

THE COURT: That's sustained. But allow him to finish his answer before you object. Your next question.

02:20:46

BY MR. SCHEXNAYDER:

**Q.** All right, sir. So, if Fisher & Phillips' position is that this apportionment where you and Marcia agreed to split the fees 50/50 was something you agreed with Marcia directly about, that is just wrong?

02:21:05

**A.** I don't -- I don't understand your question at all.

**Q.** Well, I want to make sure that your -- are you denying that it was your agreement directly with Marcia Radel to split the legal fees 50/50?

02:21:25

**A.** I agreed with her after -- after I was told what my -- that Marcia wasn't being sued --

**Q.** All right.

**A.** -- by Alia.

**Q.** If you could go back to my white notebook, sir, and turn to Exhibit 1.

02:21:46

Are you there?

**A.** Yes.

**Q.** All right. If you could just flip through these two pages and tell me if you recognize these e-mails.

**A.** Yes, I remember these.

02:22:06

**Q.** Okay. And the first e-mail, which would be really on the second page, is from you to Ms. Wynne on September 17, correct?

**A.** That's what it says. Right.

02:22:43 **Q.** And it actually says it's Leslie Tweed's mail account. But it is also signed by you, so I just want to clarify you're the one who sent this e-mail.

**A.** Okay.

**Q.** Is that correct?

02:22:56 **A.** Yes.

**Q.** Okay. And on September 17 -- so this is the day after the phone call with Alia, right?

**A.** Right.

**Q.** -- you say, "Thanks for the quick chat yesterday 02:23:07 discussing your fees," right?

**A.** Yes.

**Q.** This quick chat is the one where she browbeat you and told you you had no choice, right?

**A.** Yeah. If you look right here on -- if you look on 02:23:19 Thursday, September 2015, she says right here that -- that I did, of course, disagree.

**Q.** Well, let's just -- I am clarifying this quick chat, that you referred to it as "quick chat." That's the one where she browbeat you?

02:23:36 **A.** That's correct.

**Q.** Okay. And you tell her, "Our intentions were to have you draft a document, correctly identifying the employer of Matt Walker as HireGround/Veritas," correct?

**A.** Yes.

02:23:50 **Q.** And then Alia sends back a response same day, copying Marcia Radel and Mr. Ropollo and somebody else, and it says, "Ed, based on your e-mail below, it appears that you intend to take a position that is adverse to Veritas," correct, sir?

02:24:08 **A.** Yes.

**Q.** And it says, "If that is the case, I cannot provide you with legal advice or services or represent you in any manner because it would present a conflict of interest," correct?

02:24:18 **A.** Correct.

**Q.** "If you and Veritas can agree to apportion legal fees and potential damages among yourselves, we may be able to jointly represent you, E & L and Veritas," correct?

**A.** Correct.

02:24:31 **Q.** "However, if we were to jointly represent all the defendants, we would need to have a formal agreement signed by each, that specifies each parties' obligations and that confirms they understand that a potential conflict of interest exists," correct?

02:24:46 **A.** Correct.

**Q.** I'm sorry?

**A.** I -- I wasn't following you there. It says because of what?

**Q.** The last sentence in the first paragraph, "However, if we" -- and I just want you to confirm I am reading this correctly. "However, if we were to jointly represent all the defendants, we would need to have a formal agreement signed by each, that specifies each parties' obligations and that confirms they understand that a potential conflict of interest exists."

THE COURT: Do you have an objection, Counsel? You're standing.

MR. BANES: No, Your Honor. I am just looking. I'm just trying to find something.

THE COURT: Okay.

BY MR. SCHEXNAYDER:

**Q.** Did I read that correctly, sir?

**A.** Yes.

**Q.** Okay.

MR. SCHEXNAYDER: And I will ask to admit Exhibit 1, Your Honor.

THE COURT: Plaintiff's 1? Defense 1?

MR. SCHEXNAYDER: Defense 1.

THE COURT: Any objection?

MR. BANES: No objection, Your Honor.

THE COURT: Defense 1 is admitted without objection.

MR. BANES: Your Honor, are they also going to admit 177?

02:25:40 THE COURT: He has offered his exhibit.

MR. BANES: All right.

BY MR. SCHEXNAYDER:

**Q.** All right. Mr. Tweed, now let's look at the second paragraph in this e-mail:

02:25:47 "Because I represent Veritas and you may be adverse to Veritas in this litigation, I cannot advise you as to whether you should agree to joint representation."

Do you see that, sir?

02:25:56 **A.** Yes.

**Q.** That would be directly conflicting what she told you the day before, where she said you better agree to this deal or else.

**A.** Well, the day before she said that I was the only one

02:26:08 being sued.

**Q.** Right. But you also said she told you you better go ahead and agree to this.

**A.** Right.

**Q.** Right. But here she is telling you she cannot advise

02:26:17 you.

So you are saying she is just reversing herself the next day?

**A.** I think the day before she was looking for a quick check.

02:26:23 **Q.** That is not my question.

I am saying does this sound consistent with what she told you on the phone that -- the day before, "I cannot advise you as to whether you should agree"?

02:26:34 **A.** No. It's totally different than what she told me the day before.

**Q.** Okay. And the next sentence says, "I highly encourage you to consult with an attorney of your choice regarding this decision, and I will be happy to speak with 02:26:46 your attorney if that would be helpful," correct, sir?

**A.** That's what it says, right.

**Q.** Did you do that?

**A.** No.

**Q.** All right. Sir, could you turn to Exhibit 3, 02:27:01 Defendant's Exhibit 3?

Do you recognize this document?

**A.** Yes, I recognize it.

**Q.** And what is it?

**A.** This is the -- it looks to me like it's the 02:27:45 engagement letter where we became -- we started to work

with Fisher & Phillips.

**Q.** Okay. And, in fact, what Ms. Wynne is forwarding to you with this document is not only the engagement letter but what we have been calling the conflict waiver.

02:28:09 Do you agree with that?

**A.** Yes.

**Q.** All right. And what does she say in the paragraph after subpoint 2?

**A.** She says, "E & L's response to the complaint was due on October 26th." 02:28:35

**Q.** I'm sorry. I meant to go up one paragraph. Please read that part.

**A.** "Please read these very carefully. Before signing I strongly recommend that you have your own attorney review the agreement regarding the apportionment of fees and damages and potential conflicts, that you discuss with your attorney any questions you have regarding the agreement." 02:28:47

**Q.** Did you do that?

02:28:57 **A.** I didn't have an attorney.

**Q.** Did you seek one out?

**A.** No. She told me I didn't need one, that she had already done all this research and she had all this case history, that I didn't need another attorney.

02:29:08 **Q.** Well, sir, that is not what she is saying in this

e-mail, is it?

**A.** That's not what I interpreted it to be. I figured this was a form letter.

**Q.** Okay. But the point is, whatever it said in this 02:29:18 e-mail, that is not what you did. You didn't go out and have a separate attorney review this.

**A.** Absolutely not. I didn't have any attorneys in the State of Texas.

**Q.** All right, sir. And did you review -- at least do 02:29:47 what she said in the first sentence, "Please read these very carefully before signing"? Did you do that part?

**A.** Probably not.

**Q.** Why not?

**A.** Because, as I have told you several times, your firm 02:30:01 had already been representing me. The only thing you hadn't been doing is charging me. So all I understood was that I was a new payer to this process for the other four or five cases that you had already represented us for and this was just a continuation of the same case. And the 02:30:20 only clarification was that it wasn't only E & L Transfer that was being named, but it was now Veritas who was correctly identified as the employer.

**Q.** All right, sir. So it is your position that all the prior cases, E & L Transfer is the party that had been 02:30:40 sued?

**A.** I -- I believe that we were party to all of them and you -- you were representing us with -- along with Marcia; that is correct.

**Q.** So it might surprise you to know that in the Ozen case E & L Transfer was, in fact, not named as a party?

02:30:54

That would surprise you?

**A.** No. It wouldn't surprise me at all.

**Q.** Okay. Or in Emerson that, in fact, the only party sued was Veritas, would that surprise you?

02:31:06

**A.** No. It wouldn't.

**Q.** And in the Bellard case, would it surprise you to know that the only party sued was Veritas?

**A.** No. It wouldn't surprise me.

**Q.** Okay. And you said that this is the only case where both defendants -- both parties, E & L and Veritas, were sued together? Is that correct or not?

02:31:18

**A.** That's not correct, no.

**Q.** Okay. What other case were they sued together?

**A.** I don't -- I don't know if they were ever sued together.

02:31:34

**Q.** All right. All right. So, let's now turn to Defense Exhibit 2, sir.

And this has been talked about in the plaintiff's set of exhibits. Do you recognize this as that conflict waiver that we have been talking about?

02:31:55

**A.** Yes.

MR. SCHEXNAYDER: I move to admit defense Exhibit 2, Your Honor.

THE COURT: Any objection?

02:32:04 MR. BANES: No objection, Your Honor.

THE COURT: Defense 2 is admitted without objection.

BY MR. SCHEXNAYDER:

**Q.** Okay. Mr. Tweed, I think you just testified you

02:32:12 probably didn't read this carefully. So, does this -- does this refresh your recollection whether you read it carefully or not?

**A.** I still haven't read it clearly.

**Q.** All right. Even today?

02:32:24 **A.** No.

**Q.** All right. So I want to find out what you disagree with in this letter. Okay? Let's look at the first sentence.

"As you know, Fisher & Phillips has been

02:32:36 asked to represent Edward J. Tweed and E & L Transfer and Veritas Personnel Services, collectively the defendants, in connection with the collective action lawsuit cited above that was filed by Matthew Walker on behalf of himself and other similarly situated employees."

02:32:54 So that part of it, anything you disagree

with in that statement?

**A.** No.

**Q.** Next sentence, "Mr. Walker is alleging that he and other employees were denied overtime compensation in violation of the Fair Labor Standards Act of 1939 and has named Tweed, E & L and Veritas as defendants."

Anything you disagree with there?

**A.** No.

**Q.** So certainly by this time, you were made aware directly that both Veritas and E & L were defendants.

**A.** At this time, yeah.

**Q.** Right. That information was not withheld from you at this time, was it?

**A.** No.

**Q.** All right. Let me read the next sentence.

"When an attorney represents more than one party in the same matter, conflicts of interest may arise."

Did that statement seem confusing or puzzling to you?

**A.** No.

**Q.** All right. "The State Bar of Texas Rules of Professional Conduct require us to inform you of any potential conflicts of interest that may arise in this matter and obtain written consent before we proceed with

our joint representation of Tweed, E & L and Veritas."

Do you understand that statement?

**A.** And I understand that's where the conflict came from because I wasn't advised of any of that.

02:34:09 **Q.** Well, isn't this letter advising you of it?

**A.** No. It wasn't advising me what you were doing to better position me with the case.

**Q.** Okay. The next sentence says, "The purpose of this letter is to satisfy these requirements."

02:34:22 So I guess you're saying this letter doesn't satisfy those requirements?

**A.** No, it doesn't. I would say it doesn't satisfy any requirements.

**Q.** Even though as you sit here today, you still haven't read this letter thoroughly.

02:34:33

Is that your testimony?

**A.** No. I'm just testifying that I am saying that everything that was done before I was brought into your firm I was never notified of. I had no facts.

02:34:51 **Q.** Okay. The next sentence says, "The letter will also memorialize the agreement between Tweed, E & L and Veritas regarding the apportionment of legal costs and damages related to the lawsuit which will be essential to this firm's ability to jointly represent the defendants."

02:35:05 Did you understand what that was referring

to?

**A.** I took it as meaning that you needed additional fees to help continue to defend Veritas. So you were bringing me in as new money.

02:35:24 **Q.** All right. You didn't understand what they meant by apportionment of legal costs meaning you would pay half and Veritas would pay half?

**A.** Not really, no.

**Q.** Next sentence says, "We strongly recommend you 02:35:40 consult with an attorney of your choice regarding your decision to enter into this agreement," right, sir?

**A.** Yes.

**Q.** And you didn't do that?

**A.** That's correct. I did not.

02:35:49 **Q.** So you have been told on three separate occasions, in two e-mails that we have written up here and now in this letter, that they recommend you consult an attorney before signing it, and three times you have decided not to do that?

02:36:04 **A.** That's correct.

**Q.** The next paragraph says, "This letter is divided into four parts. The first part memorializes the agreement between defendants to share responsibility for legal fees and damages."

02:36:17 Did you understand what that meant?

**A.** Yes.

**Q.** The second part discusses "any and all potential conflicts of interest that we perceive at this time."

Did you understand what that meant?

02:36:33 **A.** Yeah. But that wasn't done. That is what my issue is.

**Q.** Okay. The third part discusses what will happen if one of these potential conflicts becomes an actual conflict.

02:36:42 Did you understand that?

**A.** Yes.

**Q.** Finally, the fourth part discusses the advantages of joint representation and requests your consent to our representation of Tweed, E & L Transfer, and Veritas

02:36:56 Personnel Services.

You understood that, didn't you, sir?

**A.** Yes.

**Q.** You understood that until you signed this letter, there was going to be no representation by Fisher &

02:37:03 Phillips, correct?

**A.** I would ask if you would repeat that.

**Q.** You understood that it was a requirement for Fisher & Phillips to start representing E & L that you sign this document first?

02:37:42 **A.** Yes.

**Q.** Okay. So the big heading here, subsection 1, "Apportionment of Fees and Damages Related to the Lawsuit," first paragraph, "Tweed and E & L will be responsible for payment of one half of this firm's monthly invoices and Veritas will be responsible for the other half," was that a correct summary of the agreement?

02:37:59

**A.** Yes.

**Q.** And that's an agreement you reached with Marcia Radel directly, correct?

**A.** This is what I was told from Alia that I needed to do to enter into the agreement.

02:38:12

**Q.** I understand. But you are saying you never talked to Marcia independently about that?

**A.** No. The letter I read was that you were bringing -- you would bring me into the case. My fee would be more than hers because she had -- she had already given you about a $25,000 retainer. So, I -- I would get a break on -- if I signed it, I would get a break of -- for -- for reducing that fee to $15,000 so that I would only have to pay legal fees of $7500, which would be much less than going out and hiring a new attorney.

02:38:25

02:38:51

**Q.** Did you ever discuss with Marcia Radel directly, just you and her, on the phone or otherwise, the concept of splitting the fees 50/50?

**A.** Not that I recall, no.

02:39:05

**Q.** Let's go to the next paragraph.

"With respect to any damages awarded by the Court or paid as part of a settlement agreement to any plaintiff in the lawsuit who worked for E & L or Tweed, Veritas will be responsible for any back wages in associated liquidated damages earned prior to January 1, 2015."

02:39:26

Next sentence, "Tweed and E & L will be responsible for back wages and associated liquidated damages earned after January 1, 2015."

02:39:45

Stopping there, sir, is that the agreement, as you understood it, with Marcia Radel?

MR. BANES: Objection; lack of foundation. Excuse me. Objection, Your Honor; lack of foundation.

THE COURT: Counsel?

02:39:58

MR. SCHEXNAYDER: Let me rephrase that, Your Honor.

THE COURT: Very well.

BY MR. SCHEXNAYDER:

02:40:03

**Q.** Did you have an agreement with Ms. Radel as it has been described in these first two sentences?

**A.** I have no recollection of that, no, of any of those dates being accurate.

**Q.** All right. So, do you know where these dates came from, why they were chosen?

02:40:19

**A.** Probably Marcia and Alia worked it up.
**Q.** Okay. Ultimately, you signed this agreement, right, sir?
**A.** Yeah.
02:40:31 **Q.** And are you saying now that you did not agree to this apportionment of liability?
**A.** I am saying that probably I didn't pay any attention to the dates.
**Q.** It is fair to say that you didn't rely in any way on 02:40:49 this written document when you decided to hire Fisher & Phillips, isn't it?

MR. BANES: Objection; calls for a legal conclusion, lack of foundation.

THE COURT: Rephrase it.

02:40:58 MR. SCHEXNAYDER: Well, actually, I think I need to ask the question in that form, Your Honor. I'll just -- I'll just repeat it, and you can let me know if it is sustained.

BY MR. SCHEXNAYDER:
02:41:07 **Q.** But did -- is it safe to say that you didn't rely on this written document when you decided to hire Fisher & Phillips?

MR. BANES: Same objection, Your Honor.

THE COURT: It's overruled. And I take it you 02:41:28 rely separate from -- I think your objection goes to

reliance --

MR. BANES: Yes.

THE COURT: -- is your objection, I understand.

So, your objection is overruled.

02:41:42 You can answer.

**A.** You are going to have to repeat the question. That was too long ago for me.

BY MR. SCHEXNAYDER:

**Q.** I hope I get it right the second time.

02:41:50 **A.** All right.

**Q.** Is it safe to say you did not rely on this written document in deciding to hire Fisher & Phillips?

MR. BANES: Same objection, Your Honor.

THE COURT: Overruled.

02:42:04 **A.** I relied on the advice that I was given, Alia, that I had a short window of time to get prepared to -- to answer this complaint. Otherwise, I -- I was going to be held wholly responsible for the lawsuit.

BY MR. SCHEXNAYDER:

02:42:24 **Q.** Okay.

**A.** So anything other than that was better than what alternative she had given me.

**Q.** But this particular written document, you didn't rely on anything in that, did you?

02:42:34 **A.** No.

**Q.** So I am gathering -- so that maybe I can just sort of speed through the rest of this, in Subsection 2 where it says "Potential Conflicts" and it has a sub heading A, "Potential Conflict Number 1," you don't recall actually reading that in any detail?

02:42:59

**A.** No. I don't recall that.

**Q.** Subpoint B, Potential Conflict Number 2, you don't recall reading that in any detail?

**A.** No.

02:43:12

**Q.** Subpoint C, Potential Conflict Number 3, you don't recall reading that in any detail?

**A.** No.

**Q.** Subpoint D, Potential Conflict Number 4, you didn't recall reading that in any detail?

02:43:23

**A.** No.

**Q.** Subpoint E, Potential Conflict Number 5, you don't recall reading that in any detail?

**A.** No.

**Q.** Subsection 2 on the last -- second to the last page,

02:43:40

page 4, "The consequences of one or more potential conflicts becomes an actual conflict and agreement that Fisher & Phillips can continue to represent Veritas Personnel Services if an actual conflict arises," is it safe to say you didn't read that section with any detail?

02:43:56

**A.** It is safe to say that, yes.

**Q.** And Subsection 3, "Advantages of Joint Representation," did you read that section?

**A.** Probably not.

**Q.** And the last page, sir, is that your signature?

02:44:15 **A.** Yes, it is.

**Q.** And the date is October 5th, 2015?

**A.** That's correct.

**Q.** So the date on this letter is September 28, right?

**A.** Uh-huh.

02:44:27 **Q.** The date at the beginning of the letter?

**A.** Right.

**Q.** And we saw an e-mail transmitting that to you on September 29, right? Do you remember going over that e-mail?

02:44:38 **A.** Right.

**Q.** And you didn't sign this document until October 5; is that correct?

**A.** Right.

**Q.** So it is fair to say you spent at least five or six days thinking about this before you signed it?

02:44:46

**A.** Oh, I would think that's probably not even close to the truth.

**Q.** So you didn't think about it before you signed it, but you did wait five or six days before you signed it; is that correct?

02:45:02

**A.** I would have to look at a calendar. Was it a weekend? I mean, you know, I guess -- I do things of what is important to me at the moment at the moment. I don't go searching around looking for legal jargon.

02:45:17 **Q.** Well, we know you didn't sign it before October 5th.

Is that a fair statement?

**A.** Sure.

**Q.** All right. If you could turn to Exhibit 5, sir, Defense Exhibit 5.

02:45:49 Are you there?

**A.** Yes.

**Q.** Do you recognize this document?

**A.** Yes.

**Q.** What is it?

02:45:55 **A.** Looks like it's an e-mail from me to Alia.

**Q.** Dated?

**A.** Dated October 1st.

**Q.** All right. October 1st. And are you responding to the e-mail she sent you on September 29?

02:46:12 **A.** It says, "Subject: Walker and E & L Privileged and Confidential."

**Q.** Right. But if you look down at the e-mail below it --

**A.** Oh, okay.

02:46:25 **Q.** -- is that the September 29 e-mail?

**A.** Yes.
**Q.** All right.
**A.** It sure looks like it.
**Q.** Is that a correct statement I said, that you're responding to the September 29 e-mail on October 1?
**A.** Yeah, it looks like it. I mean, I would have no way of knowing that because it doesn't -- I mean, it is just pasted on there.
**Q.** Well, let's look at the e-mail you actually sent.
It says, "Alia, the only issue I see is, should there be damages, Marcia and I agreed that E & L and I would be responsible for 50 percent of the damages after January 1, 2015," right?
**A.** Yes.
**Q.** I read that correctly?
**A.** Yes.
**Q.** So you're saying -- you're referring Alia to an agreement you had directly with Marcia, aren't you?
**A.** This is in October.
**Q.** Right. A few days --
**A.** This is after -- this is after the call from Alia.
**Q.** I understand it is after she sent you the proposed conflict waiver, right?
**A.** Right.
**Q.** And, in fact, that is what you're responding to.

You're saying, "The only issue I see, should there be damages, Marcia and I agreed that E & L and I would be responsible for 50 percent of the damages after January 1, 2015," right?

02:48:13 **A.** Right.

**Q.** So, is it a fair characterization that you read the conflict waiver. You saw that it didn't say that in your writing back to Alia to make sure that she changes it to what you understood the deal to be?

02:48:30 **A.** Yeah. It's -- yeah, it's an e-mail.

**Q.** Right. And so, you and Marcia did have an agreement, didn't you? You're referring to it right here, "Marcia and I agreed."

**A.** Marcia and I agreed that -- that we would -- that she -- that there basically weren't -- there is not going to be any damages because she was going to correct her bad information and make it right.

02:48:51

**Q.** That is not what you say in this e-mail, is it, sir?

**A.** Well, this e-mail really wasn't for Alia. I mean, it has nothing to do with what Marcia says.

02:49:07

**Q.** You say it is not for Alia? It's addressed to Alia and you say, "Alia" comma?

**A.** Yeah. I am saying that this e-mail is a response to the letter. But, yeah, okay.

02:49:21 **Q.** And you're talking about an agreement you had

directly with Marcia, aren't you?

**A.** Yes.

**Q.** All right. And the date you use in this e-mail is January 1, 2015, right?

02:49:32 **A.** That's the date that's in the e-mail, right.

**Q.** Right. Because that's the deal you had with Marcia.

**A.** Well, I don't know if that's the deal I had with Marcia or these dates are correct. I mean, they are dates.

02:49:47 **Q.** Well, that's what you put in the e-mail. That is all I am asking.

**A.** Yeah. That's what -- I can answer yes, that that's what I put in the e-mail.

**Q.** I mean, you had your own responsibility to be honest with Alia, didn't you? 02:49:58

**A.** Of course.

**Q.** I mean, you know that she had a duty to be honest with you; but you had the same duty back to her, didn't you?

02:50:07 **A.** Yes.

**Q.** You wouldn't send her an e-mail that was incorrect or dishonest, would you?

**A.** I don't think there is anything dishonest about it, no.

02:50:15 **Q.** Okay. And she was entitled to rely on that e-mail,

wasn't she?

**A.** Yes.

**Q.** I'm just going to put this on the timeline here, October 1 is when you respond. And we know from looking at the conflict waiver that you signed it on October 5th, right?

**A.** Right.

MR. SCHEXNAYDER: I'm not sure if I asked for Exhibit 6 to be admitted so I am asking at this time, please. I'm sorry. That was Exhibit 5, Defense Exhibit 5.

THE COURT: Any objection?

MR. BANES: No objection, Your Honor.

THE COURT: Defense 5 is admitted without objection.

BY MR. SCHEXNAYDER:

**Q.** Now, could you turn to Defense Exhibit 6, sir?

Does this e-mail look familiar to you? And it looks like a series of e-mails, so, if you could just look through all of them first.

**A.** Okay.

**Q.** Let's start with the last page, and I guess that would be the first e-mail in the chain. It's from Marcia Radel to Alia Wynne, copy to Ed Tweed, dated Thursday October 1, 2015. It says, "Alia, Ed and I just spoke, and

we are both in agreement to item 1, page 2, apportionment of fees and damages related to the lawsuit of the conflict agreement."

Do you recall seeing that e-mail?

02:53:04 **A.** What's -- do I -- do I remember? No, of course I don't remember. But it -- it's sent, so...

**Q.** Right. You don't dispute, do you, that you and Marcia spoke on October 1?

**A.** Well, I hadn't even -- I hadn't even signed the

02:53:32 conflict waiver.

**Q.** I understand. I'm just asking -- and she is saying she just spoke to you. I am asking, do you think that is right or wrong?

**A.** I'm trying to figure out how I -- how I signed a

02:54:08 conflict agreement on October 5th and this e-mail is October 2nd that said I mailed the signed agreements and check today to your attention.

**Q.** Yeah. And we are going to get to that one next.

**A.** Okay.

02:54:20 **Q.** But before we get to that one, I want to go with the first e-mail in the chain from Marcia where she says, "Ed and I just spoke."

You don't deny that, do you?

**A.** I don't deny that we spoke.

02:54:35 **Q.** Okay. And do you deny that -- what she says, "We are

both in agreement to item 1, page 2, apportionment of fees and damages"?

**A.** Page 2 is from Leslie to Alia.

**Q.** No. I am referring to the same e-mail, very last page.

02:55:03

**A.** Oh, I'm sorry.

**Q.** Yeah. I am still referring to what Marcia wrote in her e-mail. Okay?

**A.** It says, "Alia, Ed and I just spoke, and we are both in agreement to item 1, page 2, apportionment of fees and damages related to the lawsuit."

02:55:13

**Q.** You don't dispute that you spoke to her on October 1, do you?

**A.** I would have no idea.

**Q.** Right. And you don't dispute that you were both in agreement with that on October 1?

02:55:26

**A.** I don't dispute it.

**Q.** Okay. And there is some subsequent e-mails about you mailing back the agreement, and I think if you'll see, there is -- if you look at the second page of this chain of e-mails on October 5th, Leslie is e-mailing Alia.

02:55:43

You there?

**A.** Yeah.

**Q.** And she says, "Page 2 and 4 of the letter is missing." She says, "Can you resend with all pages and

02:56:01

then Ed can sign it"?
**A.** Right.
**Q.** Do you see that?
**A.** Yeah.
02:56:08 **Q.** So that is more in line with what we have seen now. October 5th, that is when you, in fact, did sign it?
**A.** Right.
**Q.** Okay. And then we see the very final e-mail on the first page of this exhibit, October 6, Leslie is e-mailing
02:56:27 to Alia Wynne saying "Sign the conflict letter attached," right?
**A.** Yes.
**Q.** Okay.

MR. SCHEXNAYDER: Your Honor, I would like to
02:56:35 move to admit Exhibit -- Defense Exhibit 6.

MR. BANES: No objection, Your Honor.

THE COURT: Defense 6 is admitted without objection.

BY MR. SCHEXNAYDER:
02:56:45 **Q.** Did you discuss this conflict letter -- conflict waiver with your wife Leslie?
**A.** Probably not.
**Q.** Okay. Does she work with the business?
**A.** She doesn't work for anything in the legal aspect of
02:57:00 it that I know of.

Q. All right. I just see her in some of these early e-mails transmitting documents and what have you so that is why I asked if you were working with her at all on this issue or -- does she have any substantive involvement in it?

02:57:14

A. No, not that I know of.

Q. Okay. Does she have another place of employment?

A. No.

Q. Okay. If you could turn to Exhibit 7, Defense Exhibit 7.

02:57:31

Do you recognize these e-mails?

A. It says "Marcia." Well, I would have done exactly what she told me here, to just skip over this.

Q. My question is: Do you recognize these e-mails?

02:58:36

A. No.

Q. All right. Do you deny that on October 16, Alia sent you and Marcia a copy of a draft answer?

A. No. I wouldn't do that. No.

Q. All right. And do you deny that on October 17, you responded, "Alia, I agree with what is written. Ed Tweed"?

02:58:55

A. Yes.

Q. You do dispute that?

A. No, I don't dispute it. No.

02:59:04

Q. Okay. That is you and that is your e-mail, right?

**A.** Yeah.

**Q.** Okay.

MR. SCHEXNAYDER: I move to admit Defense Exhibit 7.

02:59:10 MR. BANES: No objection, Your Honor.

THE COURT: Very well. Defense 7 is admitted without objection.

Counsel, is this a good stopping point for our afternoon break? Anything we need to take care of 02:59:23 before we break for the afternoon?

MR. BANES: There is a couple of things, Your Honor. I think I forgot to admit some exhibits earlier.

THE COURT: Well, you are going to get a chance to redirect this witness.

02:59:33 MR. BANES: I will do it then. That's fine.

THE COURT: Very well. 3:15.

THE LAW CLERK: All rise.

(Proceedings recessed from 2:59 p.m. to 3:15 p.m.)

THE LAW CLERK: All rise.

03:15:10 THE COURT: Please have a seat. Have a seat.

THE WITNESS: Yes, sir.

MR. BANES: Sorry, Your Honor. I was checking on a document.

THE COURT: Counselor.

03:15:33 MR. SCHEXNAYDER: All right, Your Honor. Just

a couple more questions.

BY MR. SCHEXNAYDER:

**Q.** If you could go back to Exhibit 8, sir. This is in the white notebook.

03:15:50 **A.** Yes.

**Q.** And we're back to the client service agreement with Veritas.

**A.** Uh-huh.

**Q.** Right, sir?

03:15:56 **A.** Yes.

**Q.** And one quick question about Section B, client's responsibilities. It is on page 3 of 5, I believe. It says, "client's Responsibilities, B."

Are you there?

03:16:12 **A.** Yes.

**Q.** And I think we have already established client is E & L, right, sir?

**A.** Yes.

**Q.** If you could look at Subpoint D, it says, "Client

03:16:20 will notify Veritas of any unusual wage and hour practices of client, such as an alternative work scheduled, split shift, shift differentials, et cetera, that might affect Veritas' employees," right? Again, that's -- you with me?

**A.** Yes. Yes.

03:16:36 **Q.** And that is a responsibility on E & L; is that

correct?

**A.** Yes.

MR. BANES: Objection; calls for a legal conclusion.

03:16:43 THE COURT: Just a moment.

**A.** Yes.

THE COURT: Just a moment.

THE WITNESS: Oh, I didn't know you were talking to me, sir.

03:16:48 MR. BANES: Objection; calls for a legal conclusion, Your Honor.

THE COURT: Sustained.

Rephrase.

BY MR. SCHEXNAYDER:

03:16:53 **Q.** Is that your understanding, that that's a responsibility of E & L transfer?

**A.** I have no objection to it.

**Q.** All right. And the next sentence says, "It is client's responsibility to ensure that all of its wage and 03:17:08 hour practices affecting Veritas' employees are in compliance with state and federal laws."

Do you see that?

**A.** Yes.

**Q.** And is it your understanding, again, that's -- when 03:17:19 it says "client," it is talking about E & L Transfer?

**A.** Right.

**Q.** Okay.

MR. SCHEXNAYDER: I will pass the witness.

THE COURT: Any redirect?

03:17:25 MR. BANES: Yes, Your Honor.

**REDIRECT EXAMINATION**

BY MR. BANES:

**Q.** Mr. Tweed, stay on that for a moment in Exhibit 8, Defendant's Exhibit 8.

03:17:36 **A.** Yes.

**Q.** Now, with respect to the day rate at issue in all these cases that we are talking about, was that -- was that your practice?

**A.** I had never paid day rates before.

03:17:45 **Q.** Well, did you come up with that idea?

**A.** No.

**Q.** Whose practice was it?

**A.** I believe it was in place in the building, and then Marcia continued it after she collected the -- after she collected her employees' pay stubs. 03:17:58

**Q.** So that was not something you came up with?

**A.** No.

**Q.** Now, I think you started to talk about it, but do you think Mr. -- Mr. Schexnayder was going through several provisions in the -- in the client agreement with -- 03:18:17

between Veritas and E & L.

Did you -- did you -- do you think that any of those provisions that -- did you believe that any of those provisions that required indemnity by E & L applied in any of these lawsuits, including Walker?

03:18:37

**A.** No.

**Q.** Why not?

**A.** Because it's past practice. I had never been -- it had never been brought up to me that I had done anything wrong in any of the other lawsuits. So, I mean, they were just continuing one right after another, and Marcia just kept paying them.

03:18:50

**Q.** Well, more importantly, leading up to the conflict waiver, did it -- any of those provisions that Mr. Schexnayder was trying to say now was your responsibility --

03:19:07

**A.** Right.

**Q.** -- did Mr. Ropollo talk to you about any of those?

**A.** I honestly don't ever think I ever talked to Mr. Ropollo.

03:19:17

**Q.** Did Ms. Wynne talk to you about any of those provisions and why you would be responsible instead of Veritas under this agreement?

**A.** No.

**Q.** Did she explain the agreement? Did she go through

03:19:25

line by line with -- in the agreement with you like we did today?

**A.** She never -- she -- she or Mr. Ropollo never discussed this agreement with me until today.

03:19:38 **Q.** I mean, what -- if you were -- if somebody is going to consult with you, what would you think -- what would you take that to mean?

**A.** If they were going to consult with me, I think they would be bringing an issue to me so that I could

03:19:51 completely comprehend and understand it.

**Q.** Did anyone actually sit down and talk to you about the conflict waiver, from Fisher & Phillips?

**A.** I never met anybody from Fisher & Phillips.

**Q.** Did anyone sit down and talk to you about the client

03:20:02 agreement itself?

**A.** No.

**Q.** Did anyone sit there and tell you what Ms. Radel was telling them about the client agreement?

**A.** Absolutely not.

03:20:12 **Q.** Did they tell you about what she was telling you about the conflict waiver and what she wanted in it?

**A.** No.

**Q.** So I think earlier on cross -- or on cross-examination you said leading up to the conflict

03:20:32 waiver that "I had no facts." What did you mean by that?

**A.** So that -- you know, I entered -- I got this call from this law firm that I knew that Marcia was working with, and they were asking me for money, a retainer. So I was expecting to get something out of it. And I kept waiting. And I still have yet to see any results from the work they did, if they did any.

03:20:51

As far as I know, they didn't do any work. I mean, there was -- there was a -- a copy on one of the invoices where they -- they billed me for ADP's -- doing work with ADP, but I don't see how -- I don't even know how that they would bill me for ADP's work on their invoice.

03:21:17

**Q.** Well, we are not here to -- we are not here suing them for malpractice, are we?

**A.** No. I'm just confused. I mean, you know, if they didn't do any work for me, they must have been charging me for work they were doing for somebody else is what I was concerned with.

03:21:28

**Q.** What is it that you're really concerned about with respect to this conflict waiver?

03:21:40

**A.** That I got no information out of it. I had no facts, no information. I was -- I was flying by the seat of my pants, and I thought I was going to get representation.

**Q.** I mean, did you feel like they were listening to you even when you were sending them e-mails?

03:21:53

**A.** No.
**Q.** All right. So, let's take a look at some of these e-mails that we were going through earlier.
Well, before I get to that, I think you testified on cross that you didn't really read the document, the conflict waiver, in detail?
**A.** That is correct.
**Q.** All right. Now, what did you expect the law firm to do?
**A.** I expected them to represent me wholly and keep me safe.
**Q.** Well, had they been representing you up to that -- up to that point?
**A.** I felt that they were.
**Q.** All right. Now, did they -- did you expect them to sit down with you and talk to you about the document?
**A.** What I expected was that something came -- there would be something that came out of me paying them, and I got nothing. I got no phone calls. I got a couple of e-mails. I gave them, I think 15, almost $20,000. And I might have had two -- two -- two phone calls from them, if I had two.
**Q.** And did you feel like they properly conveyed all the facts to you?
**A.** They didn't convey any facts to me.

**Q.** Well, do you think -- did you feel like they consulted with you on the content of the conflict waiver and told you what it meant?
**A.** No.
03:23:26 **Q.** I mean, at the -- in the final analysis, did you understand the conflict waiver?
**A.** All I understood about the conflict waiver was that Alia was going to cook up some kind of documents so that -- that I could be -- I didn't have to go out and get
03:23:46 another lawyer.
**Q.** I think you already testified that you didn't feel like you had a choice at that point.
**A.** Well, she said the clock is running out.
**Q.** All right. Now -- okay. Sir, can you turn to
03:25:14 Plaintiff's Exhibit 177 for a moment?
**A.** Do you need to stand up?
**Q.** Sorry?
**A.** Do you need to stand up?
**Q.** No, I am good.
03:25:29 **A.** Okay.
**Q.** You don't need to stand up.
**A.** Okay. 177?
**Q.** Yes, sir.
**A.** I am at 177.
03:25:40 **Q.** All right. Now, you testified about this on direct,

right?

**A.** Sure.

**Q.** All right. Now, first off, I want to --

MR. BANES: Your Honor, I would like to propose this document for admission.

03:25:50

THE COURT: Plaintiff's 177?

MR. BANES: Yes.

THE COURT: Any objection?

MR. SCHEXNAYDER: No, Your Honor.

03:25:58

THE COURT: Plaintiff's 177 is admitted without objection.

BY MR. BANES:

**Q.** Now, taking a look at the last sentence of -- of -- if that e-mail from -- to Marcia from you, what is it that you say in there?

03:26:26

**A.** It says, "We also discuss responsibility for costs associated with findings after January 1st, 2016."

**Q.** Now, is that what the conflict waiver had in it?

**A.** No. They put in there January 1st, 2015.

03:26:41

**Q.** All right. So they didn't follow your -- you know, what you wanted in there?

**A.** That's correct.

**Q.** Was that the only time they didn't do that?

**A.** Unfortunately, it was such a short period of time where I was involved with them, I really didn't have a lot

03:26:55

of recollection of what they were doing or weren't doing.

**Q.** Let's take a look at Defendant's Exhibit 5.

When Mr. Schexnayder was cross-examining you, he was saying that this was -- this represented the agreement. Now, what does this -- what does this say here?

**A.** Oh, it says -- which part are you asking about?

**Q.** "The only issue I see" -- "Alia, the only issue I see."

**A.** Yeah. It says, "Alia, the only issue I see, should there be damages, Marcia and I agree that E & L and I would be responsible for 50 percent of the damages after January 1st, 2015. Veritas would be responsible for 100 percent of the damages prior to that."

**Q.** Well, and is that how it ended up in the conflict waiver?

**A.** Yeah. It probably did because I put the wrong date down.

**Q.** Well, let's take a look at Exhibit 16.

I mean, did they -- do you remember them making you responsibile for only 50 percent of the damages after January 1st, 2015?

**A.** Do I -- say it one more time, sir.

**Q.** Do you remember you being responsible under the purported conflict waiver for only 50 percent of the

damages after January 1st of 2015?
**A.** You know, unfortunately, I'm just not clear on what the dates were. I mean, this is four years ago.
**Q.** Okay. Take a look at exhibit -- Plaintiff's Exhibit 16 for a second.
03:28:44
**A.** Okay. This is -- this is February of 2016. This is after I had ended my relationship with Veritas and we had taken on the employees.
**Q.** Are you in Plaintiff's Exhibit 16? You're in Defendant's Exhibit 16, sir.
03:29:09
**A.** Okay.
**Q.** It's in Volume 1 of the black books.
**A.** 16?
**Q.** 16.
**A.** Okay.
03:29:29
**Q.** So -- all right. So take a look at apportionment of fees and damages related to the lawsuit on page 2.
**A.** Yes.
**Q.** It says -- the second paragraph, can you just read that to yourself for a minute, sir?
03:29:50
**A.** Okay.
**Q.** So we already saw in your September 18th e-mail that you were -- you were saying that they are going -- that Veritas should be responsible for -- for back wages after January 1st, 2016.
03:30:17

**A.** That's correct.

**Q.** So you communicated that.

And then in this e-mail, you communicated that assuming there could be an agreement at this point, that E & L would be responsible for 50 percent of the damages after January 1st, 2015.

Now, looking at the second paragraph on page 2 of the conflict waiver at Plaintiff's Exhibit 16, are either of those things in there?

**A.** I don't -- I don't see them there, no.

**Q.** All right. So if there was any agreement with -- if there could be an agreement with Ms. Radel, it is certainly not represented in the conflict waiver?

**A.** That's correct.

**Q.** And after the discussion with Ms. Wynne, did you feel -- did you feel like you had free rein to agree to what you wanted?

MR. SCHEXNAYDER: Objection; vague.

THE COURT: Overruled.

**A.** After the discussion with Alia Wynne, I felt that they were going to steer me in whatever direction they wanted to to get this done as quickly as possible.

BY MR. BANES:

**Q.** All right. So did you feel like you had much discretion at that point?

**A.** No.

**Q.** And from this it doesn't look like they followed your direction at all.

**A.** That's correct.

03:32:45 MR. BANES: Your Honor, did we already admit 5? I think we did.

THE COURT: Which 5?

MR. BANES: Did we already admit 5, sir?

THE COURT: Which 5?

03:32:51 MR. BANES: Defendant's Exhibit 5.

THE COURT: Defendant's 5 is in evidence.

MR. BANES: Okay. Thank you, Your Honor.

Okay. Your Honor, I wanted to go back and propose for admission a few documents.

03:33:17 First of all, 197, Plaintiff's Exhibit 197. It is confidential, so it is not -- it's subject to protective order.

THE COURT: You are about to enter it on the record in a public trial, though.

03:33:36 MR. BANES: Well, I don't really want to do -- I want to do that under seal if we can, if we can seal that particular document, because it is confidential.

THE COURT: Under -- you said subject to a protective order in this case or another case?

03:33:52 MR. BANES: This case, Your Honor. It is

confidential in this case. It is sealed in this case. So it's already in the record.

THE COURT: Not between you two parties. There is another party, evidently, that --

03:34:02 MR. BANES: No, they have -- well, they have it, too. So they have seen it.

THE COURT: No, no. That is not my question.

MR. BANES: All right.

THE COURT: It says a confidential settlement

03:34:10 agreement. As to the parties to the settlement agreement, it is not two of you, obviously. It must be other parties. And what you're proposing is to enter onto the record for purposes of this trial the confidential settlement agreement of other parties.

03:34:25 MR. BANES: Well, but only -- now, it's -- we have already released it to Fisher & Phillips, so they have seen it. So, I am -- all I am proposing is that it not be allowed outside these proceedings or, you know, be released to third parties outside the parties to this lawsuit,

03:34:42 because it's been released to everybody here.

THE COURT: Counselor?

MR. SCHEXNAYDER: No objection, Your Honor.

THE COURT: I'm sorry. That was 198?

MR. BANES: 197, Your Honor.

03:35:01 THE COURT: I'm sorry. 197 is admitted under

seal --

MR. BANES: And then --

THE COURT: -- without objection.

MR. BANES: 198, Your Honor, Plaintiff's Exhibit 198.

03:35:35

THE COURT: 198 is already in evidence.

MR. BANES: Oh, it is already in? 200 and 201.

MR. SCHEXNAYDER: No objection.

THE COURT: Plaintiff's 200 and 201 are admitted without objection.

03:35:59

Counselor, are you using your phone?

MR. BANES: I am trying to get the answer on that document, Your Honor.

THE COURT: Well, don't use your phone in the courtroom, Counselor.

03:36:07

MR. BANES: I'm sorry, Your Honor.

Can I -- can I just take a quick break on 1 -- Exhibit 19 --

THE COURT: We just came from a break, Counselor.

03:36:19

MR. BANES: I know, Your Honor. I called her and I asked her to text me to see if that one document that we were trying to figure out was out of order or not is in the correct order.

03:36:29

THE COURT: We can do that at a later time.

MR. BANES: Okay. Well, I have confirmed that it is -- that is the proper order.

THE COURT: Okay. It -- the order that it is currently in the notebook?

03:36:39 MR. BANES: Yes, Your Honor.

THE COURT: That objection is still sustained. What is next?

MR. BANES: All right.

THE COURT: Anything further, Counselor?

03:37:50 MR. BANES: Just one last question, Your Honor.

BY MR. BANES:

**Q.** Turn to Defendant's Exhibit 6, Mr. Tweed.

**A.** Defendant's number what?

**Q.** 6.

03:38:08 **A.** Okay.

**Q.** I just want you to elaborate, Mr. Tweed, on -- you signed the conflict waiver, and we have seen that.

**A.** Yes.

**Q.** But what was that agreement, based upon your view, that did not happen?

03:38:18

**A.** Well, I wasn't informed of anything. So I had -- I had no knowledge of really why I was being entered into this other than needing to pay. So, at that point, I felt -- I felt that I was, in my opinion, along for the ride of the trial and that -- that they would have --

03:38:48

because I thought that's what -- that's what the law was, was to -- to receive compensation and properly administer the law. And I didn't -- I didn't -- I waited for -- to see if some of that happened, and all of a sudden they were gone. There was nothing except for cancelled checks.

03:39:15

So, I thought they had a fiduciary responsibility to give me benefit for the money that I gave them.

**Q.** I mean, did you -- do you feel that the -- did you feel that the conflict waiver was based on full disclosure to you?

03:39:32

**A.** Absolutely not.

**Q.** Why do you say that?

**A.** Because -- because nobody counseled me. There was no this is what -- this is what's right. This is what's wrong. This is what could happen. There was -- you know, I was paying them as -- my thought was that I was paying them as my lawyer and that they had my back, that they would explain to me what everything meant. I am not a lawyer.

03:39:42

03:40:02

MR. BANES: Pass the witness, Your Honor.

THE COURT: Any recross?

MR. SCHEXNAYDER: Just a few questions, Your Honor.

Point of clarification in housekeeping, I

03:40:13

referred in my cross to Plaintiff's Exhibit 163. I want to make sure to offer that into evidence.

THE COURT: Plaintiff's 163. Any objection?

MR. BANES: All of it or just part of it, Your Honor?

03:40:45

THE COURT: He seems -- he has offered all of it.

MR. BANES: Well, I don't know if we have laid a foundation for all of it.

03:40:51

THE COURT: So you have a legal objection?

MR. BANES: Yes, Your Honor.

THE COURT: Okay. What is your legal objection?

MR. BANES: Well, there's -- there is only one here where Mr. Tweed's copied on it. The rest of them, I don't think he was copied on at all, and so I don't -- I am not so sure --

03:40:58

THE COURT: Very well.

Counselor, your response?

03:41:08

MR. SCHEXNAYDER: It's a series of e-mails beginning with an e-mail that Mr. Tweed was copied on and his wife and his agent of service. I -- I guess we could redact the other two e-mails that are attached to it even though they're pretty inconsequential.

03:41:27

THE COURT: Which e-mail are you seeking to

have introduced through this witness? Was it the second page?

MR. SCHEXNAYDER: The second page was really the one -- frankly, that's all I care about.

03:41:40 THE COURT: Any objection to that page?

MR. BANES: Well, apart from the question, since it is not asked of Mr. Tweed, I don't have any objection to that.

THE COURT: The second page, document numbers

03:41:57 6 -- it's Exhibit 693A, and it will be Bates Number 6973, is admitted without objection.

MR. BANES: 163A, Your Honor?

THE COURT: I am calling it 163A since it is a subpart of the original exhibit.

03:42:15 MR. BANES: Okay.

MR. SCHEXNAYDER: Thank you, Your Honor. Just a couple more follow-up questions for the witness.

**RECROSS-EXAMINATION**

BY MR. SCHEXNAYDER:

03:42:22 **Q.** Mr. Tweed, did I you understand you to say that after you signed the conflict waiver you had no further communication with Fisher & Phillips?

**A.** Not that I recall.

**Q.** All right. If you could pull out exhibit -- my white

03:42:36 exhibit notebook and turn to Defense Exhibit 11.

Do you recognize this e-mail exchange between you and Ms. Wynne dated May 30, 2016?

THE COURT: Do you have an objection, Counsel? You're standing.

03:43:03 MR. BANES: Oh, I'm sorry, Your Honor. I'm sorry.

**A.** Well, I think that what happened here, as I understand it, was that Marcia asked me to request -- she asked -- she asked me if I would go to DHL or to -- I

03:43:58 think the company's name at the time was Geotabs -- and retrieve information that she wanted to use for the trial -- or for the -- for the cases.

**Q.** Okay. Sir, my question is, does this refresh your recollection that you were communicating directly with

03:44:16 Ms. Wynne, Alia Wynne, on May 30, 2016 regarding the case?

**A.** Yeah. I didn't say I didn't have any response, but I did say that I -- I had minimal or none that I was familiar with, right. That's correct.

**Q.** Well, I mean, I can go through each one of the

03:44:35 subsequent exhibits here that show that you had e-mail communications with Fisher & Phillips. So I want to make sure you're not saying under oath you had no communications with Fisher & Phillips after the conflict waiver.

03:44:45 You are not saying that, are you, sir?

**A.** No.

**Q.** And at any time did you contact them to find out what was going on in the case and they refused to answer?

**A.** No.

03:44:55 MR. SCHEXNAYDER: I'll pass the witness.

THE COURT: Sir, you may step down.

Mr. Banes, call your next witness.

MR. BANES: I would like to call Fisher & Phillips to the stand, Your Honor, through its corporate representative, Mr. Ropollo.

03:45:22

THE COURT: Mr. Ropollo.

THE WITNESS: Your Honor, may I bring water up?

THE COURT: You may. If you will stand next to the witness stand, face the clerk and raise your right hand.

03:45:44

(Witness sworn.)

THE WITNESS: I do.

THE LAW CLERK: Thank you.

THE COURT: And, sir, if you will pull the mic a little bit closer to you.

03:46:00

And, Counselor, I assume you are aware the court reporter cannot take down two people talking at once. Please allow the lawyers to finish their question before you begin your answer. I'll make sure they extend to you that same courtesy. Understood?

03:46:15

THE WITNESS: Yes, sir.

THE COURT: Very well.

Counselor.

MR. BANES: Thank you, Your Honor.

03:46:44

**STEPHEN JOHN ROPOLLO,**

duly sworn, testified as follows:

**DIRECT EXAMINATION**

BY MR. BANES:

**Q.** Mr. Ropollo, could you please state your full name and current job for the record?

03:46:41

**A.** My name is Stephen John Ropollo, and my current position is regional managing partner for Fisher & Phillips in Houston.

**Q.** Are you here to speak on behalf of Fisher & Phillips today?

03:46:54

**A.** I am.

**Q.** Mr. Ropollo, can you please turn to Plaintiff's Exhibit 16?

**A.** I have it.

03:47:22

**Q.** All right. Now, Mr. Ropollo, did you ever talk to Mr. Tweed about this document?

**A.** I did not personally. No.

**Q.** Do you know if Ms. Wynne ever personally sat down with Mr. Tweed and went through this document with him?

03:47:39

**A.** I don't know that.

**Q.** Was there any other conflicts or potential conflicts discussed with Mr. Tweed other than what is contained in Exhibit 16 at the beginning of the representation?

**A.** No. All the material factors that go into deciding whether joint representation could be accomplished in this case were included in the letter.

03:48:07

**Q.** All right.

MR. BANES: Strike a portion of that as -- move to strike a portion of that as nonresponsive.

THE COURT: Just a moment. Overruled.

03:48:21

BY MR. BANES:

**Q.** Okay. Mr. Ropollo, you say that everything that needed to be in it was in it at the time?

**A.** Yes.

**Q.** All right. And is that your position here today?

03:48:35

**A.** It is.

**Q.** Now, in Fair Labor Standards Act law -- what is your background generally? What kind of law do you practice?

**A.** So, I have been a labor and employment lawyer since 1990.

03:48:55

**Q.** All right. Now -- and now you manage labor and employment lawyers?

**A.** In addition to practicing labor and employment law, yes.

**Q.** All right. And was Ms. Wynne hired as a labor and

03:49:05

employment lawyer at Fisher & Phillips, too?

**A.** She was.

**Q.** Now, Fair Labor Standards Act cases, are those cases always limited to just the -- suing the companies by plaintiffs?

03:49:20

**A.** Meaning the companies that employ the individuals?

**Q.** Yes.

**A.** Liability can be extended under the Fair Labor Standards Act to joint employers, to owners, managers of businesses who are involved in setting the pay practices of the -- of the entity. So there are -- there is potential liability for others besides just the single company.

03:49:39

**Q.** So there is potential liability for, say, the owners of the companies or the presidents or officers of the companies that are sued?

03:49:54

**A.** There can be, yes.

**Q.** Was there potential liability for the owners and officers of the company sued in this case, in Walker?

**A.** If the plaintiffs were able to demonstrate that the violations occurred and that the entities that you're referring to were responsible for them, then, yes, the owner of the entity could also be designated an employer under the statute.

03:50:05

**Q.** Was that -- was that issue with respect to Ms. Radel

03:50:23

discussed with Mr. Tweed?

**A.** I don't understand your question.

**Q.** Well, the conflict -- Exhibit 16 isn't signed by Ms. Radel individually.

03:50:36 **A.** She wasn't sued individually. She wasn't named an individual party as Mr. Tweed had been.

**Q.** But isn't the goal of a conflict letter to not only -- not only list actual con -- you know, potential -- all potential conflicts?

03:50:53 **A.** I think all potential conflicts between the parties that you're seeking to represent ought to be included in the -- in the waiver letter.

Here there were three entities that had been sued, and so those were the entities that we believed 03:51:06 ought to sign the waiver of conflict letter, and that is who did.

**Q.** Well, and you didn't think there would be any adverse consequences by those that might be liable being excluded from it?

03:51:19 **A.** No. I -- there could have been any other number of entities that might be liable that I wasn't familiar with. I -- the only reasonable entities to sign a conflict letter, in my view, are the entities that are -- that are -- you are going to represent in the litigation, and 03:51:37 that's why we included those.

**Q.** Well, in Fair Labor Standards Act litigation, it would extend to those that were the officers of the companies that were responsible for setting the pay policies, wouldn't it?

03:51:53 **A.** If that were the case, then in every conflict letter, I would have to have every manager of every employer or potential employer sign a waiver letter like that, and I just don't think that is reasonable or required under the rules.

03:52:05 **Q.** Well, in this case you just decided that having Ms. Radel sign it wasn't -- wasn't necessary.

**A.** Because she wasn't a party. That's right.

**Q.** All right. And was that the only reason you decided not to have her sign it?

03:52:17 **A.** That was the only reason. Had she individually been named as a party, then she would have -- we would have drafted a separate letter to have her sign as well.

**Q.** Sir, can you turn to Exhibit 141, please, Plaintiff's Exhibit 141?

03:53:37 **A.** I am there.

**Q.** Can you identify this document for the record, sir?

**A.** It's a multipage document, an e-mail chain that begins on August 28th, an e-mail from Dave Moulton, the lawyer in the Bellard case, against Veritas, to Alia, me and my assistant, Michelle Bennett. And then he

03:54:14

apparently is copying a person in his office as well, and it is enclosing Rule 26 disclosures.

And then there are a series of other e-mails that follow relating to the Bellard case and referencing the disclosures.

And then finally on August 31, there is an e-mail from Alia to me and Ms. Radel relating to a video that was being provided to Ms. Radel of Mr. Tweed discussing pay practices with the employees at E & L that had been provided to us by Mr. Moulton in that litigation.

And then I can go on towards the front of the packet. Do you need me to continue?

**Q.** No. I think that is good enough for now. Let's talk a little bit about the prior cases.

You're familiar with the Ozen and the Mason cases and the Emerson and Bellard and all those lines of cases? You are familiar with all of those, aren't you?

**A.** I am familiar with them, yes.

**Q.** All right. Now, were they the same type of case?

**A.** They were each Fair Labor Standards Act cases, each asserting roughly the same theory of liability. They involved different individuals. Only the Walker case was filed as a collective action and was pursued as a collective action. And the parties were not always the

same. Ozen, Bellard, and -- Ozen, Bellard, and I can't remember the third one, were all against Veritas. And then against Mason, it was Mr. Tweed and E & L Transfer. And then as to the Walker case, it was both.

03:56:22 **Q.** Did you think that there was always potential liability for both E & L and Veritas in any of those cases?

**A.** Yes, I did.

**Q.** Did you think that there was also potential liability for Ms. Radel and Mr. Tweed in any of those cases? 03:56:32

**A.** I thought there was liability under the Fair Labor Standards Act. None of -- Ms. Radel had not been sued, so I don't make it a practice to hypothesize on potential liability of unnamed parties.

03:56:49 But with respect to those who had been named, yes, I was concerned about violations of the Fair Labor Standards Act based upon the pay practices that had been described to me.

**Q.** All right. Now -- and historically -- on all those cases, who was handling those cases from the companies? 03:57:05

**A.** From the companies?

**Q.** Yeah. From -- between Veritas and E & L, who was handling them?

**A.** I'm not sure I understand what you mean by "handling." 03:57:18

**Q.** Who did you -- who was your point of contact?

**A.** I understand.

Marcia Radel was the person that I primarily discussed the matters with, but there were also circumstances when I had to speak with employees -- or rather supervisors on-site, including Tom Dixon, and there may have been one or two others.

03:57:30

**Q.** All right. So -- and the managers on-site were also Veritas employees?

**A.** Now, you're using the term "employees" in a way that is a little imprecise. If you mean under the Fair Labor Standards Act, the definition of employer and employees is a little bit different. So I'm not sure you want me to get into that. But --

03:57:47

**Q.** All I am asking really is who were they paid by?

03:58:07

**A.** They -- they were paid -- the checks came from ADP, which is the paycheck company. And as I understand it, Veritas was the one that at least initially funded the payments that -- that paychecks made -- or rather that ADP made.

03:58:27

**Q.** Well, during -- up through Bellard, there -- Veritas was the one funding all those payments, right?

**A.** As far as I knew. I didn't know anything about what was going on behind the scenes. All I knew was that if there was a settlement of any of these matters, I would

03:58:39

receive checks for the settlement and for attorneys' fees for the plaintiffs and then forward them on to the plaintiff's counsel, and I would get them from Veritas.

**Q.** Well, at what point did you -- did you advise Ms. -- well, when -- when Mason and Ozen were filed in February of 2014, did you advise Ms. Radel on that?

**A.** On the risks associated with those cases?

**Q.** Yes.

**A.** Yes.

**Q.** All right. And what did you tell her at that time?

**A.** That they were exceeding -- there was an exceedingly high chance that there was potential liability in light of the day rate pay plan that had been in place with these employees.

**Q.** Now, do you know if -- did you discuss that with Mr. Tweed at that time?

**A.** No.

**Q.** Did anyone at Fisher & Phillips discuss that with Mr. Tweed?

**A.** No.

**Q.** All right.

**A.** Not to my knowledge. I can only speak for myself, but not that I am aware of.

**Q.** Did Ms. Radel -- did Ms. Radel express some concern about your advice with respect to the day rate?

**A.** I think that -- I received an e-mail from Ms. Radel just a month or two after we began working on those two cases, and she indicated that essentially Ed Tweed needed some convincing that my advice that the day rate was problematic, I needed to provide some -- some guidance or backup, an e-mail or something, because he was going to speak with DHL, and they just simply didn't believe that the day rate was problematic.

So I put together an e-mail with the advice. I addressed the motor carrier exemption and its likely inapplicability. I discussed what the potential damages were, and that was fairly soon after the lawsuits were filed.

**Q.** Did Ms. Radel also express surprise to you because of some advice she said she might have gotten from ADP?

**A.** I think that she, like many clients, especially in the wage/hour area, expressed dismay that common sense doesn't prevail and that you can't just do what makes -- what the employees want, there would -- everybody agrees to. And so that was frustrating to her. And she did mention that it was inconsistent with her understanding of how it ought to be done and that ADP, that was processing the payroll, never told her that it was a problem.

**Q.** Well, did she -- did she also tell you that -- that she got the advice about the day rate from ADP?

**A.** I am not sure she ever characterized it as advice. I think what she said was that she expected, given that she was paying money to ADP, that if there was an issue about any Fair Labor Standards Act question, that they would bring it to her attention because they were a big company.

04:01:44

**Q.** Did that -- did that advice that she gave to Mr. Tweed, based on what she had heard from -- or coordinated with ADP on, did that have -- did she tell you that that had any impact on her decision to indemnify E & L or Mr. Tweed on the prior -- on the cases prior to Walker?

04:02:08

**A.** No.

**Q.** She never told you that?

**A.** No.

04:02:36

**Q.** All right. Now, turn back to Exhibit 141, Mr. Ropollo.

**A.** I am still there.

**Q.** All right. Turn first to the e-mail from Alia to you on August 31st, 2015, at 2:58, at FP012082.

04:03:01

**A.** Could you give me the Bates number again?

**Q.** FP012082, sir.

**A.** Okay. I am there.

**Q.** Take a look at the paragraph at the bottom where it says, "Finally."

04:03:19

**A.** Yes.

**Q.** All right. Now, do you remember -- first off, do you remember this e-mail?

**A.** From Alia to -- it's really from Alia to Marcia. I am listed in the "To" line, but she is conveying all of this information to Marcia. And, yes, I do remember seeing it.

**Q.** So this is authentic and this happened?

**A.** This e-mail did happen just the way it says it did.

**Q.** All right. So -- and did she advise Ms. Radel at that time that she should notify Ed about the collective action?

**A.** So the -- as I understand it, yes, she did do that. We had just learned that the collective action was filed through the case service that we receive from the courthouse indicating that Mr. Tweed and E & L Transfer had been sued by Walker in a collective action.

And that was the only genesis of communicating with her about it. She didn't reach out to us. We kind of told her, "Hey, this is out there."

**Q.** What was Ms. Radel's response to that in the e-mail subsequent?

**A.** I mean, I -- in the e-mail up top?

**Q.** Yes.

**A.** Well, she refers to being able to review the video and she will look at it more -- in more detail. And then

she asks, "Why would it be my responsibility to notify Ed of the Walker collective action? Doesn't Walker's counsel need to make sure Ed is served? Is the default against Veritas? We may need to talk tomorrow. I have a 10 a.m. conference call but can be available after that. Let me know a good time for you."

**Q.** Did this give you any concern about whether there might be a potential conflict already with -- between Veritas and E & L?

**A.** No. The lawsuit had not been served on either party. As far as I knew, at the time Veritas had not been named to the suit. So if -- all this is suggesting is that -- that, you know, Mr. Tweed would likely be retaining his own counsel.

**Q.** Well, you have represented Mr. Tweed on the prior cases. Did you feel any obligation to him here?

**A.** I had only represented Mr. Tweed on the -- on the Mason case. That was the only case in which he was a named party. And so as the engagement letter indicated, once we resolve the matter for -- for a client, unless they specifically retain us for either ongoing general advice or a specific new matter -- and I think in the -- in the engagement letter, I specifically mentioned a wage/hour audit or something like that -- then we would essentially disengage. And that is what happened with

respect to Mr. Tweed and -- you know, after the Mason case was resolved.

**Q.** Well, let me ask this: Was there any -- was there any break in time between the Mason and Ozen case and the Walker case that a day rate was active and ongoing with you on one of these cases? Wasn't it -- weren't they -- wasn't there at least one of them filed and active and working on -- you were working on all of them at any given time?

**A.** Right. But they weren't involving Mr. Tweed or E & L as defendants. So, if you're asking me whether I was representing him on these other cases, my answer is, from the moment that we resolved the Mason litigation until the time when he retained us to represent him in Walker in this -- this joint arrangement, we were not representing him directly. He was a material witness certainly because he had information related to these lawsuits against Veritas, but he wasn't sued.

**Q.** Well, but he was sued on Walker.

**A.** Yes. Like I said, up until Walker, when we began working for him after he signed the engagement letter, that's when we began. We renewed, essentially, a legal -- an attorney/client relationship with him and his company at that time.

**Q.** And through doing these cases, did you come to

understand what the relationship between Veritas and E & L was?

**A.** Yes.

**Q.** At what point did you understand that?

04:07:46 **A.** From the very first case.

**Q.** Did you understand that Veritas was hired to do outside HR and staffing for -- for these contracts?

**A.** Yes.

**Q.** All right. Did you understand that Veritas was

04:08:01 E & L's only client?

**A.** I did not understand that at the time.

**Q.** Did you inquire about that or talk to Ed or Ms. Radel about what implication that might have, if they were the only -- if they were the sole -- if Veritas was -- was --

04:08:19 well, if E & L was Veritas' only client?

**A.** I didn't have any reason to suspect that. I didn't inquire about it, and I'm not sure it would have mattered.

**Q.** Well, ultimately that did matter in the case, didn't it?

04:08:39 **A.** No.

**Q.** It didn't matter?

**A.** The fact that the --

**Q.** It didn't matter when they stopped doing business together and Ms. -- Ms. Radel decided to shut down Veritas

04:08:47 because of that? That didn't matter at all?

**A.** Well, those are two different things.

If you're asking me whether the -- the decision not to do business with -- with your client had any bearing on any conflict issues or how -- why we eventually decided to withdraw, the answer is no.

With respect to the dissolution, though, of the company, when Veritas said it was not going to be able to meet its financial obligations under the conflict waiver letter and the apportionment deal contained in that, then, yes, that was a real problem because we had a real conflict then that could not be waived, and we needed to withdraw.

**Q.** Did you understand that the reasons you couldn't meet her financial obligations was because she shut Veritas down after the -- after E & L and her separated?

**A.** Again, those are -- those are two different things you're conflating.

The dissolution, shutting down the company, was a direct issue and very material. Stopping the business with -- with, you know, your client might not have had any bearing on it. I don't know what their capital situation was like. I don't know whether they were going to be in a position to, you know, pay for ongoing legal fees or satisfy a judgment just through its own capital reserves. I just don't know. And so just

stopping doing business with your client would have been a nonstarter for me. It wouldn't have made a difference.

**Q.** Well, when you're investigating a conflict waiver, isn't it important to understand the relative positions of the parties so that you can advise them intelligently?

**A.** Well, I don't know what you mean by "relative positions."

**Q.** Well, here, with Veritas being -- having a single client and it being its only stream of income, wouldn't that be important for the inquiry?

**A.** No. I don't believe so. I mean, from my perspective, the relevant inquiry is whether there are any conflicts that the two parties have with respect to the claims that have been asserted.

The -- whether -- as I heard earlier today, Mr. Tweed was getting ready to fire Marcia or Marcia was getting ready to fire Mr. Tweed. That really would not have made any difference in terms of what we disclosed in this process.

**Q.** Well, isn't that just half of the inquiry, about whether there is a direct conflict between the two? Isn't the other part of this that -- whether your representation would be limited because of your representation of other parties? Isn't that part of the inquiry here, too, or because of your inability to disclose certain things?

**A.** I don't understand your question.

**Q.** Well, that's the other half of that same conflicts provision, isn't it? Whether your -- whether your ability to adequately represent all the clients and disclose -- and fully disclose things to them, that's part of the inquiry, isn't it?

**A.** I would agree that in determining whether or not a lawyer can represent two parties, he must satisfy himself that he can represent both effectively and also disclose to those parties any material facts that need to be determined and their making the decision to go along with it.

**Q.** Well, let's take a look at the e-mail of September 1st, 2015, sir, at FP012081 in Exhibit 141.

**A.** Yes, I am there.

**Q.** All right. Can you read the second sentence of that e-mail to Ms. Radel from Ms. Wynne?

**A.** So Alia e-mails Ms. Radel and says, "I" -- the first sentence says, "I don't mean to suggest that you are legally obligated to contact Ed, but it might be a good idea so he knows that he needs to hire counsel on his own. Steve suggested that Ed might mistakenly believe that Veritas is going to handle this suit because it handled the previous FLSA actions."

**Q.** Does that refresh your recollection of whether you

had discussed that Veritas had covered the prior actions and that Ed might believe that the same would be appropriate here?

**A.** No. I am hypothesizing about what Mr. Tweed might think. I mean, I -- the reality is that I had no discussions with him about any of the previous settlements in terms of the numbers, how much it ought to be settled for, whether to settle. I did know that Marcia was taking the lead in handling those cases and deciding -- making decisions about them.

**Q.** All right. And you were copied on this e-mail to Ms. Radel?

**A.** On September 1st? Yes, I was.

**Q.** Did you pipe in or say anything else about this issue?

**A.** I don't believe so. Not right away at least. Not in this chain.

**Q.** All right. Now, turn to the e-mail that starts at FP12078, sir.

**A.** So the first page of the exhibit?

**Q.** Yes, sir.

**A.** Yes.

**Q.** All right. Now -- now, were you -- was Fisher & Phillips already advising Ms. Radel at this point?

**A.** Yes. And Bellard was an ongoing matter that had not

been resolved. We were actively representing her in that case.

**Q.** Were you also representing her on Walker?

**A.** I would say that we weren't representing her yet in that case because she hadn't signed an engagement letter. And she had not, as I understand it, at that time, been named as a party. So we didn't believe there was any need to represent her in the Walker case.

04:14:57

**Q.** Well, it says, "Basically, she wants us to tell her if she should agree to cover the lawsuit like she did with the previous E & L ones."

04:15:13

Do you see that part?

**A.** Can you direct my attention to it?

**Q.** The first sentence -- or second sentence where it says, "Steve," and it's to you from Alia on that September 9th e-mail.

04:15:24

**A.** I see it, yes.

**Q.** All right. So, do you remember being asked that by Alia, Ms. Wynne?

**A.** I mean, I can -- I see the statement here, that she's relaying to me that Marcia is asking essentially us together if we should -- if she should agree to cover the lawsuit like she did with the previous E & L ones. But, we didn't agree to provide that advice. We did not tell her that she should or shouldn't.

04:15:37

04:15:59

**Q.** Well, the next sentence says, "She said she is not contractually obligated to do so." And then it says, "I told her that I don't see a legal obligation to become involved at this point."

04:16:12 So wasn't she -- wasn't Ms. Wynne already giving her advice about that?

**A.** I think Ms. Wynne was advising someone who was not yet a party to a lawsuit about whether she had a legal obligation to be involved in it. And I think correctly

04:16:29 she told a nonparty, "You don't have a legal obligation to answer or otherwise be involved in the case until you are served."

**Q.** Well, she said this before she even looked at the agreement between Veritas and E & L, right?

04:16:41 **A.** Well, I don't know the timing of her looking at that -- that agreement. I know that she is relaying her -- her client's observation or opinion that she's not contractually obligated to do so.

**Q.** Did anyone talk to Mr. -- did you even try to reach

04:17:00 out and talk to Mr. Tweed at this point to see if what she was saying was right?

**A.** I did not speak with Mr. Tweed. I was not actively involved in any of the client relations at this point, although I was copied on most of this correspondence.

04:17:14 **Q.** Did you tell Ms. Wynne that she should reach out and

confirm that what Ms. Radel was telling her was correct?

**A.** Which specific parts of what she's telling her?

**Q.** Well, any of that in that paragraph.

**A.** That -- no. Until -- until we had a -- an attorney/client relationship in the Walker case with Mr. Tweed, I didn't believe that there was any need to go forth and talk to him about -- about any of this.

I think that I was familiar with the relationship between these two entities, but I did not believe that there was any obligation at this point since we hadn't been retained by either to represent them in this case. And -- and service may have just occurred. The -- I didn't think it was necessary to do either.

**Q.** Well, then she goes on and she says, "I think she understands that it is the" -- "that Walker is the same as Bellard with respect to the violations that predate January 2015."

Did you understand what she was talking about there?

**A.** Well, she may be talking about the difference being that one is a collective action, Walker; and Bellard is not. It is just a multiplaintiff handful of individuals.

But she goes on and she talks about -- she is saying she feels it unfair because she told Ed to stop paying a day rate and because he decided to rehire Walker

after he was fired for falsifying documents.

You know, from my perspective, those aren't legal reasons to feel something is unfair. But if she feels it is unfair, that is how she feels.

04:18:58 **Q.** Well, did you tell Ms. Wynne she ought to verify that allegation from Ms. Radel before we did -- before you did anything here?

**A.** Verify what allegation? The allegation about stopping paying a day rate?

04:19:11 **Q.** Yes.

**A.** I believe she had sufficient information from Ms. Radel. There may have been a document that she was provided about the day rate issue.

Ultimately, though, as this progressed 04:19:26 over the next two weeks, it was evident to us that there was ongoing discussions between Mr. Tweed and Ms. Radel about working out what the potential liability would be for each party. And once we became aware of that, then we focused on just memorializing that provision in the 04:19:45 agreement.

**Q.** Well, we were going over some of those documents earlier. Where were you getting this information about who was -- who -- about what the agreement was?

**A.** We would get information from Ms. Radel about what 04:20:01 the agreement was, and then we would send it to both

 parties. And if one or the other had a question about what was in there, they would, as Mr. Tweed did at least once, relay what his opinion was about what ought to be in the agreement.

04:20:16 **Q.** Well --

**A.** And then they would continue to discuss it. And then once they ultimately had a -- an understanding, then they both signed it.

**Q.** Well, you never talked to Mr. Tweed and confirmed that, did you? 04:20:27

**A.** I did not personally talk to Mr. Tweed. I know that Alia spoke with him once on the 16th of September.

**Q.** Well, Ms. Wynne didn't really confirm that that was Mr. Tweed's understanding by talking to him either, did you? 04:20:40

**A.** No. We understood it was Mr. Tweed's understanding by his e-mail and by his acceptance of the agreement and his signature.

**Q.** Well, there are at least two e-mails that we were talking about with Mr. -- Mr. Tweed on cross where there wasn't an agreement, obviously, at least not the one that was in the -- on the purported conflict waiver. 04:20:51

**A.** No. I think that is mischaracterizing it.

I think what you see there with those e-mails is a back and forth that is going on between two 04:21:08

04:21:25 04:21:41 04:21:52 04:22:00 04:22:13

business people about what the deal ought to be. Ultimately, we were advised by Ms. Radel that the deal had been reached and the form that ultimately was, you know, clarified and included in the agreement. We sent it to both parties. I -- presumably, if Mr. Tweed believed that there had not been an understanding reached with Ms. Radel, as included in the agreement, then he would have let us know, as he already had, but he didn't. He signed it, and he sent it back, and we provided to operate under that -- that understanding.

**Q.** Well, did you ever -- did you ever do anything to confirm that Mr. Tweed understood it?

**A.** I read his signature, yes.

**Q.** All right. Did you do anything else to confirm that Mr. Tweed understood it?

**A.** I didn't have a conversation, if that's what you mean.

**Q.** Did you direct Ms. Wynne to do anything else other than just read his signature to confirm --

**A.** No.

**Q.** -- to counsel he understood it?

**A.** I believe once she reviewed the e-mails and looked at the signed agreement, then she was satisfied that he had agreed to the terms, and Ms. Radel had as well since she signed, too.

**Q.** All right. Turn to FP12079, sir.
**A.** Oh, same exhibit?
**Q.** Yes, sir. 141.
**A.** Yes.
04:22:41 **Q.** All right. The second part of that -- or the last part of that e-mail says, "Apparently Ed Tweed is having financial problems. She feels like he is kind of going off the deep end. She wants to end their business relationship. I told her that I don't see any problem
04:22:54 with her doing that, but it won't have any affect on previous liability."
Did you know that she had given this advice to Ms. Radel?
**A.** The advice that there would be no problem with her
04:23:09 ending the business relationship?
**Q.** Yes.
**A.** I mean, I received the e-mail. So, yeah, I was aware that she had -- had indicated that it wouldn't have any impact on the litigation.
04:23:19 **Q.** I think earlier you didn't really understand the -- I think you testified earlier you didn't quite understand the relationship between Veritas and E & L in terms of there just being a one-client relationship.
Looking at this, don't you think that that
04:23:34 would have had some impact and don't you think that a

further inquiry would have been necessary?

**A.** No. I don't believe that the fact that there was a business that had one client would make a difference in terms of whether they could properly waive conflicts. I just don't believe that's the case.

04:23:52

**Q.** Was it ever disclosed to Mr. Tweed that at least as of this date, that Ms. -- Ms. Radel intended to end their relationship?

**A.** I mean, she indicates that she -- that Marcia had told her that in this e-mail.

04:24:05

**Q.** Was that -- that's not my question.

**A.** Could you repeat it?

**Q.** Was that disclosed to Mr. Tweed?

**A.** I did not disclose it to Mr. Tweed, and I don't believe anyone else did either.

04:24:15

**Q.** At the top of the e-mail on page 12078, you say, "What a mess. Let's discuss tomorrow."

**A.** Yes.

**Q.** Was that your thought at the time?

**A.** Yes, that was my thought. It was a very complicated issue both from a legal and practical perspective. It involved, you know, some issues that needed to be worked through. And so it was not as simple as just saying, sure, let's represent both. We needed to have a relatively robust and lengthy conflict letter that might

04:24:39

04:24:58

be different than what we would normally do. And this was different than what we normally would do. It was actually longer and more detailed in part because it contained the apportionment. And, frankly, we needed to just make sure that we understood how they were going to pay us, too. We were concerned, not having dealt directly with Mr. Tweed, that we were going to be compensated for our services.

**Q.** I think Ms. Wynne testified on hers that part of the consideration going into it was to ensure that y'all were paid. You knew that Veritas wasn't necessarily as financially stable.

**A.** What -- you said something about her testifying?

**Q.** Her testifying, yeah. When Ms. Wynne testified.

**A.** In her deposition?

**Q.** Yes. Yes, in deposition.

**A.** You're asking me about what she testified at her deposition?

**Q.** Yeah. I think you were there.

**A.** Yeah, I was. But I'm trying to remember what it is that you are saying that she said. I'll try to remember.

**Q.** Well, didn't she say one of the concerns was to ensure that y'all got paid?

**A.** Well, yes. I mean, in any attorney-client relationship, I mean, I think the lawyer should be paid. And we were -- not having dealt with Mr. Tweed in the

manner that we had been dealing with Ms. Radel, who had been paying us, we had no track record, and so we wanted to make sure that we were going to be paid.

**Q.** Well, and Ms. Radel was already telling you that she might have trouble covering everything.

**A.** That she might have trouble covering everything?

**Q.** Yes.

**A.** No. I don't believe she was telling us that she had trouble covering -- you mean the litigation costs?

**Q.** Well, the litigation costs and the exposure.

**A.** I mean, I don't believe she told us that.

**Q.** Well, she did tell you that they -- that she wanted to end the business relationship. Did she tell you what impact that would have on her stream of income?

**A.** She didn't say that. She is telling us that Ed Tweed is having financial problems. And so I -- and that she would have to end the business relationship. I mean, if she really believes that he is having financial problems, then maybe he doesn't pay her.

But as far as, you know, the conflict waiver, none of that really made any difference. As far as we were concerned, if they agreed to pay under the terms that we had -- we had set up for them and they had agreed to the apportionment which would have eliminated any potential conflicts with respect to indemnification or

anything else, then we were going to be just fine.

**Q.** Did you ever ask Alia to check with Ms. Radel about what impact her ending the business relationship with Mr. Tweed would have?

04:27:45 **A.** I don't remember having a conversation with her about that.

**Q.** Mr. Ropollo, could you turn to Exhibit 81?

**A.** Yet, I am there.

**Q.** All right. What is -- can you identify this --

04:29:43 MR. BANES: Actually, before I move off of that, Your Honor, I am going to move to admit Exhibit 141.

THE COURT: Any objection?

MR. SCHEXNAYDER: I'm sorry, Your Honor. No.

THE COURT: Plaintiff's 141 is admitted without

04:30:04 objection.

MR. BANES: Thank you, Your Honor.

BY MR. BANES:

**Q.** Okay. Mr. Ropollo, earlier you said that you had -- well, can you identify Exhibit 81 for the record, sir?

04:30:37 **A.** It's an e-mail from me to Alia Wynne, copying her assistant, Kristin Graner, on September 11th, 2015, forwarding a sample conflicts letter and addressing the need for a conflicts letter with her.

**Q.** So just -- you were sending a form on this date?

04:30:55 **A.** It wasn't really a form. It was more of a sample, I

guess I would call it.
**Q.** Did you give her any other advice about what to include in the conflicts letter?
**A.** As it became more complicated as time progressed and there was an apportionment component that was requested to be placed in it, yes, we had more conversations about it.
**Q.** All right. But at this point, you just sent her this? Did you have any discussions with her at this point, on September 11?
**A.** I don't recall.
**Q.** All right. Now, turn to exhibit -- well, let's see.
MR. BANES: Move to admit Exhibit 181, Your Honor -- or move to admit Exhibit 81.
THE COURT: Eight-one or --
MR. BANES: Eight-one, Your Honor.
MR. SCHEXNAYDER: No objection.
THE COURT: Plaintiff's 1 -- I'm sorry. Plaintiff's 81 is admitted without objection.
BY MR. BANES:
**Q.** Okay. Mr. Ropollo, can you turn to Exhibit 83?
**A.** I am there.
**Q.** Can you identify this document for the record?
**A.** Yeah. Let me just take a moment to refresh my recollection.
Yes. This was -- this is kind of an

update e-mail that Alia sent to me on Friday, September 11th, around 10:00 in the morning.

**Q.** And it says that, "Ed has agreed to be responsible for any post January 1 liability if Marcia covers litigation costs."

04:33:44

Was that the understanding y'all had at that time?

**A.** At that -- at that moment, because it changed pretty -- pretty frequently, yes. At that moment, on September 11th, that was what -- Marcia told Alia that the agreement was to be included in the letter.

04:33:55

**Q.** Now, had any -- now, and then it says, "At the end of this year, E & L and Veritas will amicably part ways."

Do you see that part?

**A.** Yes.

04:34:09

**Q.** Had there been any -- was there any discussion with Mr. Tweed at this point from Fisher & Phillips?

**A.** No. I believe Alia's conversation with him was about a week later.

**Q.** All right. Now, later on in this e-mail, it says that Ms. Radel had called the plaintiff and that his attorney wasn't happy about it and that he was going to bring in Veritas.

04:34:22

Did you -- did this change things any with respect to your -- the conflict waiver?

04:34:44

**A.** The fact that she called the person?

**Q.** No, no. The fact that their -- the plaintiff was now going to bring in Veritas.

**A.** Oh. I mean, I think that when it comes to what the conflict letter would have to spell out, if they were named as a party, then they would be a signatory to it.

**Q.** Well, and did you have any discussion with Ms. Wynne about whether Ms. Radel should be a signatory to it, too?

**A.** Oh, no. I mean, unless -- again, we didn't -- we hadn't seen the amendment yet. If the amended complaint had, as they had done with Mr. Tweed, included the company and the owner, then we would have had her sign off on it as well.

**Q.** Did you confirm -- well, at this point, you didn't confirm any of this with Mr. Tweed?

**A.** Confirm what the --

**Q.** Any of what is in this e-mail.

**A.** The -- the e-mail says that they were amicably parting ways, and so that suggests to me that they would have had conversations about it. When she says "Ed has agreed," it also suggests to me that they were having conversations about it.

So, no, I didn't think there was any need for me to interfere with those discussions as they were going on and that once they had reached a decision about

 how to proceed, they would let us know, and we would memorialize it.

**Q.** But you didn't confirm any of this with Mr. Tweed.

**A.** Not until the letter itself.

04:36:08 **Q.** And that was just by looking at his signature?

**A.** It was by looking at a signature of a document in an e-mail that transmitted it along with e-mails from him and to him in connection with the same.

MR. BANES: Move to admit Exhibit 83 -- excuse 04:36:27 me, Your Honor. Move to admit Exhibit 83.

MR. SCHEXNAYDER: No objection.

THE COURT: Plaintiff's 83 is admitted without objection.

BY MR. BANES:

04:37:04 **Q.** Turn to Exhibit 135, Mr. Ropollo.

Can you identify this document for the record, sir?

**A.** Yes. This -- at least the first page of this exhibit is an e-mail exchange between me and Alia Wynne following 04:37:40 up on her September 11th e-mail that we just talked about.

**Q.** And at this point you were still -- it was still the position that Marcia was -- or Ms. Radel was going to cover all the litigation costs?

**A.** I mean, it was the same day, so, yeah. We hadn't 04:38:02 heard anything different since several hours before when

Marcia had relayed that.

MR. BANES: Your Honor, I move to admit Exhibit 135.

MR. SCHEXNAYDER: No objection.

04:38:14 THE COURT: Plaintiff's 135 is admitted without objection.

BY MR. BANES:

**Q.** Mr. Ropollo, can you turn to Exhibit 84? Actually, look at 84 and 85 together.

04:39:33 **A.** All right. I am looking at both.

**Q.** All right. Well, my first question is, is 85 the attachment to 83 -- or 84? Excuse me.

**A.** Yes. My understanding is that 85 is the draft engagement letter that Alia refers to in 84.

04:39:57 **Q.** This document makes Veritas responsible for paying all the fees?

**A.** That's right. She specifically says in the e-mail, "I added a paragraph to make clear that Veritas is responsible for paying our invoices."

04:40:08 **Q.** All right. Now, at the end of it, she says, "Could we may say that if we have to take action regarding unpaid invoices, all three are jointly and severally liable."

Do you see that part?

**A.** Yeah, I do see that.

04:40:26 **Q.** Did that come from Mr. Tweed or Ms. Radel?

**A.** I think that came from Alia. I think Alia was just trying to, as a good steward of the firm, make sure that we weren't going to get stiffed on a bill. And it is always better to think about these things in advance and plan ahead, and that's what she was doing.

04:40:40

**Q.** But that wasn't discussed with Mr. Tweed at all?

**A.** I don't think it was discussed with anybody but me, and I declined to go along with her idea. I didn't mind her raising it, but I didn't think it was necessary.

04:40:58

**Q.** You didn't mind her raising it?

**A.** No. I thought it was a good idea for her to raise with me matters of -- of, you know, business practice in the firm.

**Q.** Why did you decline to do it?

04:41:11

**A.** I just didn't think it was necessary. I thought that it was already becoming a complicated enough engagement and I thought that that would just be probably ineffective and just more complicated than it needed to be.

And to be clear, when she is saying "a way to also render E & L and Tweed responsible," she is referring to the bill. She is not referring to anything else.

04:41:38

**Q.** Referring to the legal bills?

**A.** Correct.

04:41:49

**Q.** Right. Oh, Mr. Ropollo, turn to page -- or Exhibit

169.
**A.** Yes.
**Q.** Can you identify that document for the record, sir?
**A.** It is an e-mail from Alia to Marcia Radel, copying me and her assistant, enclosing a draft conflict letter to E & L Transfer and engagement letter and then providing some commentary in the e-mail.
**Q.** All right. Now, was this -- was this sent to Mr. Tweed at all?
04:44:32 **A.** No. At this point we -- since we weren't representing him yet in this matter, we were just communicating through Marcia, because she had his contact information and was going to convey all of this to him.
**Q.** You think -- did she end up conveying any of this to him?
**A.** I don't know. I assume so, because the discussions about what ought to be included in the conflict letter began not too long after this.
**Q.** Well, let's -- do you assume that or do you know that?
**A.** I am not even sure what I just said. I assume -- do I assume that she referred it to Mr. Tweed?
**Q.** Yes.
**A.** Yeah. I do assume that because I don't know firsthand whether she did or not.

**Q.** Okay.

MR. BANES: Move to admit Exhibit 171, Your Honor -- or, no, not 171. 169.

MR. SCHEXNAYDER: No objection.

04:45:45 THE COURT: Plaintiff's 169 is admitted without objection.

MR. BANES: Also move to admit 84 and 85.

MR. SCHEXNAYDER: No objection.

THE COURT: Plaintiff's 84 and 85 are admitted

04:46:16 without objection.

BY MR. BANES:

**Q.** Turn to Exhibit 171, Mr. Ropollo.

**A.** Okay. I am there.

**Q.** Turn back to Bates stamp 031288, sir.

04:47:13 **A.** 288? All right. I am there.

**Q.** At the bottom is the e-mail we were just looking at, right, transmitting the engagement -- the draft engagement letter and conflict letter?

**A.** Correct.

04:47:31 **Q.** All right. Now, does Ms. Radel respond to this?

**A.** She does the next day.

**Q.** All right. And what does she tell Ms. Wynne?

**A.** This is, I believe, the first specific reference to apportionment. She says that Veritas does not want to be

04:47:54 held responsible for all the legal costs, and I was asking

that this engagement letter specify the dates to which Ed and E & L agreed to take responsibility. And then she includes January 1, 2015, in a parenthetical.

**Q.** All right. Now, at this point did you reach out to Mr. Tweed and ask if this was agreeable to him?

**A.** No. She said she was -- she asked us to make the changes, and she said that she would forward it to Ed.

**Q.** Is that what y'all did?

**A.** Yes. We at some point made changes. I can't tell you exactly when, but we did.

**Q.** Well, take a look at the next -- the prior page, FP031287 in the same exhibit --

**A.** Yes.

**Q.** -- where Ms. Wynne says, "Marcia, so you would like legal fees split 50/50 with Ed and E & L, with Veritas responsible for pre-January back wages and Ed and E & L responsible for post-January 1 back wages."

**A.** Right.

**Q.** And is that -- did you express any concern at all at this point to any -- to Ms. Wynne that "We are negotiating an agreement between two parties to this lawsuit to settle like an aggregate liability"?

**A.** No. I -- we weren't negotiating anything. We were simply receiving the results of an ongoing negotiation. And it didn't end here. I mean, there were several other

back-and-forth e-mails in which Mr. Tweed was a party until ultimately they reached a deal that they both -- both agreed to and signed.

So, I did not feel like we were negotiating anything here.

04:50:03

**Q.** Well, were you -- it looks like y'all were advising Ms. Radel on these.

**A.** I think what she's doing is she is repeating back to Ms. Radel what she just told her in order to make sure she understood clearly. She says, "Marcia, so you would like legal fees split 50/50 with Ed and E & L, with Veritas?" She is asking a question here. So I think that what she is seeking to do is understand what the instructions are so she can place them in the agreement in a way that makes sense.

04:50:15

04:50:33

**Q.** Well, take a look at FP031286.

Now, it looks like an e-mail from Ms. Wynne to you, where it says, "Could we require E & L. Ed, to pay a 20K retainer and Marcia 5K, and make Ed -- E & L/Ed's Evergreen? If we only asked for 5K from each, we are getting less than our original arrangement."

04:50:58

Now, did that come from Ms. Radel?

**A.** No, that came from Alia. Again, Alia is -- look, I impress upon all my lawyers to make sure that we are very upfront about what the expectations are regarding payment.

04:51:15

And so she is, I think, rightly concerned that with a new client, which I kind of pound into people, when we're dealing with a new client that we have not dealt with before, someone who hasn't paid us yet, we want to make sure that we have an arrangement that won't leave us in the lurch. Thus, the need for a retainer for Mr. Tweed higher than what Ms. Radel would be required to pay, and also with the idea they would be Evergreen. Meaning, he would have to replenish it after it was exhausted.

04:51:33

04:51:50

**Q.** E & L wasn't a new client, were they?

**A.** Well, they were a new client in the sense that we were for the first time going to rely upon their assurances that they would pay.

**Q.** It looks like there are several back and forth regarding what the content of this engagement letter is going to be, or conflict waiver. Is Mr. -- was Mr. -- was any of this discussion with Ms. Radel communicated to Mr. Tweed by Ms. Wynne or you or anyone else at Fisher & Phillips?

04:52:27

**A.** You know, Alia spoke with him that same day. This e-mail -- entire e-mail chain is September 16th, and it's the day that she spoke with Mr. Tweed. So it's possible that in that conversation she discussed some of this back and forth.

04:52:45

**Q.** It's possible -- do you --

04:53:00

**A.** I don't know.

**Q.** -- know if she did that?

**A.** I don't know. You're asking me whether someone else had a conversation, and I just don't know. I do know, though, that there was a conversation that she had with him that very same day.

**Q.** Well, you heard what Mr. Tweed said about that conversation. Do you have any basis to disagree with his version of what happened during that conversation?

**A.** Yes, based upon what I understand Alia has said about that conversation. It -- what he described bore no resemblance to what Ms. Wynne told me about.

**Q.** But you don't know.

**A.** I just know what she told me. That's what I am telling you.

**Q.** All right.

MR. BANES: Your Honor, move to admit exhibit -- sorry. Move to admit Exhibit 171.

MR. SCHEXNAYDER: No objection.

THE COURT: Plaintiff's 171 is admitted without objection.

BY MR. BANES:

**Q.** Turn to Exhibit 165, sir.

**A.** All right.

**Q.** Can you identify this document for the record?

**A.** So, this is an e-mail chain -- well, actually, I apologize. It is not a chain. It is an e-mail with an attachment that Ms. Radel sends to Alia Wynne on September 14th.

04:56:44 **Q.** Okay. So what is Ms. Wynne doing in this -- in this e-mail to Ms. Radel?

**A.** Well, her e-mail of the same day is, first of all, for an amended complaint which was filed in the Walker lawsuit last week. That was the amended complaint that named Veritas as a defendant. 04:57:05

And the -- she describes generally what she observes about the amended complaint, about whether sufficient facts have been pled and so forth with respect to the joint employer issue, and then just generally kind of gives the kind of rundown on a complaint that we might 04:57:26 give any potential client that we would be seeking to represent by demonstrating what we observed about the case, and the forum, and so forth.

She then goes on to kind of describe what other options might exist, including a 12(b) motion to 04:57:44 dismiss and so forth.

And then finally at the end, she is specifically referencing the potential for conflict and the need to see the contract with E & L -- the contract between Veritas and E & L in order to continue to assess 04:58:01

that.

**Q.** Now, was Ms. Wynne actually advising Ms. Radel about how they might be able to dismiss Veritas from the lawsuit at this point?

04:58:23 **A.** I mean, I think at this point what she's saying here is that these are the various options that a client that retained us could consider. And so she was essentially spelling out those -- those options.

She -- this was preservice for Veritas. 04:58:43 They hadn't been served, and we hadn't had an engagement agreement signed with Veritas. So she is essentially kind of spitballing here about what the potential options might be for Veritas or any company in its position to go forward.

04:58:56 **Q.** Well, it is fair to say that all the advice that Ms. Wynne had given Ms. Radel up to this point had been without the benefit of the contract between E & L and Veritas; is that accurate?

**A.** Well, she hasn't received it yet, and she is 04:59:10 receiving it here. She requested and received it. So I am not sure I would characterize what she was providing is legal advice about a contract up to this point.

**Q.** Well, she is providing legal advice here, isn't she?

**A.** Not about the contract. She is asking for the 04:59:28 contract to provide a more detailed analysis of what she

is kind of preliminarily mentioning in this e-mail.

**Q.** She is providing legal advice about perhaps dismissing Veritas from the suit.

**A.** There always is the potential in a joint employer circumstance to determine whether there are sufficient facts pled to permit a finding of employer status. And so, yes, she's identifying that as a potential option for Veritas, but she also is recognizing that representing both E & L and Veritas might present a conflict. And so she is asking for the contract in order to further assess the conflict part of that.

**Q.** Well, and --

THE COURT: Counsel, find a good stopping point.

MR. BANES: Okay, Your Honor.

BY MR. BANES:

**Q.** So this is Ms. Radel forwarding the agreement to Ms. -- Ms. Wynne at the top?

**A.** That's what that is.

**Q.** All right. Now -- okay.

MR. BANES: Mr. -- or, Your Honor, move to admit Exhibit 165.

MR. SCHEXNAYDER: No objection.

THE COURT: Plaintiff's 165 is admitted without objection.

MR. BANES: That might be a good place for us to stop, Your Honor, because there is quite a long kind of period of questioning after that.

THE COURT: Very well.

05:00:57 Sir, you may step down.

THE WITNESS: Thank you, Judge.

THE COURT: How much longer do you anticipate with this witness?

MR. BANES: Probably just tomorrow morning, I think. 05:01:07

THE COURT: And then where are you going to be on your evidence? You have another witness after that?

MR. BANES: No. I don't think I do.

THE COURT: So you anticipate closing by the morning break? 05:01:16

MR. BANES: That's potentially right, Your Honor.

THE COURT: Okay. So you will turn the witness over for direct, cross, whatever the case may be, and when all is said and done, you anticipate closing by the morning break, 10:30? 05:01:30

MR. BANES: There are a few factors in here that depend on -- there is a lot of deposition testimony to go through and things of that nature that I haven't done yet. So that might take a little bit longer, but -- 05:01:42

THE COURT: But in any event you will close by --

MR. BANES: -- I think I'll finish tomorrow.

THE COURT: All right. By lunch.

05:01:52 MR. BANES: That's my plan. That's my plan, Your Honor.

THE COURT: By way of defense evidence, what do you anticipate, sir?

MR. SCHEXNAYDER: The only additional witness

05:02:05 in addition to Mr. Ropollo would be Alia Wynne.

THE COURT: Okay. So we will definitely finish tomorrow, and the question is it will just be approximately what time. All right.

MR. BANES: The only thing we had was

05:02:22 preserving the right for rebuttal, but that's after the --

THE COURT: You don't have to reserve it. That is already there, sir.

MR. BANES: All right. Good.

THE COURT: All right. Anything else before we

05:02:31 break for the evening?

MR. SCHEXNAYDER: What's the Court's preference on leaving boxes and documents here? Do we have to clear the room?

THE COURT: You are fine because we will be

05:02:38 back first thing in the morning. So I don't -- we don't

have mock trial tonight, do we? I think that was just that week.

THE LAW CLERK: Right. It was just Friday and Saturday, I believe.

05:02:45 THE COURT: So you can leave your stuff here. That is fine. Just make sure that housekeeping can get around you.

9:00 tomorrow, gentlemen.

THE LAW CLERK: All rise.

05:02:57 (Proceedings recessed at 5:02 p.m.)

COURT REPORTER'S CERTIFICATE

I, Kathleen K. Miller, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE: Feb. 19, 2019 /s/
Kathleen K. Miller, RPR, RMR, CRR